**No. 23-60471**

# United States Court of Appeals for the Fifth Circuit

NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS; ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION, LIMITED; AMERICAN INVESTMENT COUNCIL; LOAN SYNDICATIONS AND TRADING ASSOCIATION; MANAGED FUNDS ASSOCIATION; and NATIONAL VENTURE CAPITAL ASSOCIATION,

*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

On Petition for Review of an Order of the Securities & Exchange Commission

## OPENING BRIEF FOR PETITIONERS

STEPHEN J. HAMMER
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201-2923
(214) 698-3100

EUGENE SCALIA
  *Counsel of Record*
HELGI C. WALKER
BRIAN A. RICHMAN
MAX E. SCHULMAN
ROBERT A. BATISTA
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioners*

November 1, 2023

# CERTIFICATE OF INTERESTED PERSONS
No. 23-60471

NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS; ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION, LIMITED; AMERICAN INVESTMENT COUNCIL; LOAN SYNDICATIONS AND TRADING ASSOCIATION; MANAGED FUNDS ASSOCIATION; and NATIONAL VENTURE CAPITAL ASSOCIATION,

*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

_____

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Further, pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record certifies that there are no corporations that are parents of any Petitioner or that own stock in the Petitioners.

## A.    Petitioners

National Association of Private Fund Managers

## CERTIFICATE OF INTERESTED PERSONS
### (continued)

Alternative Investment Management Association Ltd.

American Investment Council

Loan Syndications and Trading Association

Managed Funds Association

National Venture Capital Association

Others who are not participants in this matter but may be financially interested in its outcome include members of the National Association of Private Fund Managers, Alternative Investment Management Association Ltd., American Investment Council, Loan Syndications and Trading Association, Managed Funds Association, and National Venture Capital Association.

**B.    Attorneys for Petitioners**

Eugene Scalia
Helgi C. Walker
Brian A. Richman
Max E. Schulman
Robert A. Batista
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306

Stephen J. Hammer
Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201-2923

**C.    Respondent**

Securities and Exchange Commission

## CERTIFICATE OF INTERESTED PERSONS
### (continued)

**D.     Attorneys for Respondent**

Megan Barbero, General Counsel
Michael A. Conley, Solicitor
Jeffrey Berger, Senior Litigation Counsel
Ezekiel L. Hill, Appellate Counsel
Securities and Exchange Commission
100 F Street, NE
Washington, D.C.  20549-1090


Dated:  November 1, 2023          Respectfully Submitted,

                                  */s/ Eugene Scalia*
                                 EUGENE SCALIA
                                   *Counsel of Record for Petitioners*

## STATEMENT REGARDING ORAL ARGUMENT

This case concerns the Securities and Exchange Commission's attempt to fundamentally change the way private funds are regulated in America. Private funds hold more than $26 trillion in investor assets. Here, in a 3-2 vote, the Commission adopted a series of sweeping rules for private funds that one of the commissioners characterized as "ahistorical, unjustified, unlawful, impractical, confusing, and harmful." Dissent of Comm'r Peirce, bit.ly/44WDa0J ("Peirce"). Petitioners respectfully submit that oral argument would be useful to the Court's consideration of this important case.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................. iv

TABLE OF AUTHORITIES .................................................................. viii

INTRODUCTION .................................................................................. 1

JURISDICTIONAL STATEMENT ......................................................... 3

STATEMENT OF THE ISSUES PRESENTED ....................................... 4

STATEMENT OF THE CASE ................................................................. 5

    A.    Congress Purposefully Exempted Private Funds from the Prescriptive Regime Applicable to Publicly Offered Investment Vehicles............................................................... 5

        1.    Publicly Offered Investment Vehicles, Such as Mutual Funds, Are Closely Regulated Under the Investment Company Act of 1940. ............................... 6

        2.    Congress Deliberately Carved Out Private Funds from This Regulatory Framework................................. 7

        3.    Freed from Unnecessary Regulatory Interference, Private Funds Have Thrived. ........................................ 9

    B.    Despite the Success of Private Funds, the Commission Proposed a Radical Overhaul of Their Business Arrangements......................................................................... 10

    C.    The Commission Adopted a Final Rule That Differed Dramatically from the Proposal yet Still Suffered the Same Fundamental Flaws.................................................... 17

SUMMARY OF ARGUMENT ............................................................... 22

STANDARD OF REVIEW..................................................................... 24

ARGUMENT ......................................................................................... 25

I.    The Rule Exceeds the Commission's Statutory Authority. .......... 25

# TABLE OF CONTENTS
*(continued)*

<u>**Page**</u>

A.   The Rule Contravenes the Statutory Framework Governing Private Funds.................................................... 25

B.   The Specific Provisions the Commission Cited Cannot Justify the Rule. ....................................................... 29

    1.   Section 913 of Dodd-Frank Is Inapplicable. ............... 29

        a)   Section 913 Applies to "Retail Customers," Not Private Funds. ............................................ 29

        b)   Even if Section 913 Applied Outside the Retail Context, It Cannot Support the Rule...... 32

    2.   Section 206(4) of the Advisers Act Is Also Inapplicable................................................................ 36

C.   The Major-Questions Doctrine Confirms the Commission's Lack of Authority.......................................... 37

II.   The Commission Failed to Provide the Public a Meaningful Opportunity to Comment. ............................................................. 39

A.   Petitioners Had No Opportunity to Comment on a Disclose-and-Consent Regime. ............................................ 39

B.   Petitioners Had No Opportunity to Comment on the Final Disclosure Obligations for Illiquid Funds. ................ 41

III.   The Rule Is Arbitrary, Capricious, and Otherwise Unlawful. ...... 42

A.   There Is No Factual Basis for the Rule................................ 42

B.   Key Provisions of the Rule Are Unnecessary and Unduly Burdensome. .......................................................... 47

    1.   Restrictions on Side Arrangements and "Preferential" Treatment............................................ 47

    2.   Restrictions on Passing Through Expenses. .............. 51

    3.   Quarterly-Reporting Requirements............................ 54

# TABLE OF CONTENTS
*(continued)*                                                    <u>**Page**</u>

C.   The Interpretive Rules Slipped into the Adopting Release Are Also Arbitrary, Capricious, and Otherwise Unlawful. .................................................................. 58

    1.   Limitations on Liability. .............................................. 59

    2.   Fees for "Unperformed Services." ............................... 64

IV.  The Commission Failed to Adequately Consider the Rule's Impact on Efficiency, Competition, and Capital Formation. ........ 66

V.   The Rule Should Be Vacated. ......................................................... 73

CONCLUSION ........................................................................................ 74

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. FDA,*
  78 F.4th 210 (5th Cir. 2023) ...................................................24, 71, 72

*Am. Equity Inv. Life Ins. Co. v. SEC,*
  613 F.3d 166 (D.C. Cir. 2010) .............................................................. 66

*Beecham v. United States,*
  511 U.S. 368 (1994) ............................................................................. 31

*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) ........................................... 25, 66, 70, 72

*Cent. & S. W. Servs., Inc. v. EPA,*
  220 F.3d 683 (5th Cir. 2000) ............................................................... 73

*Chamber of Com. v. SEC,*
  412 F.3d 133 (D.C. Cir. 2005) ........................................................66, 68

*Chamber of Com. v. SEC,*
  No. 23-60255, 2023 WL 7147273 (5th Cir. Oct. 31, 2023) ................. 70

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ............................................................................. 73

*City of New Orleans v. SEC,*
  969 F.2d 1163 (D.C. Cir. 1992) ........................................................... 44

*City of Portland v. EPA,*
  507 F.3d 706 (D.C. Cir. 2007) ............................................................. 51

*Data Mktg. P'ship, LP v. DOL,*
  45 F.4th 846 (5th Cir. 2022) ............................................................... 74

*Davidson v. Glickman,*
  169 F.3d 996 (5th Cir. 1999) ............................................................... 24

# TABLE OF AUTHORITIES
### (continued)

$$\underline{\textbf{Page(s)}}$$

*El Paso Elec. Co. v. FERC*,
  76 F.4th 352 (5th Cir. 2023) ...................................................... 24

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ................................................................... 63

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ................................................................... 37

*FEC v. Cruz*,
  596 U.S. 289 (2022) ................................................................... 25

*Flight Training Int'l, Inc. v. FAA*,
  58 F.4th 234 (5th Cir. 2023) ...................................................... 59

*Franciscan All., Inc. v. Becerra*,
  47 F.4th 368 (5th Cir. 2022) ...................................................... 73

*Freeman v. Quicken Loans, Inc.*,
  566 U.S. 624 (2012) ................................................................... 35

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006) .............................. 7, 8, 11, 12, 26, 27, 28

*GPA Midstream Ass'n v. DOT*,
  67 F.4th 1188 (D.C. Cir. 2023) .................................................. 51

*Jarkesy v. SEC*,
  34 F.4th 446 (5th Cir. 2022) ...................................................... 45

*King v. Burwell*,
  576 U.S. 473 (2015) ................................................................... 38

*McDonnell v. United States*,
  579 U.S. 550 (2016) ................................................................... 35

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) ................................................. 39, 40

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Motor Vehicle Mfrs. Ass'n, Inc. v.*
*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)............................ 42

*N.Y. Republican State Comm. v. SEC,*
799 F.3d 1126 (D.C. Cir. 2015)............................................................. 3

*Nat'l Fuel Gas Supply Corp. v. FERC,*
468 F.3d 831 (D.C. Cir. 2006)................................................. 43, 63, 65

*R.J. Reynolds Vapor Co. v. FDA,*
65 F.4th 182 (5th Cir. 2023) .................................................................. 4

*Richman v. Goldman Sachs Grp., Inc.,*
868 F. Supp. 2d 261 (S.D.N.Y. 2012)................................................... 52

*Roberts v. Sea-Land Servs., Inc.,*
566 U.S. 93 (2012) ................................................................................ 31

*Sackett v. EPA,*
598 U.S. 651 (2023) .............................................................................. 32

*SEC v. Cap. Gains Rsch. Bureau, Inc.,*
375 U.S. 180 (1963).............................................................................. 11

*Tex. Ass'n of Mfrs. v. CPSC,*
989 F.3d 368 (5th Cir. 2021)................................................................ 39

*Tex. Ent. Ass'n v. Hegar,*
10 F.4th 495 (5th Cir. 2021) .............................................................. 3, 4

*West Virginia v. EPA,*
142 S. Ct. 2587 (2022).............................................................. 24, 37, 38

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

**Statutes**

5 U.S.C.
§ 551 ..........................................................................................59
§ 553 ..........................................................................................39
§ 706 ....................................................................................24, 73

15 U.S.C.
§ 78j ...........................................................................................36
§ 78m .........................................................................................33
§ 80a-1 .........................................................................................6
§ 80a-3 ......................................................................................6, 8
§ 80a-10 .......................................................................................6
§ 80a-12 .......................................................................................6
§ 80a-14 .......................................................................................6
§ 80a-15 .......................................................................................6
§ 80a-16 .......................................................................................6
§ 80a-17 ........................................................................15, 59, 61
§ 80a-18 .......................................................................................7
§ 80a-19 .......................................................................................7
§ 80a-21 .......................................................................................7
§ 80a-22 .......................................................................................7
§ 80a-29 ..................................................................7, 26, 33, 55
§ 80b-1 .......................................................................................11
§ 80b-2 ..............................................8, 11, 25, 27, 28, 66, 72
§ 80b-3 (2006) ...........................................................................28
§ 80b-4 .......................................................................................11
§ 80b-6 ............................................................................11, 36, 60
§ 80b-11 ........................................27, 29, 30, 32, 33, 34, 35
§ 80b-13 ..............................................................................3, 4, 73
§ 80b-15 .....................................................................................60

# TABLE OF AUTHORITIES
*(continued)*                                            **Page(s)**

Dodd-Frank Wall Street Reform and Consumer Protection
    Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010)
    § 403.................................................................................. 11
    § 406.................................................................................. 29
    § 913................................................................. 29, 30, 31, 32

**Regulations**

17 C.F.R. § 201.140................................................................ 3

**Other Authorities**

*Cherokee Inv. Partners, LLC,*
    Advisers Act Release No. 4258 (Nov. 5, 2015),
    bit.ly/3MjTgLg................................................................ 44

*Commission Interpretation Regarding Standard of Conduct
    for Investment Advisers,*
    84 Fed. Reg. 33,669 (July 12, 2019) ............................ 62, 63

*Comprehensive Cap. Mgmt., Inc.,*
    Advisers Act Release No. 5493 (Jan. 11, 2022),
    bit.ly/497vsUI.................................................................. 63

Dissent of Comm'r Peirce (Aug. 23, 2023),
    bit.ly/44WDa0J.......................... iv, 18, 21, 42, 43, 46, 48, 58

Dissent of Comm'r Uyeda (Aug. 23, 2023),
    bit.ly/46TnQE4................................................ 21, 22, 56, 71

*The Inspector General's Statement on the SEC's Management
    and Performance Challenges, October 2022* (2022).................. 12, 13

Merriam-Webster's Collegiate Dictionary (11th ed. 2007).................... 34

*Private Fund Advisers; Documentation of Registered
    Investment Adviser Compliance Reviews,*
    88 Fed. Reg. 63,206 (Sept. 14, 2023)........................... *passim*

# TABLE OF AUTHORITIES
*(continued)*                                                    <u>**Page(s)**</u>

*Private Fund Advisers; Documentation of Registered*
  *Investment Adviser Compliance Reviews*,
  87 Fed. Reg. 16,886 (Mar. 24, 2022)...................... 12, 14, 15, 16, 40, 42

*Private Investment Companies*,
  61 Fed. Reg. 68,100 (Dec. 26, 1996) .................................................... 26

*Registration Under the Advisers Act of Certain*
  *Hedge Fund Advisers*,
  69 Fed. Reg. 72,054 (Dec. 10, 2004) ................................................... 28

S. Rep. No. 104-293 (1996) ...................................................................... 26

*Safeguarding Advisory Client Assets*,
  88 Fed. Reg. 14,672 (Mar. 9, 2023)..................................................... 71

SEC, *Mutual Funds and ETFs: A Guide for Investors*
  (Dec. 2016), bit.ly/46VXuRy .................................................................. 6

Vanguard, *What's a Mutual Fund?*, vgi.vg/40jz8P8 (last
  visited Nov. 1, 2023)............................................................................... 6

**INTRODUCTION**

This case concerns an attempt by the Securities and Exchange Commission to fundamentally alter the way private funds are regulated in America. Private funds are—as the name implies—*private*, not part of the public securities market. They are generally open only to the world's wealthiest, most sophisticated, and experienced investors—think the Abu Dhabi Investment Authority and Yale University endowment—who, unlike ordinary investors, often are represented by the world's largest law firms. By congressional design, private funds and their investors have significant latitude to structure their business relationships as they see fit.

This market-oriented, contract-based approach has worked remarkably well. Private funds are a competitive, thriving sector of our economy. They invest in thousands of companies, with millions of employees, and have returned, over the years, tremendous gains to investors—generally exceeding the returns available from other investment options. Reflecting private funds' long track record of success, investors have steadily *increased* their investments in private funds.

1

The Commission nevertheless seeks to fundamentally alter the way private funds operate.  In a 3-2 vote, over strong dissents, the Commission adopted a sweeping rule ("Final Rule" or "Rule") that restricts—or even prohibits—the longstanding, widely used business arrangements of private funds.  The Commission conceded that this Rule will cost *billions* and commandeer *millions of hours* of employee time, but is unable to cite a shred of evidence that the Rule—aimed at "protecting" the largest, most savvy investors on the planet—is warranted.

As for statutory authority for this massive reformation, the Commission has none.  The agency's "best" authority is a random, ancillary provision, titled "Other Matters," from a section of the Dodd-Frank Act that has never been applied to private-fund advisers.  Instead, that provision, by its plain terms, applies to "retail customers," *i.e.*, Main Street investors who are generally not eligible to invest in private funds.

The Commission's justification for the Rule goes downhill from there.  Each part of the Rule is unnecessary, unworkable, and unduly burdensome—and the Commission failed to establish otherwise.  The gaping holes in the Commission's action include a failure to put key last-minute additions to the Rule out for public comment, and a failure to offer

any serious projection of the Rule's likely economic effects. The Rule is flawed from root to branch, and this Court should set it aside.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 15 U.S.C. § 80b-13(a), which permits a person aggrieved by a Commission order, including a final rule, issued under the Investment Advisers Act to petition for review in the court of appeals. *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1130 (D.C. Cir. 2015). Petitioners petitioned for review on September 1, 2023. Dkt. 1-1. The petition is timely because it was filed "within sixty days" of the Commission's "entry" of the order on August 23, 2023. 15 U.S.C. § 80b-13(a); *see* Dkt. 1-2 at 660; 17 C.F.R. § 201.140(c).

Petitioners have standing. All have members who are private-fund advisers directly subject to the Rule's requirements. AR.145:1; AR.177:1.n.1; AR.214:1.n.1; AR.182:1.n.1; AR.176:1; AR.226:2-4.[1] Those members would have standing to challenge the Rule in their own right. *Tex. Ent. Ass'n v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021). Further, Petitioners' purpose is to protect the legal and economic interests of their

---

[1] The administrative record is cited as AR.[document]:[page range].

members, and neither the claims asserted nor the relief requested requires the participation of individual members, as Petitioners seek only equitable relief. *Id.* at 504-05.

Venue is proper because Petitioner National Association of Private Fund Managers is incorporated, and has its principal office or place of business, in Texas. 15 U.S.C. § 80b-13(a); *cf. R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 188 & n.5 (5th Cir. 2023).

### STATEMENT OF THE ISSUES PRESENTED

I.   Whether the Rule exceeds the Commission's statutory authority.

II.  Whether the Commission denied the public a meaningful opportunity to comment.

III. Whether the Rule is arbitrary, capricious, or otherwise unlawful.

IV.  Whether the Commission failed to discharge its statutory responsibility to consider the Rule's adverse effects on efficiency, competition, and capital formation.

V.   Whether the Rule should be vacated.

## STATEMENT OF THE CASE

### A. Congress Purposefully Exempted Private Funds from the Prescriptive Regime Applicable to Publicly Offered Investment Vehicles.

This case concerns "private funds"—pooled investment vehicles that are not offered to the public.  Unlike more familiar pooled investment vehicles, like mutual funds, private funds are generally not accessible to non-professional investors (known as retail customers).  Instead, they serve some of the world's most sophisticated investors.  AR.145:31-32.

Because private funds serve large, predominately institutional, investors capable of protecting their own interests, Congress deliberately exempted them from the prescriptive regulatory regime applicable to publicly offered investment vehicles. *Infra* pp.6-8.  This arrangement has proven remarkably successful, as investments in private funds are valued at some *$26.6 trillion*.  Final Rule, 88 Fed. Reg. 63,206, 63,207/3 (Sept. 14, 2023).

### 1. Publicly Offered Investment Vehicles, Such as Mutual Funds, Are Closely Regulated Under the Investment Company Act of 1940.

Many Americans are familiar with pooled investment vehicles in the form of mutual funds—"collection[s] of assets that invest[] in stocks, bonds, and other securities."[2]  These funds are open to retail customers.[3] Mutual funds and other publicly offered pooled investment vehicles are "investment compan[ies]" required to register with the Commission.  15 U.S.C. § 80a-3(a)(1).

To protect retail customers who invest in these vehicles, Congress has subjected registered investment companies to extensive regulation under the Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq.*, which governs virtually every aspect of their operations, including their:

- boards of directors, *id.* §§ 80a-10, -16;

- functions and activities, *id.* § 80a-12;

- size, *id.* § 80a-14;

- contractual relationships, *id.* § 80a-15;

---

[2] Vanguard, *What's a Mutual Fund?*, vgi.vg/40jz8P8 (last visited Nov. 1, 2023).

[3] SEC, *Mutual Funds and ETFs: A Guide for Investors* 1 (Dec. 2016), bit.ly/46VXuRy.

- capital structure, *id.* § 80a-18;

- dividend payments, *id.* § 80a-19;

- lending relationships, *id.* § 80a-21;

- distributions, redemptions, and repurchases of securities, *id.* § 80a-22; and

- reports and financial statements, *id.* § 80a-29.

In short, the Investment Company Act restricts investment companies' "management structure," "investing behavior," and "types of transactions"—all to protect Main Street investors. *Goldstein v. SEC*, 451 F.3d 873, 875-76 (D.C. Cir. 2006).

### 2. Congress Deliberately Carved Out Private Funds from This Regulatory Framework.

Congress decided that private funds—entities designed to pool money from sophisticated investors—should not be tangled in this thicket of regulation. As the name suggests, private funds (which include venture capital funds, hedge funds, private credit funds, private equity funds, real estate funds, and collateralized loan obligations) are not offered to retail customers.

Each private fund is managed by an adviser—typically a firm—that often serves as a general partner and receives "a fixed fee and a percentage of the gross profits." *Goldstein*, 451 F.3d at 876. The fund's investors typically become limited partners, "generally tak[ing] no part in management." *Id.* Unlike investors in ordinary mutual funds, private-fund investors have a significant hand in determining the terms on which they invest, often negotiating vigorously before making an investment. AR.145:21.

In recognition that "[i]nvestment vehicles that remain private and available only to highly sophisticated investors have historically been understood not to present the same dangers to public markets," Congress exempted private funds from the Investment Company Act's prescriptive requirements. *Goldstein*, 451 F.3d at 875. Although private funds would otherwise qualify as "investment compan[ies]," 15 U.S.C. § 80a-3(a)(1), Congress created exemptions to registration for funds that do not offer securities to the public and have either 100 or fewer beneficial owners, *id.* § 80a-3(c)(1), or whose investors are "qualified" high net-worth individuals or institutions, *id.* § 80a-3(c)(7); *see id.* § 80b-2(a)(29).

### 3.    Freed from Unnecessary Regulatory Interference, Private Funds Have Thrived.

Private funds have flourished.  The market is competitive, innovative, and abounding with choices for investors.  AR.145:3 & App'x 1 at 11, 22.  Over the past decade, the number of private funds has increased from 32,000 to over 100,000, and their value has grown from $9.8 trillion to *$26.6 trillion*.  88 Fed. Reg. at 63,207/3.

Private funds draw these investments by generating strong returns through tailored commercial arrangements that are only possible due to the existing market-based regulatory framework.  Their success has attracted the world's wealthiest and most savvy investors.  For example, top private-fund investors include the Hong Kong Monetary Authority, Stanford Management Company, and Harvard Management Company.  AR.145:31-32.  Private-fund investors engage expert counselors, often including their *own* investment advisers, and typically conduct extensive diligence.  AR.145:21; AR.182:11-12.  They are under no obligation to invest in private funds and enjoy a plethora of other investment options.  AR.145:App'x 1 at 12.  These investors are more than capable of judging their own interests without the prescriptive regulation applicable to retail-oriented investment companies.

In the exercise of that judgment, investors have steadily increased their investments in private funds. 88 Fed. Reg. at 63,207/3. For example, among pension funds—which owe fiduciary duties to invest soundly for their beneficiaries—"the median allocation to private equity has risen from less than 1 percent in 2001 to approximately 9 percent in 2020." AR.145:2. As sophisticated investors have flocked to private funds, they have been rewarded handsomely. Over the past 20 years, "pension funds have earned returns of 9.25% per year in private equity, as opposed to only 5.4% per year in the public markets." AR.145:1.n.6.

In short, Congress's decision to shield private funds from the comprehensive regulatory structure applicable to investment companies has worked as planned. In a highly competitive marketplace, the world's sharpest investors have voted with their feet by increasing their investments in private funds.

**B.    Despite the Success of Private Funds, the Commission Proposed a Radical Overhaul of Their Business Arrangements.**

While Congress exempted private funds from the Investment Company Act, it does regulate *advisers* to private funds in specific, limited

10

respects through the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq*.

The Advisers Act regulates "[i]nvestment adviser[s]," defined to include "any person who, for compensation, engages in the business of advising others … directly … as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11). Although the statute once exempted many private-fund advisers, the Dodd-Frank Act repealed that exemption; in a title dedicated to private funds, Dodd-Frank made most private-fund advisers subject to the same limited requirements as other investment advisers. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 403, 124 Stat. 1376, 1571-72 (2010) (codified at 15 U.S.C. § 80b-4(b)).

The Advisers Act recognizes a fiduciary duty between an investment adviser and its client. *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191-92, 201 (1963) (citing 15 U.S.C. § 80b-6). Crucially, for advisers to private funds, that client is the *fund itself*—not the fund's investors. *Goldstein*, 451 F.3d at 881. A private-fund adviser must be "concerned with the fund's performance, not with each investor's financial

11

condition," particularly since an individual investor's interests will at times diverge from those of other investors or of the fund itself. *Id.* at 880.

Despite private funds' success and Congress's decision to exempt them from heavy-handed regulation, in February 2022 the Commission proposed sweeping new regulations of private-fund advisers that effectively regulate private funds themselves. *Private Fund Advisers; Documentation of Registered Investment Adviser Compliance Reviews*, 87 Fed. Reg. 16,886 (Mar. 24, 2022).

The Commission's process was deeply flawed—reflective, in part, of the fact that the agency was simultaneously undertaking a host of other complex rulemakings.  During the first eight months of 2022, "the SEC proposed *26 new rules*, more than twice as many rules proposed the preceding year and more than it had proposed in each of the previous 5 years." *The Inspector General's Statement on the SEC's Management and Performance Challenges, October 2022*, at 2 (2022) (emphasis added).  As the Commission's own Inspector General warned in an extraordinary report, the agency was using "shortened timelines" and "shortened public

comment periods" to rush through this "aggressive agenda" without adequate "research and analysis." *Id.* at 3. The agency was relying on "detailees" with "little or no experience in rulemaking." *Id.*

The proposed rule threatened a host of new restrictions on private funds, prohibiting terms that had been widely accepted by the experienced investors who are limited partners in private funds.

Of particular relevance here, the Commission proposed, *first,* to sharply limit the **"*side arrangements*"** investors could enter into. Side arrangements are a common practice by which certain investors negotiate specialized terms that differ from those in the fund's governing documents. Private-fund investors request these terms to address their individual needs, concerns, or obligations. Sometimes their requests seek additional information about the fund. For example, pension funds may want to receive particular information for their own internal purposes. That request can be accommodated without changing the reporting received by all investors. Other side requests relate to substantive interests. For example, an "anchor investor"—the first to make a substantial capital commitment to a fund—may request certain redemption or infor-

mation rights or a lower fee in exchange for making its critical investment. AR.145:45-49 & App'x 1 at 27; AR.226:27-28; AR.177:7. The Commission's proposal would have barred the granting of certain "preferential" redemption and information rights and barred *all* other side arrangements absent disclosure. 87 Fed. Reg. at 16,928/2-16,932/2.

*Second,* the Commission proposed to ban advisers from charging funds for regulatory and compliance ***fees or expenses***, or fees or expenses associated with examinations or investigations of the adviser. 87 Fed. Reg. at 16,922/2-16,923/2. Compliance costs include legal fees to develop a comprehensive supervisory framework in accord with applicable rules, the costs of preparing and submitting regulatory filings, and retaining compliance teams that use state-of-the-art technology to ensure advisers adhere to legal requirements. AR.226:25-26. Although investors in many funds agree to have these fees and expenses passed through to the fund to incentivize advisers to invest in compliance, AR.226:28, the proposed rule would have prohibited that practice.

*Third*, the Commission proposed a requirement that advisers prepare and distribute ***quarterly-reporting statements*** containing de-

14

tailed information regarding fees, expenses, and performance for any private fund they advise. 87 Fed. Reg. at 16,890/2-16,911/2. Under the current system, investors negotiate for their specific information needs without federal micromanagement. AR.226:25.

*Fourth*, the Commission proposed a prohibition on advisers seeking ***reimbursement, indemnification, exculpation, or limitation of liability*** by the fund—in some cases, even for simple negligence. 87 Fed. Reg. at 16,925/1-3. Private-fund advisers commonly use limitation-of-liability provisions to protect themselves from garden-variety negligence claims (including claims second-guessing investment decisions), allowing them to take the calculated risks necessary to achieve outstanding returns on investment. AR.226:13. The Investment Company Act allows mutual funds to indemnify advisers for negligence. 15 U.S.C. § 80a-17(i). Yet for private funds—which serve the world's largest and most savvy investors and were exempted from that Act—the Commission was proposing more severe restrictions.

*Fifth*, the Commission proposed a prohibition on charging ***fees for so-called "unperformed services."*** 87 Fed. Reg. at 16,921/2-16,922/2.

Advisers to private equity funds commonly charge the fund for monitoring its portfolio investments. *Id.* at 16,921/2. Under existing agreements, fund investors agree to accelerate those fees upon a triggering event, such as the sale of a portfolio company. *Id.* Investors prefer these acceleration clauses because, otherwise, the adviser would receive monitoring fees only as long as it keeps the portfolio company, which could dissuade the adviser from selling the company sooner to investors' benefit. AR.176:5.

The Commission received hundreds of comments on the proposals. In addition to protesting the lack of statutory authority for the proposal, commenters objected that the proposed restrictions were unnecessary, ineffective, and counterproductive. At the most basic level, they explained, the Commission had failed to show any need to fundamentally rework this thriving sector that delivers strong returns for investors. AR.145:21-22.

Commenters also enumerated the proposal's serious adverse consequences. Because side arrangements are often necessary to recruit anchor investors and others, limiting them would make it more difficult for new funds to enter the market. AR.226:27-28; AR.145:45-49. Private-fund investors stressed that without the institution-specific provisions

created through side arrangements, "the majority of institutional [limited partners] would not be able to invest in private funds." AR.139:4; *see* AR.251:2. The ban on charging fees and expenses would disincentivize spending on compliance, to the detriment of funds and their investors, or would spur advisers to increase general management fees to compensate. AR.226:25-26; AR.145:37-39. The ban on limiting liability would discourage risk taking and dampen returns—as even many limited partners agreed. AR.226:20-23; AR.145:32-36; AR.139:2; AR.251:2-3. And the quarterly-reporting rule would pointlessly increase costs. AR.226:28; AR.145:52-60.

Numerous commenters urged the Commission to withdraw the proposal in full. AR.253:2; *see*, *e.g.*, AR.226:2.

## C. The Commission Adopted a Final Rule That Differed Dramatically from the Proposal yet Still Suffered the Same Fundamental Flaws.

With advisers to private funds and a number of investors objecting sharply, the Commission recognized it needed to re-tool its proposal. But as its own Inspector General reported, the Commission was using "shortened timelines" to rush through an "aggressive" agenda—so rather than

design proposed fixes and put them out for public comment, the Commission jammed the Final Rule through by a 3-2 vote. 88 Fed. Reg. at 63,206/1. Although some provisions were adopted largely unaltered, other parts changed dramatically, for the worse.

By the Commission's own estimate, the Rule will cost *$5.4 billion* and require *millions of hours* of employee time. 88 Fed. Reg. at 63,330/1-2, 63,336/2-63,337/3, 63,348/3, 63,352/2-3, 63,370/1-63,379/1.

With respect to ***side arrangements***, the Commission purported to accommodate commenters' concerns, saying that it had "modified" the proposal to include "exceptions" "to address commenters' concerns that the rule would curtail their ability to secure important" side arrangements. 88 Fed. Reg. at 63,277/3. But these supposed fixes failed to rectify the problem. For example, the Final Rule purports to allow certain "preferential" redemption and information rights where the "same" rights are offered to "*all*" investors. *Id.* (emphasis added). But as commenters would have told the Commission—had it put the change out for comment—"[c]onditioning preferential rights on offering them to everyone" amounts to "a ban on offering preferential rights." Peirce, *supra*.

18

As to the bar on charging regulatory, compliance, and examination *fees or expenses* to the fund, the Commission recognized that "[i]t is in investors' best interest for advisers to develop robust regulatory and compliance programs." 88 Fed. Reg. at 63,264/2. And it "acknowledge[d] that a prohibition of certain of these charges without an exception for instances in which the adviser provides effective disclosure could result in unfavorable outcomes for investors." *Id.* at 63,265/1. Similarly, with regard to charging investigation fees to the fund, the Commission recognized that a flat prohibition of certain of these charges "could result in unfavorable outcomes for investors," such as increased management fees. *Id.* The Commission accordingly claimed to create an exception if the adviser distributes written notice to, and in some cases, obtains consent from, fund investors for specific types of expenses. *Id.* at 63,389/1. But these requirements are entirely impractical—a de facto prohibition—as, again, commenters would have told the Commission had it vetted the change through notice and comment.

The Rule largely retained the proposal's onerous, unworkable requirement for *quarterly-reporting statements*, except the Commission made it worse by expanding requirements for "illiquid funds"—once

again without giving commenters the chance to warn against this change. 88 Fed. Reg. at 63,239/3-63,240/1.

As noted, the Commission received widespread criticism—from advisers and investors alike—for its proposed prohibition on advisers seeking ***reimbursement, indemnification, exculpation, or limitation of liability*** from the fund.  (Recall that the Investment Company Act indisputably *allows* mutual-fund advisers to seek such protections for negligence.)  The Commission responded to commenters' objections by omitting the controversial requirement from the text of the Final Rule—but in the Rule's preamble, the agency declared that the ban was not needed because seeking "reimbursement, indemnification, or exculpation" is *already* "invalid under the Act," which, depending on the circumstances, could include indemnification for negligence.  88 Fed. Reg. at 63,277/1 & n.783.  Once again, this was a surprise to commenters (and presumably to the Commission, which scarcely a year earlier had believed such a restriction needed to be written into law).

The Commission similarly declined to adopt the proposed prohibition on advisers charging ***fees for "unperformed services"*** because (the

agency declared) "such activity already is inconsistent with the adviser's fiduciary duty." 88 Fed. Reg. at 63,274/3.

Commissioners Peirce and Uyeda dissented. "Private funds," Commissioner Peirce explained, "have grown up, as Congress planned, outside of the requirements that govern registered investment companies, which are designed for the general public." Peirce, *supra*. By "[u]prooting the historical approach to regulating private funds," the Commission's Rule would "irreparably mar the regulatory landscape." *Id.* The Rule is "a prescriptive regime that edges out mutually agreed upon ground rules for private funds"—even though "[p]rivate fund investors are wealthy individuals and sophisticated institutions" that "are well represented by highly qualified professionals in their search for and negotiations with private fund advisers." *Id.*

Commissioner Uyeda echoed these concerns, criticizing the Commission for seeking "to impose rules for private funds—which are generally available only for sophisticated investors—that are far more burdensome and restrictive than those [for] products for retail investors." Dissent of Comm'r Uyeda, bit.ly/46TnQE4 ("Uyeda"). There was no need for the Commission to "us[e] the coercive power of government regulation to

favor one side of a private negotiation"—and its attempt to do so exceeded its statutory authority. *Id.*

## SUMMARY OF ARGUMENT

The Commission's quest to regulate private funds as if they were mass-market investment vehicles for ordinary investors, and to insert itself between private funds and their highly sophisticated investors, fails for four independent reasons.

**I.**    The Rule exceeds the Commission's statutory authority. Congress purposely exempted private funds from the prescriptive regulation applicable to funds serving retail customers. The Rule turns that structure upside down.

To justify this inversion of the statutory framework, the Commission seized upon an ancillary provision titled "Other Matters" and a general antifraud authority, but neither is applicable. The first applies only to "retail customers," not private funds. And both provisions address investment-advisory relationships: private-fund advisers have an advisory relationship only with the *fund*, yet the Commission seeks to regulate the relationship between the adviser and *investors* in the fund. Even if these

provisions did apply to private-fund investors, they do not reach the conduct at issue.  Tellingly, for example, the Commission seized on its anti-fraud authority to promulgate the Rule, but did not even count fraud reduction among the Rule's benefits.  As the major-questions doctrine confirms, the statutory provisions the Commission invoked are insufficient to sustain its vast power grab.

**II.**    The Commission denied the public a meaningful opportunity to comment.  Having rushed out an ill-informed proposal, it was forced to make extensive revisions, but allowed no opportunity to comment on its re-tooling of the proposal.

**III.**    The Rule is arbitrary, capricious, and otherwise unlawful. The Commission claimed that the Rule is needed to fix an industry problem, but cited no evidence of any problem.  The Rule is also unworkable and unduly burdensome.

**IV.**    In imposing new multi-billion-dollar regulatory obligations, the Commission neglected its statutory duty to consider whether the Rule "will promote efficiency, competition, and capital formation."  The agency

failed adequately to substantiate the Rule's costs and benefits; opportunistically and inconsistently framed those costs and benefits; and failed to consider the cumulative effect of its numerous pending rules.

**V.**    This Court should vacate this deeply flawed Rule.

## STANDARD OF REVIEW

Under the APA, this Court "shall … hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A), (C).

This Court's review is "searching and careful."  *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 245 (5th Cir. 2023).  It reviews legal issues de novo, *Davidson v. Glickman*, 169 F.3d 996, 1000 (5th Cir. 1999), and is skeptical of agency reaches for a "transformative expansion in [their] regulatory authority" without clear congressional authorization, *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022).  The Court ensures agency decisions are "reasonable and reasonably explained," *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 364 (5th Cir. 2023), and that the Commission fulfills

its duty to account for rules' effects on "efficiency, competition, and capital formation," 15 U.S.C. § 80b-2(c); *see Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011).

## ARGUMENT

## I.    The Rule Exceeds the Commission's Statutory Authority.

Congress never authorized the Commission to redesign "the governance structure" of private funds.  88 Fed. Reg. at 63,210/2.  Rather, *Congress* set that governance structure; the Commission's job is to give it effect, not undermine it.

### A.    The Rule Contravenes the Statutory Framework Governing Private Funds.

The Rule "cannot 'operate independently of'" the laws that supposedly authorized it, *FEC v. Cruz*, 596 U.S. 289, 301 (2022), but here there is no way to reconcile the two.  In designing the statutory framework applicable to private funds, Congress made two important structural decisions.  The Commission bulldozes both.

*First*, Congress drew a sharp line between private funds and funds that serve ordinary retail customers.  Retail-focused "investment companies" are subject to the Investment Company Act, which sets forth de-

tailed requirements governing almost every aspect of the funds' operations. *Supra* pp.6-7. Private funds are exempt from this regime. *Supra* pp.7-8. Because private funds "remain private" and are generally "available only to highly sophisticated investors," *Goldstein*, 451 F.3d at 875, Congress concluded it should leave private-fund investors to structure their own investment terms, *Private Investment Companies*, 61 Fed. Reg. 68,100, 68,102/3 (Dec. 26, 1996) (citing S. Rep. No. 104-293, at 10 (1996)); *supra* pp.7-8.

The Rule runs roughshod over that determination. Instead of trusting the experienced, well-counseled investors in private funds to negotiate for themselves, as they have for decades, the Rule imposes precisely the sort of prescriptive regulations from which Congress freed private funds. For example, Congress authorized the Commission to require *investment companies* to prepare quarterly reports, 15 U.S.C. § 80a-29(b), but exempted private funds from this requirement, *supra* pp.7-8. The Commission imposed a "quarterly reporting" requirement on private funds anyway. 88 Fed. Reg. at 63,225/3.

*Second*, although Dodd-Frank provided for limited regulation of advisers to private funds, *supra* pp.10-12, Congress kept that regulation

within the context of an adviser's duties as an "investment adviser." An investment adviser advises its client "directly." 15 U.S.C. § 80b-2(a)(11). And in the private-fund space, that "type of direct relationship exists" *only* "between the adviser and the fund" itself, "not between the adviser and the investors in the fund." *Goldstein*, 451 F.3d at 880; *supra* pp.11-12. Congress stressed this point repeatedly: a private-fund adviser advises the fund, "not … an investor in [the] private fund." 15 U.S.C. § 80b-11(a); *see id.* § 80b-11(g)(1) ("[T]he Commission shall not ascribe a meaning to the term 'customer' that would include an investor in a private fund[.]").

The Commission again subverted Congress's plan. It complained that "[b]ecause the adviser" acts "on behalf of the fund," not individual "investors in the fund," "the governance structure" for private funds does not—in its opinion—sufficiently "prioritize investor oversight." 88 Fed. Reg. at 63,210/2-3. So, the Commission said, to level the playing field among private-fund investors, its Rule must address the "indirect[]" relationship between the adviser and "investors in [the] fund[]." *Id.* at 63,210/2. That is a blatant subversion of the congressional design: Con-

27

gress decided to regulate private-fund advisers as "[i]nvestment adviser[s]," and that this advisory relationship includes only the "direct[]" relationship between an adviser and its fund client.  15 U.S.C. § 80b-2(a)(11); *see Goldstein*, 451 F.3d at 880; *supra* pp.10-12.  The Commission may disagree with Congress's choices, but it is not free to "correct" them.

Indeed, the Commission tried a similar maneuver before—and lost. In 2004, the Commission lamented that hedge-fund advisers were not registered with the Commission.  At the time, the Advisers Act exempted advisers with "fewer than fifteen clients," 15 U.S.C. § 80b-3(b)(3) (2006); each hedge-fund adviser generally had only one client—the fund.  To "correct" this oversight, the Commission ordained that hedge-fund advisers count *investors* in the fund as their clients.  *Registration Under the Advisers Act of Certain Hedge Fund Advisers*, 69 Fed. Reg. 72,054, 72,088/1 (Dec. 10, 2004).  The D.C. Circuit vacated the rule.  *Goldstein*, 451 F.3d at 883.  While the Commission "wanted a hook on which to hang more comprehensive regulation of hedge funds," it could not "accomplish its objective by a manipulation" of the adviser-client relationship.  *Id*. at 882. It was this 2004 rule that prompted Congress, in the Dodd-Frank title

addressing private funds, to expressly forbid the Commission from defining "client" to include private-fund investors. *See* § 406, 124 Stat. at 1574 (codified at 15 U.S.C. § 80b-11(a)).

Undaunted, the Commission returns again to regulate advisers as if investors were their clients.

## B. The Specific Provisions the Commission Cited Cannot Justify the Rule.

The Commission claimed authority to redraw the statutory framework under section 913 of Dodd-Frank and section 206(4) of the Advisers Act. *See* 88 Fed. Reg. at 63,213/1-2 & n.69. Neither provision can sustain the Rule.

### 1. Section 913 of Dodd-Frank Is Inapplicable.

#### a) Section 913 Applies to "Retail Customers," Not Private Funds.

Section 913 is titled "Study and Rulemaking Regarding Obligations of Brokers, Dealers, and Investment Advisers," Dodd-Frank § 913, 124 Stat. at 1824, and both the "Study" and "Rulemaking" concern "retail customers." The section instructs the Commission to analyze the "effectiveness" of legal protections concerning recommendations "to retail customers," § 913(b)(1), 124 Stat. at 1824-25, and identifies thirteen specific

items to "consider," all of which concern "retail customers," § 913(c), 124 Stat. at 1825-27.  The section further instructs the Commission to draft a "report" about "retail customers," § 913(d), 124 Stat. at 1827, and authorizes the agency to "commence a rulemaking" addressing protections for "retail customers," § 913(f), 124 Stat. at 1827-28.  This has nothing to do with private funds.

The Commission's suggestion that two sentences tacked onto the end of section 913(g) authorize "restructur[ing]" private funds' "business models," 88 Fed. Reg. at 63,338/1, is not plausible.  Like the rest of section 913, subparagraph (g) concerns "retail customers."  The subparagraph—titled "Authority to Establish a Fiduciary Duty for Brokers and Dealers," 124 Stat. at 1828—authorizes the Commission to establish a fiduciary duty for brokers and dealers with respect to "retail customer[s]." § 913(g)(1)-(2), 124 Stat. at 1828-29.

After the introductory phrase "Other Matters," the Act provides that the Commission can "facilitate the provision of simple and clear disclosures to investors," and prohibit or restrict "certain sales practices, conflicts of interest, and compensation schemes." § 913(g)(2), 124 Stat. at 1829 (codified as amended at 15 U.S.C. § 80b-11(h)).  *The Commission*

30

*rested virtually the entire Rule on those two lines*. The Commission insisted that because those two sentences do not explicitly refer to "retail customers," the Commission may regulate *any* "sales practice[]," "conflict[] of interest," or "compensation scheme[]," and facilitate disclosure of *any* "terms."

That is not plausible. Courts seek the "plain meaning of the whole statute, not of isolated sentences." *Beecham v. United States*, 511 U.S. 368, 372 (1994). Read as "an harmonious whole," *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012), section 913—including the Commission's favorite two sentences—concerns retail customers. Every subparagraph, including (g), links to "retail customers." So does every relevant title. The "Study" and "Rulemaking" in section 913 involve standards of care for "retail customers," *supra* pp.29-30, and the "Fiduciary Duty" in subparagraph (g) concerns one of those standards—again, for "retail customers," *supra* p.30. The two sentences the Commission cited are cleanup provisions—literally, "Other Matters," § 913(g)(2), 124 Stat. at 1829—providing ancillary authority to regulate sales practices and the like in the retail-customer context.

If Congress really intended to authorize "restructur[ing]" the "business models" of private funds, 88 Fed. Reg. at 63,338/1, it would have done so in the title of Dodd-Frank dedicated to private funds—the one titled "Regulation of Advisers to Hedge Funds and Others." 124 Stat. at 1570. Congress did not omit vast new power over private funds from *there*, only to bury it in the "mousehole[]" of an "ancillary" provision, *Sackett v. EPA*, 598 U.S. 651, 677 (2023), concerning "Other Matters," § 913(g)(2), 124 Stat. at 1829, about "retail customers."

### b) Even if Section 913 Applied Outside the Retail Context, It Cannot Support the Rule.

*i.* The Commission cited a sentence from section 913 codified at 15 U.S.C. § 80b-11(h)(1) to support the quarterly-reporting rule, *see* 88 Fed. Reg. at 63,213/3, but that language does not apply. To begin, subsection (h)(1) governs advisory relationships. It authorizes the Commission to "facilitate the provision of simple and clear disclosures to investors regarding the terms of their relationships with brokers, dealers, and investment advisers." 15 U.S.C. § 80b-11(h)(1). But investors in private funds do not have a relationship "with [the] investment adviser[]" *as an investment adviser*. The adviser advises the fund, *supra* pp.11-12, 26-28;

there are no advisory terms between the adviser and the investors—unlike, for example, the terms between a broker and her retail client—and thus no advisory terms to disclose.

The investor, to be sure, has an agreement with the fund, but that is not an advisory agreement; the investor is not a client of—and therefore receives no investment advice from—the adviser.   AR.238:10; AR.145:18.  Even if there were an advisory agreement, the new quarterly-statement rule does not require disclosures "regarding the terms" of the agreement.   15 U.S.C. § 80b-11(h)(1).  Details about past performance and fees—financial reports—are not "the terms." *Id.*  Congress knew how to require financial reporting, *id.* §§ 78m, 80a-29(b), but did not for private funds.

*ii.*    The Commission cited another sentence from section 913 codified at 15 U.S.C. § 80b-11(h)(2) to support other parts of the Rule, *see* 88 Fed. Reg. at 63,213/3, but that language also cannot do the work the Commission wants (even supposing it applied outside the retail context).  Like (h)(1), subsection (h)(2) applies to advisory relationships.  It authorizes the Commission to "examine and, where appropriate, promulgate rules prohibiting or restricting certain sales practices, conflicts of interest, and

compensation schemes *for … investment advisers*." 15 U.S.C. § 80b-11(h)(2) (emphasis added). But again, for private funds the advisory relationship exists between the adviser and the fund, not the adviser and the fund's investors. The Commission's attempt to regulate "risk … [to] investors in private funds" concerns a completely different relationship. 88 Fed. Reg. at 63,217/2.

Further, whatever the Rule is about, it does not regulate "sales practices, conflicts of interest, and compensation schemes." 15 U.S.C. § 80b-11(h)(2). "Sales practices," for example, refers to the "way" in which a good or service is "s[old]" or "promot[ed]." Merriam-Webster's Collegiate Dictionary 974, 1097 (11th ed. 2007) (defining "sales" and "practice"). It does not refer to *characteristics* of the product being sold. Yet that is how the Commission read "sales practices" here. The Commission is regulating "preferential terms," 88 Fed. Reg. at 63,279/3; the *terms* of a fund investment are not the *method* by which the fund is sold.

Similarly, the Commission overread "conflicts of interest" and "compensation schemes." 15 U.S.C. § 80b-11(h)(2). Subsection (h)(2) does not reach every conceivable "conflict[] of interest" or "compensation scheme[]"—only "certain" ones, *id.*, and the context reveals which. A

34

"word is known by the company it keeps." *McDonnell v. United States*, 579 U.S. 550, 568-69 (2016). Here, the three phrases—"sales practices, conflicts of interest, and compensation schemes," 15 U.S.C. § 80b-11(h)(2)—share a "common 'core of meaning,'" *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012): in the context of an advisory relationship, the terms address incentives for, or methods of, nudging investors into unsuitable transactions. Think of a broker cold-calling a retiree (a sales practice) to pressure her into buying worthless stock so the broker can win a sales contest (a conflict of interest) or a performance bonus (a compensation scheme). The Commission's suggestion that "conflict[] of interest" or "compensation scheme[]" could, instead, encompass virtually any payment (or "additional compensation for … fees and expenses," 88 Fed. Reg. at 63,264/3) to a fund adviser is not a fair reading.

The Commission's rendering of "conflict[] of interest" is particularly problematic. A "conflict of interest" must arise in the context of a principal-agent relationship—*e.g.*, client-adviser. But, again, the Commission seeks to regulate not the relationship between the adviser and the fund

(the adviser's client), but the arm's-length negotiation between the adviser (on the fund's behalf) and the sophisticated investors in the fund. The adviser is not an agent of those investors.

### 2.    Section 206(4) of the Advisers Act Is Also Inapplicable.

Section 206(4) of the Advisers Act authorizes the Commission to "define, and prescribe means reasonably designed to prevent," "acts, practices, and courses of business" that are "fraudulent, deceptive, or manipulative."  15 U.S.C. § 80b-6(4).  The Commission's error in invoking that provision begins with the fact that it failed to "define" the allegedly fraudulent acts, or to explain how the Rule would prevent those (undefined) acts.  AR.145:10-11; AR.238:11, 19; AR.226:17.

Moreover, the Commission did not show that the Rule is "reasonably designed," 15 U.S.C. § 80b-6(4), especially given the authority the Commission already has to police fraud, *see id.* § 78j(b); AR.224:11.  A broad, prophylactic prohibition that "*may*" deter some fraud because the prohibition sweeps so widely, capturing a range of legitimate practices, 88 Fed. Reg. at 63,224/1 (emphasis added), is not "reasonably designed" to prevent fraud.  AR.145:11-12; AR.224:9-11.  (Tellingly, when the Commission described the benefits of its new Rule, it does not mention fraud

prevention, *see*, *e.g.*, 88 Fed. Reg. at 63,326/3-63,328/3, the supposed statutory predicate for its requirements, *id.* at 63,213/3.  *See also* AR.226:17-18.)  Such sweeping prophylactic requirements are particularly misplaced in the case of private-fund investors whom Congress regarded as particularly capable of protecting their own interests, and who already can and do negotiate to receive disclosures on fund performance. AR.145:12; AR.226:18; AR.234:8; *supra* pp.14-15.

### C.    The    Major-Questions    Doctrine    Confirms    the Commission's Lack of Authority.

Congress does not delegate massive powers in "'modest words,' 'vague terms,' or 'subtle device[s].'"  *West Virginia*, 142 S. Ct. at 2609 (alteration in original).  Although not necessary to resolve this case, this doctrine confirms the Commission lacks the authority asserted here.

A major question is measured not just by the scope of the rule at hand, but also by the broader import of the agency's claimed authority. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000).  Private funds are a $26 trillion segment of the economy.  88 Fed. Reg. at 63,207/3.  With the Rule, the Commission claimed virtually unrestricted authority to force these funds "to restructure" their "business models," *id.* at 63,338/1, plus authority to regulate the terms on which

funds contract with investors and the manner and services for which fund advisers are compensated.  This "transformative expansion" of a hitherto "unheralded power," *West Virginia*, 142 S. Ct. at 2610, would by the Commission's own estimates force "billions of dollars in spending" in a key financial-services sector that Congress purposely exempted from the Investment Company Act, *King v. Burwell*, 576 U.S. 473, 485 (2015).  And the full implications of the Commission's claimed authority are far greater, as reflected in the even-more-intrusive provisions of the proposed rule.

If Congress *really* intended to empower the Commission to "fundamentally and dramatically alter the regulatory regime" of private funds, AR.145:App'x 2, ¶ 1, it would have provided "clear congressional authorization," *West Virginia*, 142 S. Ct. at 2614; *see* AR.349:1-2.  All the Commission could cite, however, is a clean-up provision entitled "Other Matters" and a general antifraud provision.  That is a "wafer-thin reed" on which to rest so consequential a Rule.  *West Virginia*, 142 S. Ct. at 2608.

## II.    The Commission Failed to Provide the Public a Meaningful Opportunity to Comment.

An agency must "give interested persons an opportunity to participate in [a] rule making."  5 U.S.C. § 553(c).  This "opportunity to comment" must be "meaningful."  *Mock v. Garland*, 75 F.4th 563, 583 (5th Cir. 2023).  To meet that standard, "'the final rule the agency adopts must be a logical outgrowth of the rule proposed.'"  *Id.*  Because "[t]he objective" of this logical-outgrowth requirement is "fair notice," *Tex. Ass'n of Mfrs. v. CPSC*, 989 F.3d 368, 381 (5th Cir. 2021), "the Proposed and Final Rule must be *alike in kind* so that commentators could have reasonably anticipated the Final Rule," *Mock*, 75 F.4th at 584 (emphasis added).  A prejudicial violation of the logical-outgrowth requirement requires vacatur.  *Id.* at 586.

The Commission violated the logical-outgrowth requirement in prejudicial fashion twice over.

### A.    Petitioners Had No Opportunity to Comment on a Disclose-and-Consent Regime.

The Commission abandoned its proposal to prohibit certain adviser activities and replaced that regime with a requirement that advisers dis-

close—and in some cases, obtain investors' consent for—those same activities. *Compare* 87 Fed. Reg. at 16,920/2-16,928/2, *with* 88 Fed. Reg. at 63,261/3-63,274/3.

A disclose-and-consent regime is not a logical outgrowth of a prohibition regime—the concepts "bear little resemblance" and are different "in kind." *Mock*, 75 F.4th at 583-84.

This logical-outgrowth violation prejudiced Petitioners because they had no way of commenting on the many problems with the adopted disclose-and-consent regime. Consider the rule that advisers cannot require a fund to pay fees related to government investigations unless "a majority" of investors consent "in writing" "in each specific instance," once the adviser has "describe[d] how" the fee "is related to the relevant investigation." 88 Fed. Reg. at 63,270/3-63,271/3 & nn.703, 716. That is a sharp deviation from existing practice, where expense provisions are negotiated during contracting, not after an investigation is underway. The new requirements are infeasible (if not impossible), because investigations typically are confidential, and securing consent in writing from a majority of investors at a time when no other contractual terms are being

negotiated will often be impracticable. This new disclose-and-consent regime amounts to a de facto prohibition on charging investigation-related fees, the very thing the Rule purports *not* to be doing. *Id.* at 63,272/1.

These are all points Petitioners had no reason to make when the Commission proposed an outright prohibition. *See also infra* pp.51-53 (discussing these and other workability problems with the disclose-and-consent requirements).

### B. Petitioners Had No Opportunity to Comment on the Final Disclosure Obligations for Illiquid Funds.

The Commission also violated the logical-outgrowth requirement by imposing highly burdensome disclosure obligations on "illiquid" funds.

The Commission drew a distinction between "liquid" funds and "illiquid" funds that have limited redemption and withdrawal rights. 88 Fed. Reg. at 63,236/2-63,237/1. For illiquid funds, the proposed quarterly-statement rule would have required advisers to disclose only "unlevered returns," *i.e.*, performance metrics "*without* the impact of fund-level subscription facilities." *Id.* at 63,239/3-63,240/3. (Fund-level subscription facilities are essentially loans that advisers use to make investments for the fund. *Id.* at 63,241/2-3; AR.145:App'x 1, ¶¶ 113-15.) The Final Rule, however, requires that advisers to illiquid funds *also*

disclose "levered returns," *i.e.*, performance metrics "*with* the impact of fund-level subscription facilities."  88 Fed. Reg. at 63,239/3-63,240/3.

That is not a logical outgrowth.  In the proposal, the Commission criticized levered returns as "not reflect[ive] [of] the fund's actual performance" and "potential[ly] … mislead[ing]."  87 Fed. Reg. at 16,903/3.  And it prominently suggested "*prohibiting* advisers from" disclosing levered returns.  *Id.* at 16,958/2-3 (emphasis added).  Yet in an about-face, the Rule *requires* disclosure of levered returns.  88 Fed. Reg. at 63,240/2-3.

Had the Commission proposed requiring advisers to disclose *both* unlevered and levered returns, commenters would have explained that these additional disclosure obligations will impose high costs without any benefit to investors.

## III.  The Rule Is Arbitrary, Capricious, and Otherwise Unlawful.

### A.    There Is No Factual Basis for the Rule.

"After reading through more than 600 pages of release text, the question that remains is why the Commission feels it necessary to under-take this rulemaking."  Peirce, *supra*.  The Commission cannot "articu-late a satisfactory explanation."  *Motor Vehicle Mfrs. Ass'n, Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It said it must impose billions of dollars in costs, and commandeer millions of hours in employee time, to prevent "problematic practices" the Commission has supposedly "observed." 88 Fed. Reg. at 63,207/1, 63,209/1-3. But the Commission failed to provide any "evidence of a real problem." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006) (Kavanaugh, J.). The Court should vacate the Rule for that reason alone: "Professing that an order ameliorates a real industry problem but then citing no evidence demonstrating that there is in fact an industry problem is not reasoned decisionmaking." *Id.* at 843.

Sprinkled throughout its order, the Commission cited a few dozen examples of alleged wrongdoing, over a 34-year period, but those "do little" to justify the Rule. Peirce, *supra*, at n.6; *see also* AR.227:5. As commenters noted, "[t]hat is a trivial amount in the context of an industry" with *trillions* of dollars in assets under management. AR.224:7. If anything, it shows that the private-fund industry has had "remarkably *few* problems," *id.* (emphasis added), and that the Commission "already can bring cases where necessary," Peirce, *supra*, at n.6.

43

The vast majority of examples the Commission cited are "settled action[s]." *E.g.*, 88 Fed. Reg. at 63,209/1-2 & nn.26-32. These are "not binding" in "any other proceeding," and, by their own terms, do not purport to establish wrongdoing. *E.g.*, *Cherokee Inv. Partners, LLC*, Advisers Act Release No. 4258, at 1, 2 n.1 (Nov. 5, 2015), bit.ly/3MjTgLg, *cited in* 88 Fed. Reg. at 63,209/2 n.26. Accordingly, "neither [the public], nor the Commission, can determine from [these] settled matter[s] whether there was any underlying improper behavior or, if there was, whether it was material in the circumstances." AR.224:7.

The Commission glossed over this limitation. At times it acknowledged that settlements reflect only "alleg[ations]," 88 Fed. Reg. at 63,209/2, yet it leaped to the unfounded—arbitrary—conclusion that "advisers *have*" actually engaged in the alleged conduct, *e.g.*, *id.* at 63,222/2 & n.170 (emphasis added). *Allegations* are not *evidence*, and the Commission cannot substitute the former for the latter "without ascertaining" the allegations' veracity. *City of New Orleans v. SEC*, 969 F.2d 1163, 1167 (D.C. Cir. 1992); *see* AR.182:App'x A, ¶¶ 16-19. Such blind reliance

is particularly problematic here, where the allegations arose in unconstitutional proceedings. *See Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023).

Moreover, many of the Commission's examples have little if any relevance. For example, the Commission asserted that charging a fund for regulatory, compliance, and examination expenses "create[s] a conflict of interest" because it "provide[s] an incentive for an adviser to … allocate expenses away from the adviser to the fund." 88 Fed. Reg. at 63,264/3. In support of that statement, the Commission cited "*In the Matter of NB Alternatives Advisers*," *id.* at 63,264/3 n.641, but that matter has nothing to do with regulatory, compliance, or examination expenses.

The pattern continued throughout the order. The Commission said the quarterly-statement requirement is designed to "prevent" certain conduct that the Commission "ha[s] observed," 88 Fed. Reg. at 63,223/1 & n.177, but the Rule would not have stopped the Commission's own examples. The Commission, for instance, cited a number of matters concerning *unregistered* advisers, *id.*, yet the quarterly-reporting rule applies only to *registered* advisers, *id.* at 63,388/1.

Finally, the Commission's claimed need for onerous new protections is disproved by the real-world "trend" of the sharpest investors increasing their stake in "flourishing" private funds that offer customized strategies, diversification, and superior risk-adjusted returns. Peirce, *supra*; *see also* AR.157:2. The record belies the Commission's paternalistic concern for the supposed "disparity" in "bargaining power" of investors (which it has no authority to redress anyway). 88 Fed. Reg. at 63,341/1-2. These experienced investors, who "often are represented" by "the world's leading law firms," AR.145:2, need no federal assistance pursuing their interests. Undisputed empirical evidence shows fees are declining, AR.182:App'x A, ¶ 24; AR.366:11; AR.227:6; AR.238:7, and that investors have made consistent progress in persuading advisers to use the form agreement recommended by the Institutional Limited Partners Association, *see* AR.234:18 & n.53; AR.145:23; *see also* AR.139:3 & n.9.

The Commission's suggestion that the Rule will save investors from "need[ing] to engage in their own [investment] research," 88 Fed. Reg. at 63,309/3, misapprehended not only the Commission's limited mandate,

46

but also the fact that many limited partners have a *fiduciary duty* to conduct research, which no regulation can or will remove, *see supra* p.10; AR.166:1.

Simply, when it comes to the purported problems motivating the Rule, there is no there there.

## B.    Key Provisions of the Rule Are Unnecessary and Unduly Burdensome.

The Rule arbitrarily imposes a sea change in the regulation of private funds. Private funds operate in a world where sophisticated investors capably negotiate their own fee structures, bespoke reporting requirements, and side arrangements. The Rule is an unreasoned, direct assault on the foundations of this market-oriented, contract-based system.

### 1.    Restrictions on Side Arrangements and "Preferential" Treatment.

The Commission's restrictions on so-called "preferential" treatment are arbitrary and capricious because they would effectively ban many uses of an "essential tool" (side arrangements) investors use to tailor their investments to their particular needs. AR.139:4. Investors *themselves* urged the Commission to drop this proposal, which, they feared, would

curtail their ability to secure important rights.  AR.196:8.  The Commission purported to hear commenters' "concern[s]," including that the proposal "would curtail [investors'] ability to enter into side" arrangements, 88 Fed. Reg. at 63,277/3, but ultimately plowed ahead with a Rule creating the very adverse consequences commenters warned about.

In the Final Rule, the Commission claimed to create "exceptions" "designed" to save certain side arrangements, 88 Fed. Reg. at 63,277/3, but the purported exceptions are illusory.  The Rule, for instance, purports to allow certain "preferential" rights where the adviser offers the "same" rights to "*all*" investors.  *Id.* at 63,277/3, 63,281/3-63,282/1 (emphasis added).  But "[c]onditioning preferential rights on offering them to everyone" is a "ban on offering preferential rights." Peirce, *supra*.  When an agency *agrees* that it should avoid banning an essential tool, but bans it anyway, that is arbitrary and capricious.

The rule is unworkable for other reasons, all unaddressed by the Commission.  As numerous investors explained, many private funds *already* have a well-functioning notice process for side-arrangement rights that runs "*after* the final close of" certain funds.  AR.139:5 (empha-

sis added); *see also* AR.237:27. Requiring *advance* notice to all prospective investors of the terms negotiated by others is infeasible. Side arrangements "are negotiated up to the final moments before the fund's final close." AR.139:5. So, requiring disclosures *before* the final close "would be an inaccurate and incomplete reflection of the provisions secured by other [investors] in the fund" and would offer "little to no utility." *Id.* The Commission acknowledged these "timing concerns," 88 Fed. Reg. at 63,285/3, but barreled ahead anyway. It thought it "crucial" for investors to have "access to certain information," but entirely failed to explain whether the mandated process was workable. *Id.*

Critically, moreover, the Commission's focus on providing "investors" information (88 Fed. Reg. at 63,285/3) only highlights the mismatch between the authority the Commission claimed and the restrictions it adopted. The Commission may regulate the relationship between the adviser and the fund. *Supra* pp.11-12, 26-28. It is not the Commission's place to regulate the relationship between the adviser and the limited partners that invest in the fund, nor—as often seemed its purpose—to assure uniform treatment *among* investors in the fund. *See*, *e.g.*, 88 Fed. Reg. at 63,210/2-3, 63,278/3-63,288/1.

49

Overbreadth is another matter the Commission ignored. The Rule, for example, prevents the offering of "*any* preferential treatment" to "*any* investor,*" unless the adviser provides written notice to all current and prospective investors. 88 Fed. Reg. at 63,389/3-63,390/1 (emphases added). That is astonishingly broad and would seemingly bar, or at least disincentivize, normal investor communications that are common in the industry (and favored by investors). AR.182:40. Suppose an investor calls the adviser and asks to speak to staff who specialize in particular investment types. That request would normally be considered in light of the facts and circumstances. But now, if the adviser accommodates the request, the adviser could be giving that investor "preferential treatment," which, under the Rule, would require the adviser to log the treatment and disclose it to all other investors. The Commission, again, said nothing about this issue.

Even while downplaying these serious workability concerns, the Commission estimated that the preferential-treatment rule will be enormously costly, with the disclosures alone costing more than $400 million annually, 88 Fed. Reg. at 63,348/3—which is actually a significant "underestimate[]," AR.145:App'x 1, ¶ 52. The Commission failed to

identify or quantify benefits that would outweigh these costs. *See* 88 Fed. Reg. at 63,345/1-63,346/2, 63,348/2-3, 63,358/3 (speculating that benefits "may" accrue, without quantification). And "[w]ithout quantified benefits to compare against costs, it is not apparent just how the agency went about weighing" them. *GPA Midstream Ass'n v. DOT*, 67 F.4th 1188, 1200 (D.C. Cir. 2023). Especially in conjunction with the Rule's other flaws, the paucity of reasoning supporting the Commission's cost-benefit analysis makes it arbitrary and capricious. *See City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (APA does not "tolerate rules based on arbitrary and capricious cost-benefit analyses").

### 2.    Restrictions on Passing Through Expenses.

The restrictions on passing through certain adviser expenses likewise will not further the Commission's stated purposes.

Take the Commission's treatment of investigation expenses. In response to the proposed ban on advisers charging such expenses, commenters explained that investors already had the ability to negotiate which expenses would be charged to the fund. AR.215:10-12; AR.161:28-29; AR.239:4. Other commenters predicted that advisers would assess higher management fees if they could not allocate these expenses to

funds.  AR.211:16-18; AR.188:18-19; AR.149:8.  The Commission recognized that such increased fees would be an "unfavorable outcome[] for investors."  88 Fed. Reg. at 63,271/3.

The Commission purported to alleviate those concerns through its disclose-and-consent exception, but that exception suffers serious practical problems making it tantamount to a ban.  *Supra* pp.18-19, 40-41.  Investigations often are confidential and typically highly sensitive—even *public companies* are generally not required to disclose investigations.  *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274-75 (S.D.N.Y. 2012).  But to obtain consent to recoup expenses, an adviser would have to disclose the investigation and potentially other confidential (or privileged) information.  Disclosure of the mere existence of an investigation would impose significant costs, including reputational costs.  Nor will the dialogue necessarily end there—investors may have questions, request more information before consenting, and perhaps even consider whether to pursue a legal claim of their own.  Faced with the choice between increasing management fees or relying on this unworkable pass-through model, advisers will opt for increased fees—yielding the

exact result the Commission admitted would harm investors.  88 Fed. Reg. at 63,271/3.

The Commission's treatment of regulatory and compliance expenses is similarly flawed.  Commenters explained that a "ban on charging regulatory and compliance fees to the fund will … have detrimental effects on investors" by causing some advisers to "invest[] less in compliance and other administrative costs" and others to "increas[e] overall fees."  AR.226:25-26.  The Commission recognized that it is "in investors' best interest for advisers to develop robust regulatory and compliance programs," and "acknowledge[d]" that prohibiting passing through compliance-related costs "could result in unfavorable outcomes for investors," by, for example, disincentivizing compliance activities, or increasing management fees.  88 Fed. Reg. at 63,264/2, 63,265/1.  The Commission purported to avoid these effects by allowing certain expenses to be passed through once disclosed.

This disclosure exception is unworkable.  It requires highly granular notice every quarter of "each specific category of fee or expense as a separate line item."  88 Fed. Reg. at 63,263/3 n.630.  Thus, for example, advisers will have to separately itemize expenses associated with *each* of

the numerous different forms they are required to submit to government bodies, *see id.* at 63,264/3 n.642, and *each* of the different technology systems that advisers implement, update, or enhance to comply with regulatory requirements, *see id.* at 63,263/3 n.630. Contrary to the Commission's protests that this will not cause "significant disruption," *id.* at 63,265/2, such highly detailed disclosures are not commonly used, and would prove so cumbersome as to be impracticable, especially in a 45-day reporting window. *Supra* pp.18-19, 40-41; *see, e.g.*, AR.238:17-18.

### 3.    Quarterly-Reporting Requirements.

The quarterly-statement rule imposes burdensome, one-size-fits-all requirements that will harm advisers, funds, and investors.

Advisers *already* provide robust disclosures to private-fund investors as a result of the arm's-length bargaining between these well-counseled parties. AR.145:52-54; AR.161:3. As the Commission acknowledged, *see* 88 Fed. Reg. at 63,330/3-63,331/1, investors negotiate disclosures tailored to their specific needs, AR.145:54. With these tailored disclosures, investors *already* have the information they need to monitor fund performance, evaluate adviser services to the fund, and compare investment returns across funds. *Cf.* 88 Fed. Reg. at 63,326/3-63,327/1.

Moreover, tailored disclosures avoid wasting time providing (and reading) useless information. AR.145:52-54. Existing market practice is thus mutually beneficial.

Yet the Commission has now designated itself arbiter of the fee and performance information that advisers must disclose. This intrusive, one-size-fits-all regulation is unnecessary, irrational, and affirmatively harmful. It inexplicably imposes *more* burdensome requirements than the Investment Company Act imposes for advisers serving retail investors. *See* 15 U.S.C. § 80a-29(e); AR.177:23; AR.238:18 & n.73. The Commission estimated compliance costs for the new requirements at nearly $500 million annually, which it conceded will be "ultimately paid by the fund investors." 88 Fed. Reg. at 63,330/1-2. And the disclosures will impose additional heavy costs on *investors*, by forcing them to sift through mountains of granular line items for nuggets of useful information. This will make investors *less* able to monitor fund performance and compare investment returns across funds. Comments highlighted these costs, AR.145:52-54; AR.177:23, yet the Commission ignored them, *see* 88 Fed. Reg. at 63,328/3-63,330/3, 63,333/1-63,334/1 (discussing only compliance costs).

The Rule threatens to deprive investors of the tailored disclosures they actually want. If advisers are already required to make onerous disclosures, investors lose leverage in trying to negotiate for more tailored disclosures. The Commission admitted this "may occur," but insisted investors will still be able to negotiate for tailored disclosures. 88 Fed. Reg. at 63,334/1. If true, that just underscores why the Rule is unnecessary.

Making matters worse, the Commission gave short shrift to the impact of onerous disclosure requirements on small and emerging advisers. It said there is no problem because the new disclosure requirements do not apply to unregistered advisers, including those advising small funds. 88 Fed. Reg. at 63,224/3. The message is clear: to avoid these burdensome requirements, small advisers should remain small. But as Commissioner Uyeda observed, asking smaller "advisers to reduce their assets under management … to avoid registration is astonishingly terrible advice." Uyeda, *supra*.

These reporting burdens are compounded by the requirement that disclosures include information about an adviser's "related persons," de-

fined to include any person that "directly or indirectly" controls the adviser or is "under common control with the adviser." 88 Fed. Reg. at 63,227/3-63,228/1. This extremely broad definition means that large financial-service firms may have to develop new, complex compliance processes to accommodate disclosure of information about all worldwide affiliates. AR.189:2-6. This would exponentially increase the already-enormous amount of irrelevant disclosure information that investors will need to wade through to identify any actual conflicts of interest. *Id.*

The Commission has not identified meaningful countervailing benefits. Significantly, although the Commission invoked the Act's antifraud provisions as its authority for the quarterly-statement rule, the agency did not mention fraud when tallying the rule's benefits. *See* 88 Fed. Reg. at 63,326/3-63,328/3, 63,330/3-63,333/1. This confirms that the Commission's invocation of antifraud authority was pretextual. The purported benefits the Commission did cite—helping investors monitor investments and enhancing comparability across funds, *see id.*—have nothing to do with preventing fraud or with any asserted statutory authority. And even these benefits, the Commission admitted, cannot be "meaningful[ly]" quantified. *Id.* at 63,326/2.

57

Ultimately, the Commission's analysis of purported benefits is use-less because it lacks significant examination of whether the mandated disclosures improve on existing disclosures. "[T]he benefit" of the new requirements, the Commission said, "will depend on the extent to which investors already receive the mandated information"—yet ascertaining this was among the Commission's most basic responsibilities *before* promulgating disclosure requirements. 88 Fed. Reg. at 63,326/2. As for the Commission's observation that disclosures "vary across" funds, *id.*, that is precisely *because* investors negotiate for disclosures tailored to their distinct needs.

### C. The Interpretive Rules Slipped into the Adopting Release Are Also Arbitrary, Capricious, and Otherwise Unlawful.

Although the Commission purportedly declined to adopt proposed prohibitions on two adviser activities—negotiating limitations on liabil-ity and charging fees for so-called "unperformed services"—the Commis-sion did so only because it declared these activities *already* prohibited under the Act. But if the Act already forbids these activities, "why did [the Commission] need to propose a prohibition?" Peirce, *supra*. The Commission has no answer.

These portions of the preamble to the Final Rule are interpretive rules that, like the regulations adopted in the order, are unlawful. Interpretive rules are "agency action," *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 242 (5th Cir. 2023); *see* 5 U.S.C. § 551(13), subject to judicial review just like legislative rules.

### 1.    Limitations on Liability.

The prevailing market practice is to freely negotiate limitations on an adviser's liability, such as indemnification by the fund for negligent conduct. AR.145:12. These agreed limitations "ha[ve] been instrumental in the growth of private capital" because they encourage advisers to take the types of investment risks that generate diversified, risk-adjusted returns investors *want*, without fear of liability. AR.145:36. The reaction to the Commission's proposal to end negotiated indemnification was overwhelmingly negative. "[M]ost commenters opposed it," with "[m]any" pointing out that investment companies—which serve retail customers—are *permitted* to limit liability for negligence. 88 Fed. Reg. at 63,276/1-2 & n.774; *see* AR.145:9; 15 U.S.C. § 80a-17(i). Investors warned that prohibiting limitations on liability (particularly for negligence) would "cause

advisers to take less risk, which could result in lower investor returns."
88 Fed. Reg. at 63,276/2 & n.773; *see* AR.139:2.

Confronted with this opposition, the Commission purported "not
[to] adop[t] this prohibition"—but then endeavored to impose it anyway
through an interpretive rule contained in the preamble to the Final Rule.
88 Fed. Reg. at 63,276/2.  In the Commission's telling, the prohibition "is
not needed" because certain limitations on an adviser's liability for neg-
ligent conduct are *already unlawful*.  *Id.* at 63,276/1-63,277/1.  Specifi-
cally, according to the Commission, "[a] breach of [an adviser's] fiduciary
duty may involve conduct that is … negligent," and therefore limiting li-
ability for negligence—without a carve-out for federal fiduciary breach
claims—can improperly limit liability for breach of an adviser's fiduciary
duty.  *Id.* at 63,277/1.  Any such "waiver" of fiduciary duties, the Com-
mission said, is "invalid under" the Act's antifraud provisions.  *Id.* at
63,276/2-63,277/1 (citing 15 U.S.C. §§ 80b-6, 80b-15(a)).  The Commission
addressed this by mandating a "savings clause" that any limitation on
liability must include to be compliant.  *Id.* at 63,277/1.

This portion of the preamble was presented as the Commission's
considered, settled legal position—and as a warning to industry.  This

interpretation was a "reaffirm[ation] and clarif[ication] [of its] views," the Commission said; the agency even "provide[d] … examples" "of how [its] interpretation applies to certain facts and circumstances," including when a "savings clause" is mandatory.  88 Fed. Reg. at 63,276/2-63,277/1. The message is unequivocal:  "an adviser *may not* seek reimbursement, indemnification, or exculpation" without including the Commission's newly minted savings clause.  *Id.* at 63,277/1 (emphasis added).  Otherwise, the Commission will consider the indemnification provision, including one that provides for indemnification only for negligence, to be a waiver of fiduciary duties that violates the Advisers Act.  *Id.* at 63,276/3-63,277/1.

The Commission's interpretation is contrary to statutory design and irrationally differentiates advisers to private funds from advisers to investment companies with retail customers.  The Investment Company Act prohibits advisers to registered investment companies—serving retail customers—from limiting their liability for "gross negligence," thus permitting advisers to limit liability for ordinary negligence.  15 U.S.C. § 80a-17(i).  It is nonsensical to interpret the Advisers Act as imposing a *more* onerous prohibition on private-fund advisers.  AR.145:35-36.

61

Limitations on liability (even without a savings clause) do not violate the antifraud provisions of the Act because there is nothing fraudulent about negotiating limitations on liability with sophisticated counterparties at arm's length. AR.145:20. A congressionally permitted practice for mutual-fund advisers does not become fraudulent when followed by private-fund advisers.

The Commission also erred in asserting that limiting liability for an adviser's breach of its "fiduciary duty" under the Act (which the Commission said "may involve … negligent" conduct) is "a[n] [invalid] waiver" of the adviser's fiduciary duty. 88 Fed. Reg. at 63,277/1. The Commission cited no authority for the proposition that limitations on liability are equivalent to a blanket waiver of fiduciary duties. Indeed, that proposition is flatly inconsistent with the agency's 2019 Fiduciary Interpretation. *See Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 84 Fed. Reg. 33,669 (July 12, 2019). There, the Commission concluded that "hedge clauses"—*i.e.*, "clause[s] in an advisory agreement that purpor[t] to limit an adviser's liability"—are not cat-

62

egorically unlawful. *Id.* at 33,672/2 n.31. Instead, their lawfulness depends on the "facts and circumstances," including the client's "sophistication." *Id.*

The Commission's order paid lip service to that conclusion, *see* 88 Fed. Reg. at 63,276/3, but in the next paragraph asserted a directly contrary view: limitations on liability (hedge clauses), even for advisers of private funds, are (without a savings clause) *per se* unlawful because they "operate effectively as a waiver" of an adviser's fiduciary duty, *id.* at 63,277/1. This "'[u]nexplained inconsistency'" renders the new interpretive rule "'arbitrary and capricious.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (alteration in original).

The interpretive rule is arbitrary and capricious for other reasons. The Commission claimed that limitations on liability are a "problematic practice," 88 Fed. Reg. at 63,276/2, but the agency "cit[ed] no evidence" of a real problem, *Nat'l Fuel*, 468 F.3d at 843—unsurprising, since even investors defended the practice. The Commission cited (at 63,276/3 n.779, 63,277/1 n.781) a single, settled action in which it alleged certain hedge clauses may have misled "retail clients," not private-fund investors. *Comprehensive Cap. Mgmt., Inc.*, Advisers Act Release No. 5493, ¶ 15

(Jan. 11, 2022), bit.ly/497vsUI.  Finally, the interpretive rule will impose heavy costs, including deterring advisers from pursuing the very investment strategies investors seek in order to obtain diversified, superior risk-adjusted returns.  AR.182:16-19.

## 2.    Fees for "Unperformed Services."

The Commission's interpretive rule regarding fees for "unperformed services" should likewise be vacated.

A standard feature of many advisers' compensation is payment by the fund's portfolio companies for the adviser's monitoring of these investments.  Many fund documents include a clause permitting the adviser to accelerate unpaid monitoring fees when a portfolio company is sold.  Investors prefer these clauses because, otherwise, the adviser would receive monitoring fees only as long as it keeps the portfolio company, which could disincentivize the adviser from selling the company at a time beneficial to investors.  AR.176:5.

The Commission pejoratively labeled these accelerated-fee provisions "fees for unperformed services," and proposed to prohibit them.  87 Fed. Reg. at 16,921/2-16,922/3.  It dropped this proposal from the Final

Rule, but only because the Commission suddenly decided the arrangement "already is inconsistent with the adviser's fiduciary duty" under the Act. 88 Fed. Reg. at 63,274/3. These statements articulated a definitive "interpretation" of law—and a warning to industry. *Id.* at 63,275/3. "Under our interpretation," the Commission announced, an adviser "is not permitted to charge for services that it does not reasonably expect to provide." *Id.*

This interpretive rule is not justified under the Act's antifraud provisions because, as with limitations on liability, there is nothing fraudulent about investors agreeing to fees in arm's-length negotiations.

The interpretive rule is also arbitrary and capricious. The Commission cited no evidence that these accelerated fees harm private-fund investors. *Nat'l Fuel*, 468 F.3d at 843. It cited seven enforcement actions (six of them settled), all involving allegations of an adviser's failure to disclose material facts about the fees; an adviser's violation of its own agreements regarding the fees; retail clients; or *all* of these. 88 Fed. Reg. at 63,275/2-3 nn.757, 759. Moreover, the "overwhelming market practice" is that 100% of monitoring fees are offset by a corresponding reduction in management fees, which confirms that investors are well-

equipped to negotiate favorable terms without regulatory intervention.

AR.145:37.

## IV. The Commission Failed to Adequately Consider the Rule's Impact on Efficiency, Competition, and Capital Formation.

In needlessly adopting a costly Rule that will upend a well-func-

tioning, competitive market, the Commission violated its heightened

statutory duty to consider "whether [its] action will promote efficiency,

competition, and capital formation." 15 U.S.C. § 80b-2(c). The Commis-

sion's failure to adequately "apprise itself" of the "economic

consequences" of its rules has repeatedly resulted in invalidation of Com-

mission rules. *Bus. Roundtable*, 647 F.3d at 1148; *see also Am. Equity*

*Inv. Life Ins. Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010); *Chamber of Com.*

*v. SEC*, 412 F.3d 133, 140-44 (D.C. Cir. 2005). Here, the Commission

"failed once again" to fulfill this statutory duty. *Bus. Roundtable*, 647

F.3d at 1148. Its economic analysis is incomplete, contrary to the record,

and conspicuously lacks any finding that the Rule "will" promote compe-

tition or capital formation. 15 U.S.C. § 80b-2(c).

Properly considered, the record shows the Rule will *stifle*—not "pro-

mote"—efficiency, competition, and capital formation. *See* AR.360, 366.

The Commission itself admitted (although it implausibly downplayed)

that "[t]here may be losses of efficiency from the rules" in multiple ways, including forcing investors to abandon private funds in favor of "alternative investments," or forcing advisers to "[re]structure their funds" to "avoid the costs of the rules." 88 Fed. Reg. at 63,359/2-3. As to the other statutory factors, the Commission did not even purport to find that the Rule will promote competition or capital formation. Instead, it stated that the Rule "may ... affect competition" (in largely "negative" ways), and admitted the Rule "carr[ies] a risk that capital formation may be negatively affected." *Id.* at 63,360/2-3, 63,362/3. The Commission identified only two possible "pro-competitive effects," and four possible effects to "facilitate capital formation," but those effects are dwarfed by the much longer (and weightier) list of "negative effects." *Id.* at 63,360/2-63,364/2. In particular, by the Commission's own admission, "advisers, *particularly smaller or emerging advisers*, may find it more difficult to compete" under the Rule, and so will "exit, or forgo entry," into the market—costs that "are likely to fall disproportionately" on "smaller advisers," who are "most likely to exit the market in response to the final rules." *Id.* at 63,361/1-2 (emphasis added).

67

Particularly when accompanied by such damning admissions, the Rule's half-baked economic analysis falls short of the Commission's statutory responsibilities.  The Commission must "determine *as best it can* the economic implications of the rule it has proposed." *Chamber*, 412 F.3d at 143 (emphasis added).  The Commission has not done that.  It conceded it failed to quantify "many factors determining the economic effects" of the Rule. 88 Fed. Reg. at 63,293/2.  And although it complained that estimating the effects would be "difficult," *id.*, that does not "excuse the Commission from its statutory obligation" to estimate the economic effects "as best it can," *Chamber*, 412 F.3d at 143.  The Commission must "make tough choices" about which estimates are "most plausible," "even if … the estimate[s] will be imprecise," or if the "Commission can determine only [a] range." *Id.* (ellipsis in original); AR.175:13-14.  That is particularly true where, as here, the Commission ignored already-existing data identified in comments. *See*, *e.g.*, AR.182:App'x A, ¶ 58.  The Commission cannot just throw up its hands.

Here, the Commission failed even "to hazard a guess" about the likely economic effects of its Rule. *Chamber*, 412 F.3d at 143.  In its 6-

page analysis of efficiency, competition, and capital formation—in an order hundreds of pages in length—the Commission presented *24* separate statements in the form of conditional assertions that, "to the extent" that predicate X obtains, then conclusion Y "may" follow.  88 Fed. Reg. at 63,358/3-63,364/2.  These cagey statements do not satisfy the Commission's obligation of reasoned analysis, which requires assessing whether the predicate *actually exists*.  "To the extent that pigs have wings, they may be able to fly," is not reasoned decisionmaking:  It calls for consideration of whether pigs *in fact* have wings.  Many of the predicates for the Commission's conditional statements are in fact highly doubtful—such as the assumption "the substantial majority of advisers" will rely on the Rule's disclose-and-consent exceptions, *id.* at 63,337/3; as discussed, no one is going to use those exceptions, *supra* pp.18-19, 40-41, 51-53.

The Commission's "qualitative" discussion shows it has no idea what the Rule is going to do.  88 Fed. Reg. at 63,293/2.  For example, the Commission admitted "[t]here may be losses of efficiency from the rules prohibiting various activities … to the extent that investors currently benefit from those activities."  *Id.* at 63,359/2.  Again, "to the extent" is

the give-away.  The Commission cannot reasonably claim to have adequately "assess[ed] the economic consequences of its rule," *Bus. Roundtable*, 647 F.3d at 1150, when it admittedly did not know *whether* investors benefit from the now-prohibited activities *at all*, let alone how many investors benefit or by how much.

The Commission's analysis is also inadequate because it "inconsistently and opportunistically framed the costs and benefits."  *Bus. Roundtable*, 647 F.3d at 1148-49.  The Commission declared at one point, for example, that the Rule will expand competition by creating opportunity for "newer or smaller advisers" to compete with larger advisers.  88 Fed. Reg. at 63,360/2.  But elsewhere, the Commission sought to downplay the Rule's costs by suggesting that smaller advisers may "reduc[e] their size" to avoid the newly imposed burdens.  *Id.* at 63,361/2.  And, as noted, in still another part of the order, the Commission projected that the Rule's burdens will force small advisers to exit the market.  *Supra* pp.55-56, 66-67.  Self-"contradict[ion]" is not reasoned decisionmaking.  *Bus. Roundtable*, 647 F.3d at 1149.  "The SEC cannot have it both ways," *Chamber of Com. v. SEC*, No. 23-60255, 2023 WL 7147273, at *11 (5th Cir. Oct. 31, 2023); it cannot simultaneously claim

70

to be *expanding* competition to the benefit of small advisers while also acknowledging that those same advisers will likely *shrink* or exit the market altogether.

Finally, the Commission failed to consider the aggregate impact of recent rulemakings. The "cumulative effect" of related rulemakings is "unquestionably an important aspect of the problem" that the agency must consider. *All. for Hippocratic Med.*, 78 F.4th at 246. Here, the Commission is simultaneously considering numerous proposals that address similar issues and would require funds to devote similar legal, technology, and reporting resources, potentially simultaneously. *See*, *e.g.*, *Safeguarding Advisory Client Assets*, 88 Fed. Reg. 14,672 (Mar. 9, 2023); *supra* pp.12-13 (discussing flurry of rulemakings). The Commission, however, has "refus[ed]" to offer the public its own analysis of the aggregate impacts of these proposals, "significantly constrain[ing]" the opportunity to meaningfully comment. Uyeda, *supra*; AR.254:26-31. The Commission argued its analysis reflected "each adopt[ed rule]" to date, 88 Fed. Reg. at 63,382/1, but that ignores the numerous pending proposals affecting private funds. It is irrational for the Commission to act with its right hand without accounting for what its left hand is doing. And so,

because the Commission "failed to consider the cumulative effect" of its many rulemakings, the Rule is unlawful. *All. for Hippocratic Med.*, 78 F.4th at 256.

* * *

With its new Rule, the Commission has made a massive, costly intervention in a vibrant market that is enjoying huge inflows from the world's most sophisticated investors, and which Congress never intended be subject to such heavy-handed regulation.  This is exactly the kind of radical intrusion that should receive searching scrutiny under the statutory requirement to pause and consider "whether the action will promote efficiency, competition, and capital formation."  15 U.S.C. § 80b-2(c).  Far from demonstrating the clear and compelling benefits necessary to justify the staggering costs of remaking this market, the record and the Commission's own analysis reveal massive downside risks, with no affirmative findings that the Rule will actually promote competition or capital formation.  "By ducking serious evaluation" of whether the Rule will leave the market more efficient, more competitive, and better capitalized than when the Commission found it, "the Commission acted arbitrarily." *Bus. Roundtable*, 647 F.3d at 1152.

72

## V. The Rule Should Be Vacated.

In light of the Rule's manifold defects, this Court should set aside the order on review in entirety.

The APA directs that courts "*shall* … hold unlawful and set aside agency action" that is contrary to law.  5 U.S.C. § 706(2)(A), (C) (emphasis added); *see also* 15 U.S.C. § 80b-13(a).  Accordingly, the APA's plain text requires that "[i]n *all* cases," unlawful "agency action *must* be set aside." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) (emphases added); *see Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation.").

Although this Court has occasionally remanded without vacatur upon finding that an agency would "'be able to substantiate its decision'" and vacatur would be "'disruptive,'" *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000), that is no basis to withhold vacatur here.  There is no prospect the Commission would be able to support its decision on remand, as there is no statutory authority for the Rule, and

its blunderbuss approach to important aspects of the Rule cannot be rationalized. Nor would vacating the Rule cause disruption: Vacatur would *maintain* the long-standing status quo.

This Court should apply its "default" remedy and set aside the order on review. *Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 859 (5th Cir. 2022).

## CONCLUSION

The Court should grant the petition for review and vacate the order on review.

Dated: November 1, 2023

Respectfully Submitted,

 */s/ Eugene Scalia*

STEPHEN J. HAMMER
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
(214) 698-3100

EUGENE SCALIA
   *Counsel of Record*
HELGI C. WALKER
BRIAN A. RICHMAN
MAX E. SCHULMAN
ROBERT A. BATISTA
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioners*

# CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2023, I caused the foregoing brief to be electronically filed with the United States Court of Appeals for the Fifth Circuit by using the Court's CM/ECF system.

Dated:  November 1, 2023          Respectfully Submitted,

                                         */s/ Eugene Scalia*
                                      EUGENE SCALIA
                                       *Counsel of Record for Petitioners*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts exempted under Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, it contains 12,992 words.

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point New Century Schoolbook LT.

I further certify that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: November 1, 2023        Respectfully Submitted,

_/s/ Eugene Scalia_
EUGENE SCALIA
_Counsel of Record for Petitioners_