No. 23-60471

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS;
ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION, LIMITED;
AMERICAN INVESTMENT COUNCIL; LOAN SYNDICATIONS AND
TRADING ASSOCIATION; MANAGED FUNDS ASSOCIATION; NATIONAL
VENTURE CAPITAL ASSOCIATION,

*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

On Petition for Review of an Order of the
Securities and Exchange Commission

## BRIEF OF RESPONDENT
## SECURITIES AND EXCHANGE COMMISSION

MEGAN BARBERO
*General Counsel*

MICHAEL A. CONLEY
*Solicitor*

JEFFREY A. BERGER
*Assistant General Counsel*

EZEKIEL L. HILL
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202.551.7724 (Hill)
hillez@sec.gov

# CERTIFICATE OF INTERESTED PERSONS

*NA of Private Fund Managers v. SEC*, No. 23-60471

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    Petitioners Alternative Investment Management Association Limited, American Investment Council, Loan Syndications and Trading Association, Managed Funds Association, National Association of Private Fund Managers, and National Venture Capital Association.

      Counsel for Petitioners Robert A. Batista, Stephen J. Hammer, Brian A. Richman, Eugene Scalia, Max E. Schulman, and Helgi C. Walker of Gibson, Dunn & Crutcher LLP.

2.    Respondent Securities and Exchange Commission.

      Counsel for Respondent Megan Barbero, Jeffrey A. Berger, Michael A. Conley, and Ezekiel L. Hill.

3.    *Amicus Curiae* Committee on Capital Markets Regulation.

      Counsel for *Amicus Curiae* C. Wallace DeWitt of Allen & Overy LLP, and Hal S. Scott of Committee on Capital Markets Regulation.

4.    *Amicus Curiae* Chamber of Commerce of the United States of America.

      Counsel for *Amicus Curiae* Justin W. Aimonetti, Steven A. Engel, Brian A. Kulp, and Michael H. McGinley of Dechert LLP, and Tyler S. Badgley and Kevin R. Palmer of the U.S. Chamber Litigation Center.

5.    *Amici Curiae* Investor Choice Advocates Network and California Alternative Investments Association.

Counsel for *Amici Curiae* Angela Laughlin Brown of Gray, Reed & McGraw LLP, and Nicolas Morgan of Paul Hastings LLP.

6.   *Amicus Curiae* Securities Industry and Financial Markets Association.

Counsel for *Amicus Curiae* Avi M. Kupfer, Carmen N. Longoria-Green, and Nicole A. Saharsky of Mayer Brown LLP, and Kevin Carroll of Securities Industry and Financial Markets Association.

7.   *Amici Curiae* Paul G. Mahoney, New Civil Liberties Alliance, Adam C. Pritchard, and J.W. Verret.

Counsel for *Amici Curiae* Mark S. Chenoweth and Russell G. Ryan of New Civil Liberties Alliance.

*/s/ Ezekiel L. Hill*
Ezekiel L. Hill
Attorney of Record for Respondent

## STATEMENT REGARDING ORAL ARGUMENT

The Securities and Exchange Commission is prepared to present oral argument if it would assist this Court in resolving the petition for review.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................i

STATEMENT REGARDING ORAL ARGUMENT ....................................iii

TABLE OF CONTENTS..........................................................................iv

TABLE OF AUTHORITIES ....................................................................vii

INTRODUCTION ....................................................................................1

COUNTERSTATEMENT OF JURISDICTION............................................3

COUNTERSTATEMENT OF THE ISSUES.................................................3

COUNTERSTATEMENT OF THE CASE....................................................4

      A.    Congress authorized the Commission to regulate private-fund advisers..4

           1.    Private-fund advisers play a key role in operating private funds ....4

           2.    Congress significantly expanded regulatory oversight of private-fund advisers in 2010 ............................................................5

      B.    The Commission adopted new rules for private-fund advisers.................7

           1.    The Commission proposed a set of rules, which it moderated in response to comments ................................................................7

           2.    The rules enhance transparency, reduce conflicts of interest, and further investor protection............................................................8

STANDARD OF REVIEW ...................................................................... 12

SUMMARY OF ARGUMENT................................................................... 12

ARGUMENT ......................................................................................... 15

I.    Petitioners have not demonstrated standing, and thus have not shown that venue is proper in this Court ................................................................. 15

II.    Congress authorized the Commission to adopt the rules .................................. 16

    A.    Congress authorized the Commission to adopt the rules pursuant to
        Section 211(h) .............................................................................. 17

        1.    Section 211(h) covers private-fund advisers and investors .......... 17

        2.    The statutory terms in Section 211(h) cover the five new rules .. 22

    B.    Congress authorized the Commission to adopt the rules pursuant to
        Section 206(4). ............................................................................. 28

    C.    The major questions doctrine does not apply here. ................................. 31

III.    The Commission satisfied the APA's procedural requirements because the
    final rules are a logical outgrowth of the proposed rules. .................................... 33

IV.    The Commission reasonably explained its decision to adopt the rules............. .35

    A.    The Commission substantiated the problems that the rules are
        designed to solve .......................................................................... 36

    B.    The Commission provided reasoned explanations for the three rules
        that petitioners challenge .............................................................. 38

        1.    The Commission reasonably explained its decision to adopt
            the preferential-treatment rule. ......................................... 39

        2.    The Commission reasonably explained its adoption of
            disclosure and consent requirements for expenses........................ 41

        3.    The Commission reasonably explained its adoption of
            quarterly-reporting requirements ........................................ 42

V.    The Commission reasonably considered the rules' likely economic effects...... 44

VI.    The Commission reasonably interpreted the Advisers Act. ............................... 51

    A.    The Commission properly reaffirmed its interpretation that waivers
        of liability may violate the Advisers Act........................................ 51

B.    The Commission reasonably interpreted fees for unperformed services as inconsistent with an adviser's fiduciary duty ........................... 54

VII.    The rules should not be vacated ............................................................. 55

CONCLUSION ....................................................................................................... 56

CERTIFICATE OF SERVICE AND FILING

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                    <u>**Page(s)**</u>

*10 Ring Precision, Inc. v. Jones,*
   722 F.3d 711 (5th Cir. 2013) ........................................................................... 48

*All. for Fair Bd. Recruitment v. SEC,*
   85 F.4th 226 (5th Cir. 2023) ........................................ 12, 17, 32, 36

*All. for Hippocratic Med. v. FDA,*
   78 F.4th 210 (5th Cir. 2023) ........................................................... 50

*Am. Hosp. Ass'n v. Azar,*
   983 F.3d 528 (D.C. Cir. 2020) ........................................................ 49

*Cath. Soc. Serv. v. Shalala,*
   12 F.3d 1123 (D.C. Cir. 1994) ........................................................ 55

*Chamber of Com. v. SEC,*
   412 F.3d 133 (D.C. Cir. 2005) .................................................. 49, 50

*Chamber of Com. v. SEC,*
   85 F.4th 760 (5th Cir. 2023) ................................................ 47, 48, 49

*Chem. Mfrs. Ass'n v. EPA,*
   870 F.2d 177 (5th Cir. 1989) .................................................... 34, 35

*Cmty. for Creative Non-Violence v. Turner,*
   893 F.2d 1387 (D.C. Cir. 1990) ...................................................... 55

*Corley v. United States,*
   556 U.S. 303 (2009) ........................................................................ 21

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021) ............................................................... 35, 49

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ................................................................... 31-32

*Fin. Planning Ass'n v. SEC*,
   482 F.3d 481 (D.C. Cir. 2007) ......................................................21

*Flight Training Int'l, Inc. v. FAA*,
   58 F.4th 234 (5th Cir. 2023) ........................................................51

*Ga. Republican Party v. SEC*,
   888 F.3d 1198 (11th Cir. 2018) ............................................. 15, 16

*Goldstein v. SEC*,
   451 F.3d 873 (D.C. Cir. 2006) ......................................................20

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021).............................................. 22, 33, 34, 35

*Lindeen v. SEC*,
   825 F.3d 646 (D.C. Cir. 2016) ......................................................47

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007) .......................................................................33

*Nasdaq Stock Mkt. L.L.C. v. SEC*,
   34 F.4th 1105 (D.C. Cir. 2022).................................................. 46, 49

*Nasdaq Stock Mkt. L.L.C. v. SEC*,
   38 F.4th 1126 (D.C. Cir. 2022)...........................................30, 37, 56

*Oklahoma v. Castro-Huerta*,
   142 S. Ct. 2486 (2022) ..................................................................19

*Robare Grp., Ltd. v. SEC*,
   922 F.3d 468 (D.C. Cir. 2019) ......................................................52

*Sebelius v. Cloer*,
   569 U.S. 369 (2013) ................................................................. 17, 19

*SEC v. Capital Gains Research Bureau, Inc.*,
   375 U.S. 180 (1963) .........................................................................6

*Shalala v. Guernsey Mem'l Hosp.*,
   514 U.S. 87 (1995) .........................................................................51

*Shrimpers & Fishermen of the RGV v. Tex. Comm'n on Env't Quality,*
   968 F.3d 419 (5th Cir. 2020) .................................................................15

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ...............................................................................15

*Tenn. Republican Party v. SEC,*
   863 F.3d 507 (6th Cir. 2017) .................................................................15

*Tex. Office of Pub. Util. Counsel v. FCC,*
   265 F.3d 313 (5th Cir. 2001) ...........................................................48-49

*Transamerica Mortg. Advisors v. Lewis,*
   444 U.S. 11 (1979) ........................................................................5, 6, 52

*Travers v. Fed. Express Corp.,*
   8 F.4th 198 (3rd Cir. 2021) ...................................................................21

*United States v. Gomez,*
   960 F.3d 173 (5th Cir. 2020) .................................................................21

*United States v. O'Hagan,*
   521 U.S. 642 (1997) ..........................................................................28, 30

*Wagner v. FEC,*
   793 F.3d 1 (D.C. Cir. 2015) (en banc) .................................................30

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) .....................................................................31, 33

**Statutes**

Dodd-Frank Wall Street Reform and Consumer Protection Act,
   Pub. L. No. 111-203, 124 Stat. 1376 (2010) ..............................*passim*

5 U.S.C. 706(2)(A) .....................................................................................12

5 U.S.C. 706(2)(C) .....................................................................................12

5 U.S.C. 553(b) ...........................................................................................33

5 U.S.C. 553(c) ........................................................................................33

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.
    Section 4(g)(4)(A), 15 U.S.C. 78d(g)(4)(A)...........................................19
    Section 4(g)(4)(B), 15 U.S.C. 78d(g)(4)(B)...........................................19
    Section 4(g)(4)(C), 15 U.S.C. 78d(g)(4)(C)...........................................19
    Section 4(g)(4)(D), 15 U.S.C. 78d(g)(4)(D)...........................................19
    Section 4(g)(4)(E), 15 U.S.C. 78d(g)(4)(E)...........................................19
    Section 15D, 15 U.S.C. 78o-6 .................................................................25
    Section 15E, 15 U.S.C. 78o-7(h) ............................................................25

Investment Company Act of 1940, 15 U.S.C. 80a-1 et seq.
    Section 3(c)(1), 15 U.S.C. 80a-3(c)(1) .....................................................4
    Section 3(c)(7), 15 U.S.C. 80a-3(c)(7) .....................................................4
    Section 17(i), 15 U.S.C. 80a-17(i) ..........................................................52

Investment Advisers Act of 1940, 15 U.S.C. 80b-1, et seq.
    Section 202(a)(29), 15 U.S.C. 80b-2(a)(29) .............................................4
    Section 202(a)(30), 15 U.S.C. 80b-2(a)(30) ...........................................18
    Section 202(c), 15 U.S.C. 80b-2(c) .................................................. 44, 45
    Section 203(*l*), 15 U.S.C. 80b-3(*l*) .......................................................16
    Section 204(b), 15 U.S.C. 80b-4(b) ..........................................................6
    Section 204(b)(2), 15 U.S.C. 80b-4(b)(2).................................................20
    Section 204(b)(3)(F), 15 U.S.C. 80b-4(b)(3)(F) .................................. 6, 18
    Section 204(b)(3)(H), 15 U.S.C. 80b-4(b)(3)(H) .............................. 16, 18
    Section 204(b)(4), 15 U.S.C. 80b-4(b)(4).......................................7, 16, 18
    Section 204(b)(5), 15 U.S.C. 80b-4(b)(5).......................................7, 16, 18
    Section 204(b)(6), 15 U.S.C. 80b-4(b)(6).......................................7, 16, 18
    Section 206(4), 15 U.S.C. 80b-6(4)...................................................*passim*
    Section 211(h), 15 U.S.C. 80b-11(h) .................................................*passim*
    Section 211(h)(1), 15 U.S.C. 80b-11(h)(1) ........................................*passim*
    Section 211(h)(2), 15 U.S.C. 80b-11(h)(2) ........................................*passim*
    Section 213(a), 15 U.S.C. 80b-13(a) ..............................................3, 15, 37
    Section 215(a), 15 U.S.C. 80b-15(a) ......................................................52

**Commission Regulations**

Rule 204 under the Investment Advisers Act of 1940, 17 C.F.R. 275.204
    17 C.F.R. 275.204-2(a)(11)(i)(A)(2) ........................................................20
    17 C.F.R. 275.204-2(a)(15)(i)...................................................................20
    17 C.F.R. 275.204-2(a)(20) .......................................................................12

17 C.F.R. 275.204-2(a)(21) ...............................................................12
17 C.F.R. 275.204-2(a)(22) ...............................................................12
17 C.F.R. 275.204-2(a)(23) ...............................................................12
17 C.F.R. 275.204-2(a)(24) ...............................................................12

Rule 206 under the Investment Advisers Act of 1940, 17 C.F.R. 275.206
17 C.F.R. 275.206(4)-1(e) ...................................................................18
17 C.F.R. 275.206(4)-7(b) ..................................................................12
17 C.F.R. 275.206(4)-10.....................................................................11

Rule 211 under the Investment Advisers Act of 1940, 17 C.F.R. 275.211
17 C.F.R. 275.211(h)(1)-1 ..................................................................44
17 C.F.R. 275.211(h)(1)-2. ..........................................................10, 42
17 C.F.R. 275.211(h)(1)-2(b)(1)........................................................43
17 C.F.R. 275.211(h)(2)-1 ...........................................................10-11
17 C.F.R. 275.211(h)(2)-1(a)(1) ..................................................11, 41
17 C.F.R. 275.211(h)(2)-1(a)(2) ..................................................11, 41
17 C.F.R. 275.211(h)(2)-1(a)(3) ........................................................11
17 C.F.R. 275.211(h)(2)-1(a)(4) ........................................................11
17 C.F.R. 275.211(h)(2)-1(a)(5) ........................................................11
17 C.F.R. 275.211(h)(2)-2 ..................................................................12
17 C.F.R. 275.211(h)(2)-3(a)(1) ..................................................10, 39
17 C.F.R. 275.211(h)(2)-3(a)(2) ........................................................10
17 C.F.R. 275.211(h)(2)-3(b) ......................................................10, 39
17 C.F.R. 275.211(h)(2)-3(b)(1)........................................................40

## Commission Releases

*Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles,*
    72 Fed. Reg. 44756 (August 9, 2007).............................................25

*Commission Interpretation Regarding Standard of Conduct for Investment Advisers,*
    84 Fed. Reg. 33669 (July 12, 2019) ........................................ 51, 53

*Private Fund Advisers; Documentation of Registered Investment Adviser Compliance Reviews,*
    87 Fed. Reg. 16886 (Mar. 24, 2022)...................... 7, 8, 34, 35, 54

*Private Fund Advisers; Documentation of Registered Investment Adviser Compliance Reviews,*
    88 Fed. Reg. 63206 (Sept. 14, 2023) .......................................*passim*

*In the Matter of Cherokee Investment Partners, LLC and Cherokee Advisers, LLC*,
   IA Rel. No. 4258 (Nov. 5, 2015) ..................................................................37

## Other Authorities

*Black's Law Dictionary* (11th ed. 2019) ............................................................ 18, 23

6 Thomas L. Hazen, *The Law of Securities Regulation* (2023).................................. 6

*Merriam-Webster's Collegiate Dictionary* (10th ed. 2002) ...................................... 18

*Webster's New International Dictionary* (2d ed. 1952) ............................................ 28

S. Rep. No. 111-176 (2010).................................................................................16

## INTRODUCTION

The private-fund sector, which includes private-equity funds and hedge funds, has grown significantly in recent years and attracts investments not only from the largest sovereign-wealth funds and universities, but also from many private and public pension funds, smaller educational institutions, and non-profit organizations.  As investors have increasingly turned to private funds, their stakeholders—including millions of law-enforcement officers, firefighters, and teachers—are affected by the actions of private-fund advisers, which exercise broad discretion to manage the money contributed by investors to private funds.  Private-fund advisers drive private funds; they market and sell interests in the funds, negotiate terms with the funds' investors, choose the funds' investments, and charge fees for their work.

In Dodd-Frank, Congress overhauled the Investment Advisers Act of 1940, substantially increasing the Securities and Exchange Commission's oversight of private-fund advisers.  In the 13 years since—a period that coincides with significant growth in the private-fund sector—the Commission has observed problematic practices by private-fund advisers arising from conflicts of interest, insufficient transparency, and a lack of effective governance mechanisms.  Those practices, which have persisted despite the Commission's examination and enforcement efforts, create a risk of harm for private-fund investors and their stakeholders, particularly smaller investors with less bargaining power and less access to information.

The Commission, exercising both authority that Congress granted in Dodd-Frank, and its longstanding prophylactic antifraud authority, engaged in rulemaking to address these problems. The Commission adopted five new rules to protect investors of all sizes, facilitate capital formation, and increase efficiency in the sector. The final rules, which the Commission moderated significantly in response to comments on the proposed rules, concern the flow of information to investors, the manner in which advisers sell private-fund interests to investors, and the conflicts that can arise from how advisers earn compensation. The rules, only three of which petitioners discuss in their brief, require private-fund advisers to provide investors with more information about performance and fees; mitigate conflicts of interest; and disclose, obtain investor consent for, or limit certain activities that can harm investors. Far from "fundamentally alter[ing] the way private funds operate," Br. 2, or invest, the rules are a flexible and measured approach to resolve problems affecting investors and their stakeholders.

In addition to standing and venue issues that preclude this Court's review, petitioners' challenge fails on the merits. Congress authorized the Commission to adopt the rules. The public had a meaningful opportunity to engage with the rulemaking. And the Commission reasonably explained its decision to adopt the rules, reasonably assessed the rules' likely economic effects, and provided reasonable interpretations of the federal fiduciary duty imposed by the Advisers Act.

# COUNTERSTATEMENT OF JURISDICTION

The Commission issued the rules under the Investment Advisers Act of 1940 (Advisers Act).  R.63386.[1]  While petitioners timely filed a petition for review under Section 213(a) of the Advisers Act, 15 U.S.C. 80b-13(a), they have not demonstrated Article III standing, as discussed below.  *See infra* pp.15-16.

# COUNTERSTATEMENT OF THE ISSUES

1.    Whether petitioners have established standing and, consequently, whether venue is proper in this Court.

2.    Whether the Commission has authority to adopt the five new rules regarding private-fund advisers.

3.    Whether the Commission provided sufficient notice before adopting two rules that it modified after proposal.

4.    Whether the Commission reasonably explained its rational decision to adopt the three rules challenged under the Administrative Procedure Act.

5.    Whether the Commission reasonably considered the rules' likely economic effects.

---

[1] "R._____" refers to the page in the Federal Register publication of the adopting release.  *Private Fund Advisers; Documentation of Registered Investment Adviser Compliance Reviews*, 88 Fed. Reg. 63206 (Sep. 14, 2023).  The administrative record is cited as AR.[document]:[page].

6.      Whether the Commission's interpretations of the Advisers Act in the adopting release are reasonable.

## COUNTERSTATEMENT OF THE CASE

**A.      Congress authorized the Commission to regulate private-fund advisers.**

### 1.      Private-fund advisers play a key role in operating private funds.

The rules under review do not regulate private funds; they regulate private-fund advisers.  Private funds are investment vehicles that are excluded from the definition of "investment company" in the Investment Company Act of 1940 because they satisfy certain statutory requirements.  15 U.S.C. 80b-2(a)(29); *see id.* 80a-3(c)(1), (7).  There are many types of private funds, including private-equity funds, hedge funds, and venture-capital funds.  R.63208.

Private-fund advisers are the engines of private funds.  They typically have exclusive authority over the private fund's affairs, and private-fund officers (if any) are employees of the adviser.  R.63208, 63272.  A private-fund adviser drafts the fund's governing documents, markets the fund, negotiates with investors, manages investments, charges fees and expenses to the fund, and provides fund information to investors.  R.63208.  Private funds are commonly formed as partnerships; the adviser serves as a general partner (or managing partner) that controls the fund and investors serve as limited partners with little or no control over the fund.  R.63210.

While the client is the fund, the adviser's conduct significantly affects the fund's investors (*e.g.*, a pension fund) and those who indirectly invest in the fund (*e.g.*, firefighters receiving benefits from the pension fund). Private-fund investors pay management fees and expenses to the private-fund adviser, as well as other fees and expenses associated with the private fund and its investments. R.63208.

Private funds have attracted large investors, like the Abu Dhabi Investment Authority and Yale University, Br. 1, but many smaller investors, including state and local pension funds, have helped fuel the growth of the sector. R.63207-08; *see also* R.63208, 63210, 63305-06 (identifying "a trend of rising interest in private fund investments by smaller investors with less bargaining power," including pension funds seeking to address "underfunding problems"). As the number of private-fund investors has grown, public employees, religious organizations, and non-profit organizations are increasingly exposed to the successes and failures of private funds, and the "risks and harms imposed by private fund advisers on private funds." R.63209.

### 2. Congress significantly expanded regulatory oversight of private-fund advisers in 2010.

Congress enacted the Advisers Act "to deal with abuses that Congress had found to exist in the investment advisers industry." *Transamerica Mortg. Advisors v. Lewis*, 444 U.S. 11, 12-13 (1979). In the Advisers Act, Congress substituted "a philosophy of full disclosure for the philosophy of caveat emptor," and sought to

"eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *SEC v. Capital Gains Research Bur., Inc.*, 375 U.S. 180, 186, 191-92 (1963).

All advisers are subject to certain provisions of the Advisers Act, including its antifraud provisions and the federal fiduciary duty it imposes. *Transamerica*, 444 U.S. at 17, citing 15 U.S.C. 80b-6. Other provisions apply only to advisers that are registered (or must register) with the Commission. Before 2010, most private-fund advisers were exempt from registration, but the Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), imposed a "new regulatory scheme." 6 Thomas L. Hazen, Law of Securities Regulation § 21:6 (2023). Dodd-Frank eliminated this "private-adviser exemption," and most private-fund advisers became subject to the same oversight as other Commission-registered advisers. Dodd-Frank also added new provisions that apply to all advisers, including private-fund advisers.

Additionally, Dodd-Frank created a new reporting regime for private-fund advisers by adding Advisers Act Section 204(b), which requires private-fund advisers to maintain specified reports and records and provide them to the Commission. 15 U.S.C. 80b-4(b). For example, private-fund advisers must maintain records related to "side letters," by which "certain investors in a fund obtain more favorable rights or entitlements than other investors." *Id.* 80b-4(b)(3)(F).

Finally, Dodd-Frank granted the Commission additional rulemaking authority. Congress authorized the Commission to promulgate rules implementing the new reporting and recordkeeping requirements.  15 U.S.C. 80b-4(b)(4)–(6).  Dodd-Frank also added Section 211(h), which directs the Commission to "facilitate the provision of simple and clear disclosures to investors regarding the terms of their relationships with * * * investment advisers" and to "examine and, where appropriate, promulgate rules prohibiting or restricting certain sales practices, conflicts of interest, and compensation schemes for brokers, dealers, and investment advisers that the Commission deems contrary to the public interest and the protection of investors." *Id.* 80b-11(h).

### B.    The Commission adopted new rules for private-fund advisers.

#### 1.    The Commission proposed a set of rules, which it moderated in response to comments.

The Commission proposed five new rules regarding private-fund advisers (as well as a definitional rule) and two amendments to existing rules.  After a decade of experience overseeing, regulating, and collecting data on private-fund advisers, the Commission determined that "there is a need to enhance the regulation of private fund advisers to protect investors, promote more efficient capital markets, and encourage capital formation."  *Private Fund Advisers; Documentation of Registered Investment Adviser Compliance Reviews*, 87 Fed. Reg. 16886, 16889-90 (Mar. 24, 2022).  The proposed rules were intended "to protect those who directly or indirectly invest in

private funds by increasing visibility into certain practices, establishing requirements to address certain practices that have the potential to lead to investor harm, and prohibiting adviser activity that [the Commission] believe[s] is contrary to the public interest and the protection of investors." *Id.* at 16890. The Commission received and considered more than 350 comments, including those submitted after the close of the 78-day comment period. R.63207 n.3.

After making significant modifications to the proposed rules, including striking certain provisions, the Commission adopted the final rules on August 23, 2023. R.63390. While petitioners incorrectly refer to a "rule"—singular—the Commission adopted several new rules and amended existing rules—plural—in a single release.

### 2. The rules enhance transparency, reduce conflicts of interest, and protect investors.

The Commission moderated its proposal in response to comments, adopting rules that are "less restrictive and more flexible" than proposed, while still protecting investors. R.63209. Although petitioners discuss the *proposed* rules at length, Br. 10-17, the adopted rules control. The Commission adopted the rules pursuant to Advisers Act Sections 206(4) and 211(h), R.63386, based on its finding that "three primary factors" pose risks to investors, R.63209. The Commission stated that "lack of transparency, conflicts of interest, and lack of effective governance mechanisms"

contribute to "significant investor harm," including "advisers incorrectly, or improperly, charging fees and expenses to the private fund." *Id.*

The Commission explained the problems underlying each factor. Private-fund investments "are often opaque, and advisers do not frequently or consistently provide investors with sufficiently detailed information" to allow "even sophisticated investors" to "understand the fees and expenses they are paying, the risks they are assuming, and the performance they are achieving in return." R.63209-10. There are also "conflicts of interest commonly present in private fund adviser practices" that "can harm investors," such as when: advisers grant certain types of preferential treatment to entice specific investors, which augments advisers' fees but leaves other investors at a disadvantage; or advisers use their own valuation of a fund's assets to calculate their fees, which may harm investors by "diminishing the fund's returns." R.63210. Finally, because private-fund advisers are "typically not required to obtain the input or consent" of fund investors, private-fund governance does not prioritize "investor oversight" of advisers or their "conflicts of interest." *Id.*

The Commission substantiated these problems. It cited information gathered from private-fund advisers, including pursuant to Dodd-Frank's reporting requirements, enforcement actions, comment letters, including from private-fund investors, and other sources. *See infra* p.36 & nn.4-9. The Commission found that "problematic practices" had "persist[ed]" despite enforcement efforts, and it adopted the rules to protect fund clients and fund investors "by increasing visibility into

certain activities, curbing practices that lead to harm to funds and their investors, and restricting adviser activity that is contrary to the public interest and the protection of investors." R.63209.

Petitioners specifically address only three of the new rules: the quarterly-statement, preferential-treatment, and restricted-activities rules. The quarterly-statement rule requires registered private-fund advisers to provide investors with quarterly statements disclosing fund-level information about performance, adviser compensation, and other fund fees and expenses. 17 C.F.R. 275.211(h)(1)-2.

The preferential-treatment rule addresses private-fund advisers giving some private-fund investors better terms than others. The rule precludes an adviser from providing an investor with preferential redemption terms or preferential access to information regarding a fund's portfolio holdings if the adviser reasonably expects that doing so will have a material, negative effect on other fund investors. 17 C.F.R. 275.211(h)(2)-3(a)(1)-(2). There is an exception if the adviser offers the same terms to all fund investors (or, in the case of preferential redemption terms, the arrangement is required by law). *Id.* And a private-fund adviser cannot give an investor other types of preferential treatment unless the adviser discloses the preferential treatment to current and, in some cases, prospective, investors. *Id.* 275.211(h)(2)-3(b).

The restricted-activities rule prohibits private-fund advisers from engaging in specified activities but, in a change from the proposal, R.63212, provides exceptions based on disclosure to, and, in some cases, consent from, investors. 17 C.F.R.

10

275.211(h)(2)-1.  This rule covers five categories of activities, but petitioners mention

only two.  First, a private-fund adviser cannot charge a fund fees or expenses from a

government investigation of the adviser without investor consent.  *Id.* 275.211(h)(2)-

1(a)(1).[2]  And regardless of consent, a private-fund adviser cannot charge a fund fees

or expenses relating to a government investigation of the adviser that results in a

sanction for violating the Advisers Act.  *Id.*  Second, an adviser cannot charge a fund

for the adviser's regulatory, examination, or compliance fees or expenses unless it

discloses them to investors.  *Id.* 275.211(h)(2)-1(a)(2).  And in provisions petitioners

do not discuss, the restricted-activities rule prohibits advisers from (1) reducing a

contractual obligation to return performance-based compensation based on taxes

applicable to the adviser unless disclosed to investors, *id.* 275.211(h)(2)-1(a)(3); (2)

charging a fund fees related to a portfolio investment on a non-pro rata basis, unless

the allocation is fair and equitable and disclosed to investors, *id.* 275.211(h)(2)-1(a)(4);

or (3) borrowing money or taking a loan from a fund without disclosure to and

consent from investors, *id.* 275.211(h)(2)-1(a)(5).

Petitioners also do not discuss or challenge the other two new rules or the rule

amendments.  The audit rule requires registered private-fund advisers to cause the

private funds they advise to undergo audits.  17 C.F.R. 275.206(4)-10.  And the

---

[2] To avoid forcing contract renegotiations, the Commission provided "legacy status"
for aspects of the restricted-activities and preferential-treatment rules, which do not
apply to covered agreements entered into prior to the compliance date.  R.63292-93.

adviser-led secondaries rule requires registered private-fund advisers to provide independent fairness or valuation opinions—and disclose any relationship with the opinion provider—when offering investors the option to cash out or move their investments to a different fund advised by the same adviser. *Id.* 275.211(h)(2)-2. The Commission amended Advisers Act Rule 206(4)-7 to require all registered advisers to document their annual compliance review in writing. *Id.* 275.206(4)-7(b). And the Commission amended Advisers Act Rule 204-2 to require advisers to retain books and records related to the new rules. *Id.* 275.204-2(a)(20)–(24).

## STANDARD OF REVIEW

Under the Administrative Procedure Act (APA), a rule should be upheld unless the Commission exceeded its statutory authority or the rule is arbitrary and capricious. 5 U.S.C. 706(2)(A), (C). The Commission must "articulate a satisfactory explanation for its action," and this Court may not "substitute [its] judgment for that of the agency," but rather must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *All. for Fair Bd. Recruitment v. SEC*, 85 F.4th 226, 258 (5th Cir. 2023) (cleaned up).

## SUMMARY OF ARGUMENT

If this Court determines that petitioners have established standing and that venue is proper, it should deny the petition for review because petitioners have not demonstrated that the Commission acted beyond its authority or violated the APA in adopting flexible and moderate rules regulating private-fund advisers.

Congress authorized the Commission to adopt the new rules.  In Dodd-Frank, Congress expanded Commission oversight of private-fund advisers, including through augmented rulemaking authority.  The Commission properly adopted the rules pursuant to Advisers Act Section 211(h), which authorizes rules to facilitate disclosures to investors and to restrict or prohibit sales practices, conflicts of interest, and compensation schemes that threaten harm to investors.  And the Commission properly adopted the rules pursuant to Advisers Act Section 206(4), which authorizes prophylactic antifraud rules.  Petitioners' authority arguments ignore the statutory text, the structure of Dodd-Frank and the Advisers Act, and the Commission's reasons for exercising the authority that Congress gave it.

The Commission satisfied the APA's procedural requirements, and there is no logical outgrowth problem.  The public had fair notice because the Commission requested comment on the possibility of the changes to the restricted-activities and quarterly-statement rules that the Commission ultimately adopted.  Moreover, the Commission received comments, including from some petitioners, that addressed the types of modifications the Commission made.

The Commission also satisfied the APA's substantive requirements, providing a reasoned explanation for its response to existing issues concerning private-fund advisers.  The Commission provided evidence of the asymmetries and market failures that the rules are designed to solve.  And the Commission justified the three rule provisions that petitioners challenge: the disclosure/consent provisions of the

preferential-treatment rule balances investor choice and investor protection; the disclosure/consent provisions of the restricted-activities rule mitigates conflicts of interest; and the quarterly-statement rule provides investors with fund-level information that allows them to determine the fees and expenses that funds pay and the funds' performance, all of which affect what investors pay and what investors get for their money.

The Commission reasonably assessed the rules' likely economic effects in a robust economic analysis that petitioners largely disregard. In examining economic effects and the costs and benefits of the rules, the Commission properly considered the rules' effects on efficiency, competition, and capital formation; permissibly used predictive judgments and qualitative analysis, alongside quantitative analysis; described the rules' potential effects on small advisers; and reasonably examined existing regulations to define the economic baseline for evaluating the rules.

Finally, the Commission reasonably interpreted the Advisers Act in explaining why it did not adopt two proposed provisions. The Commission properly reaffirmed its earlier interpretation that the Advisers Act does not permit an adviser to waive its federal fiduciary duty. And the Commission reasonably interpreted that duty as precluding advisers from charging fees for services they do not reasonably expect to provide.

# ARGUMENT

## I.  Petitioners have not demonstrated standing, and thus have not shown that venue is proper in this Court.

Petitioners have not borne their "burden of establishing Article III standing," which, "similar to [what is] required at summary judgment," must be "supported by citations to specific facts in the record." *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 423 (5th Cir. 2020) (cleaned up).  As petitioners acknowledge, Br. 4, the only petitioner that "resides" in this circuit, 15 U.S.C. 80b-13(a), is the National Association of Private Fund Managers (NAPFM).

NAPFM asserts standing on behalf of purported private-fund adviser members.  Br. 3.  The Supreme Court requires those claiming associational standing "to identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).  That is true even for those who "seek only equitable relief."  Br. 4; *see Summers*, 555 U.S. at 493.

NAPFM's terse claim of standing, unsupported by evidence, is insufficient, and it has not shown its standing to challenge the rules.  *See Shrimpers*, 968 F.3d at 425 (on direct review of final agency action, "mere allegations rather than concrete evidence * * * falls short"); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204-05 (11th Cir. 2018) ("For reasons unknown to this Court, the Georgia party has not submitted an affidavit from a member."); *Tenn. Republican Party v. SEC*, 863 F.3d 507, 517 (6th Cir. 2017) (similar).

Without NAPFM, "this Circuit is clearly not the appropriate venue" because no other petitioner resides here. *Ga. Republican Party*, 888 F.3d at 1205. Therefore, this Court should transfer the petition to the D.C. Circuit, which is a proper venue for all other petitioners assuming they can demonstrate standing.

## II.     Congress authorized the Commission to adopt the rules.

The Commission acted within its statutory authority. While private-fund advisers have long been subject to the antifraud provisions of, and the federal fiduciary duty imposed by, the Advisers Act, Congress brought them more fully within the Commission's ambit in 2010 to fill a "serious regulatory gap." S. Rep. No. 111-176, at 38-39, 71-73 (2010). Dodd-Frank required most private-fund advisers to register with the Commission, subjected them to reporting, recordkeeping, and examination requirements, and added new provisions applicable to all investment advisers, including private-fund advisers. To implement these changes, Congress augmented the Commission's rulemaking power, including by authorizing the Commission to issue rules "for the protection of investors" concerning certain disclosures, sales practices, conflicts of interest, and compensation schemes. 15 U.S.C. 80b-11(h); *see also id.* 80b-3(*l*) (rules regarding registration exemptions); *id.* 80b-4(b)(3)(H), (b)(4)-(6) (rules implementing reporting and records requirements).

The Commission properly adopted the challenged rules pursuant to this new authority in Section 211(h), as well as preexisting prophylactic antifraud rulemaking authority in Section 206(4). While petitioners incorrectly assume that the Commission

seeks to alter the business model of private funds, Br. 2, 25-29, 30, 32, 27, the rules reflect moderate adjustments to how private-fund advisers operate.  Petitioners offer a myopic view of the statutes that empower the Commission to regulate private-fund advisers, failing to grapple with the text of Sections 211(h) and 206(4).

### A.    Congress authorized the Commission to adopt the rules pursuant to Section 211(h).

The term "investors" in Section 211(h) includes private-fund investors, contrary to petitioners' atextual reading, Br. 29-32.  And because the statutory terms in Section 211(h)—*e.g.*, "sales practices"—encompass the challenged rules, petitioners are incorrect that Section 211(h) does not authorize them, Br. 32-36.

### 1.    Section 211(h) covers private-fund advisers and investors.

Section 211(h) uses the word "investors" without modification or limitation, and the term includes private-fund investors.  "To determine the extent of the SEC's statutory authority," this Court "give[s] effect to the unambiguously expressed intent of Congress."  *Fair Bd. Recruitment*, 85 F.4th at 248 (cleaned up).  That starts "with the statutory text," and "statutory terms are generally interpreted in accordance with their ordinary meaning."  *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (cleaned up).

Congress authorized the Commission to "promulgate rules prohibiting or restricting certain sales practices, conflicts of interest, and compensation schemes" for investment advisers that the Commission deems contrary to "the protection of investors," 15 U.S.C. 80b-11(h)(2)—not for the protection of only "retail customers,"

"retail investors," or "clients," as petitioners claim. Similarly, Congress authorized the Commission to facilitate the provision of "disclosures to investors regarding the terms of their relationships" with advisers, 15 U.S.C. 80b-11(h)(1), not disclosures to a subset of "investors."

The term "investor" does not exclude private-fund investors. Congress did not define the term, and its plain meaning refers to someone who commits money "to earn a financial return," *Merriam-Webster's Collegiate Dictionary* (10th ed. 2002); *accord Black's Law Dictionary* (11th ed. 2019) ("A buyer of a security or other property who seeks to profit from it without exhausting the principal."), quoted in *Centerboard Secs. v. Benefuel*, 730 F. App'x. 179, 183 (5th Cir. 2018). When Congress and the Commission have used the word "investors," they have not limited it to retail investors, but rather have included investors in private funds. *E.g.*, 15 U.S.C. 80b-2(a)(30) (defining "foreign private adviser" in terms of the number of "investors in the United States in private funds"); *id.* 80b-4(b)(3)(F) (requiring adviser to maintain copies of side letters that benefit "investors in a [private] fund"); 17 C.F.R. 275.206(4)-1(e) (marketing rule's applicability to "investors in a private fund"). Similarly, Congress has employed the phrase "for the protection of investors" numerous times to authorize Commission rulemaking that specifically concerns private-fund advisers. *E.g.*, 15 U.S.C. 80b-4(b)(3)(H), (b)(4)-(6). Petitioners ignore the text and do not offer any plausible definition of "investors" that would exclude private-fund investors—indeed, their brief uses the word "investor" dozens of times to refer to private-fund investors.

Contrary to petitioners' view, Br. 30, the structure of Dodd-Frank only reinforces this natural reading of "investor."  Dodd-Frank Section 913, which added Section 211(h), demonstrates that Congress knew how to specify a subset of investors when it wanted.  Dodd-Frank § 913, 124 Stat. at 1824-30.  Congress defined the term "retail customers" in Section 913(a) and used it over 30 times throughout Sections 913(b)-(f).  The word "investor," however, does not appear in these subsections.

But then in the part of Section 913(g)(2) that added Section 211(h), Congress switched to "investors," and did not use "retail customers."  Even within Section 913(g), the juxtaposition is evident: part of Section 913(g)(2) authorized the Commission to create a conduct standard for advisers serving "retail customers," and defined the term again, but then used "investors" in the provisions at issue here.

In essence, petitioners rest their argument on the premise that when Congress wrote "investors" in Section 913(g)(2), it really meant "retail customers."  Br. 30-31.  But courts presume that Congress "says what it means and means what it says," *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496 (2022) (cleaned up), and when "Congress includes particular language in one section of a statute but omits it in another section of the same [a]ct, it is generally presumed that Congress acts intentionally."  *Sebelius*, 569 U.S. at 378 (cleaned up).  Congress could have narrowed its grant of rulemaking authority by using "retail" as a modifier in Section 211(h), but it did not.  *See* 15 U.S.C. 78d(g)(4)(A)-(E) (establishing an Investor Advocate and differentiating between "retail investors" and "investors" in describing its functions).

19

Petitioners similarly go nowhere by arguing that this natural reading of "investors" scrambles the lines between fund advisers, fund clients, and investors. Br. 25-29. Congress (and the Commission) have demonstrated their ability to distinguish between the relevant actors, such as when Congress deemed a private fund's records to be those of its adviser, 15 U.S.C 80b-4(b)(2), and when it precluded the Commission from defining "customer" or "client" to include private-fund investors for purposes of the antifraud prohibitions in Advisers Act Sections 206(1)-(2). Dodd-Frank § 913(g), 124 Stat. at 1828-29, adding 15 U.S.C. 80b-11(g); Dodd-Frank § 406, 124 Stat. at 1574, amending 15 U.S.C. 80b-11(a); *accord* 17 C.F.R. 275.204-2(a)(11)(i)(A)(2), (a)(15)(i) (distinguishing between client and investor disclosures).

A construction of "investors" that includes *all* investors does not somehow re-define private-fund investors to be "clients," as petitioners claim, and their reliance on a statutorily-superseded decision is misplaced. Br. 26, 27, 28, citing *Goldstein v. SEC*, 451 F.3d 873 (D.C. Cir. 2006). In *Goldstein*, the D.C. Circuit vacated a Commission rule that would have required advisers to count hedge-fund investors as "clients" for purposes of the registration exemption. 451 F.3d at 877. But the Commission is neither relying on a statute that uses the term "client" nor converting investors into "clients." And *Goldstein* is no longer relevant because Congress abolished the statute containing the reference to "client" that the court examined when Congress eliminated the private-adviser exemption.

Petitioners next contend that "investors" in Section 211(h) must refer to "retail customers" because Section 211(h) is titled "Other Matters." Br. 30-31. It is "well established," however, "that the heading of a section cannot limit the plain meaning of the text." *United States v. Gomez*, 960 F.3d 173, 178 (5th Cir. 2020) (cleaned up). And to the extent it is relevant, the heading differentiates between the parts of Dodd-Frank that use "retail customer" and those that use "investor"—"the word 'other' connotes existing besides, or distinct from, that already mentioned or implied." *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 489 (D.C. Cir. 2007) (cleaned up); *accord Travers v. Fed. Express Corp.*, 8 F.4th 198, 203 & n. 11 (3d Cir. 2021) (construing Congress's use of "other" to mean "something distinct or different" from "those first mentioned") (cleaned up). Thus, if it means anything, "Other Matters" means that Congress intended Section 211(h) to cover more than retail customers. While petitioners label Section 211(h) as a "random, ancillary provision," Br. 2, it does not have less meaning than other parts of the statute, which must be interpreted "so that no part will be * * * insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009).

Finally, petitioners argue, Br. 32, that if Section 211(h) concerned private funds, Congress would have located it in Title IV of Dodd-Frank, which removed the private-adviser exemption, not in Title IX. But unlike the provisions that Congress did locate in Title IV, Section 211(h) does not concern only private-fund advisers—it concerns all investment advisers. Indeed, other Dodd-Frank provisions concerning

investment advisers, including private-fund advisers, were located in Title IX. *See, e.g.,* Dodd-Frank §§ 911, 914, 915, 124 Stat. at 1822-24, 1830-32; *see also* R.63215 n.87.

Because the term "investors" unambiguously includes those who invest in private funds, this Court need not address whether the Commission's interpretation of that term is entitled to deference. But were it to reach that issue, it should "defer to [the Commission's] construction" because it is "reasonable." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 433 (5th Cir. 2021) (cleaned up).

### 2. The statutory terms in Section 211(h) cover the five new rules.

The five rules fit within either Section 211(h)(2), which covers the adviser-led secondaries, audit, preferential-treatment, and restricted-activities rules, or Section 211(h)(1), which covers the quarterly-statement rule. Petitioners address only three of the five rules—their brief does not mention the audit or secondaries rules—and their contentions that Section 211(h) does not apply to these three rules have no merit. Br. 32-36.

a.    Section 211(h)(2) authorizes the four rules that restrict "certain sales practices, conflicts of interest, and compensation schemes" for "investment advisers," including private-fund advisers.

"*Sales Practices*"—The preferential-treatment rule regulates the way in which private-fund advisers market and sell investments in private funds. *See* Br. 34 (referring to dictionary definitions of "sales" and "practice"). Petitioners do not

dispute that private-fund advisers "attract preferred, strategic, or large investors to invest by offering preferential terms as part of negotiating with those investors," R.63278, and they highlight the negotiations that precede an investment, Br. 49, which are types of sales practices. Instead, petitioners believe that "sales practices" refers to "the method" of selling something, not "the terms" of the sale. Br. 34 (cleaned up). Even if this were not a false distinction—*e.g.*, offering a discount is a well-established "method" of closing a deal—the rule *does* target sales "methods," namely efforts "to induce or solicit a person to invest" in a private fund, which can include "an adviser offering preferential terms to certain * * * investors to attract, or retain, their investment." R.63213.

*"Compensation Schemes"*—The adviser-led secondaries, audit, and restricted-activities rules all regulate the "plan" or "arrangement" by which private-fund advisers receive "[r]emuneration." *Black's Law Dictionary* (11th ed. 2019) (definitions of "scheme" and "compensation"). Advisers receive compensation as a result of adviser-led secondary transactions, R.63213; audits affect the valuation of assets upon which adviser fees are usually based, R.63250-52; and several restricted activities affect the ways in which advisers generate revenue or otherwise calculate their compensation, such as by passing certain fees and expenses on to funds, R.63213, 63262-71.

Petitioners claim that the Commission overstepped its bounds by trying to reach *all* compensation, but the rules are narrower. Br. 35. As support, petitioners

point to the Commission's finding that requiring investors to pay for the advisers' "regulatory or compliance fees" on top of management fees is a compensation scheme.  R.63264.  But requiring disclosure of such fees and expenses hardly amounts to requiring disclosure of "virtually any payment," Br. 35, and the Commission agreed that Congress's use of "certain" as a modifier means that Section 211(h) "does not apply to all * * * compensation schemes."  R.63216.

*Conflicts of Interest*"—All four rules target situations where the interests of the private-fund adviser may be adverse to the interests of the fund and its investors.  For instance, adviser-led secondary transactions create conflicts of interest "[w]hen advisers offer investors the choice between selling and exchanging their interests in the private fund for interests in another vehicle advised by the adviser" because the adviser profits from being on both sides of the transaction.  R.63213, 63257-58.  The audit rule addresses valuations of fund assets that can affect adviser fees, the preferential-treatment rule targets advisers' economic incentives to provide preferential terms to certain investors, and the restricted-activities rule addresses conflicts that arise when an adviser borrows from a private fund despite it not being in the best interest of the fund or seeks to recover fees and expenses that may diminish investor returns.  R.63213, 63262-71.

Petitioners incorrectly argue that Section 211(h)(2)'s reference to "conflicts of interest" is inapplicable because a conflict of interest can only arise in "a principal-agent relationship—*e.g.*, client-adviser."  Br. 35-36.  Under petitioners' theory, advisers

can advantage themselves over investors without consequence, even though general-partner advisers often owe state-law fiduciary duties to limited-partner investors. *Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*, 72 Fed. Reg. 44756, 44760 & n.41 (Aug. 9, 2007) (citing the Uniform Limited Partnership Act). Petitioners offer no legal support for this misguided theory, which conflicts with the common-sense notion that the interests of general partners (private-fund advisers) can—and do— conflict with the interests of limited partners (private-fund investors), such as when an adviser is on both sides of an adviser-led secondary transaction that can benefit an adviser to an investor's detriment.  R.63209-10.  Moreover, even if petitioners were correct that private-fund advisers and investors lack a typical principal-agent relationship, Congress frequently uses the term "conflict of interest" to describe a broader set of conflicts.  *E.g.*, 15 U.S.C. 78o-6 ("conflicts of interest" affecting securities analysts publishing research reports); 15 U.S.C. 78o-7(h) ("conflicts of interest" affecting credit-rating agencies).

Taking the three statutory terms together, petitioners incorrectly assert that Section 211(h)(2) addresses only "incentives for, or methods of, nudging investors into unsuitable transactions."  Br. 35.  This definition is unduly constrained; Congress used three separate phrases that have different (albeit related) meanings.  But even under their definition, petitioners fail to explain why it would not include a private-fund adviser pitching an adviser-led secondary transaction (sales practice) that overvalues an underlying asset in the transaction (conflict of interest), and

consequently receiving money from the transaction (compensation scheme).

R.63257-58.  Nor do they explain why, under their reading, Section 211(h)(2) would

not cover an adviser using a preferential redemption term to induce a "preferred,

strategic, or large investor[]" to invest (sales practice) even though the term puts other

investors at a disadvantage (conflict of interest) and generates more fees for the

adviser (compensation scheme).  R.63278.

b.    The Commission properly grounded the quarterly-statement rule in

Section 211(h)(1).  The requirement that advisers disclose to fund investors the terms

of their investments—fund fees, expenses, performance—is within the Commission's

power to facilitate the provision of "disclosures to investors regarding the terms of

their relationships with * * * investment advisers," 15 U.S.C. 80b-11(h)(1).  The rule

requires "the provision of simple and clear disclosures to private fund investors

regarding some of the most important and fundamental terms of their relationships

with investment advisers," namely what "fees and expenses those investors will pay

and what performance they receive for their private fund investments."  R.63213.

Petitioners challenge the Commission's authority because private-fund

investors are not the advisers' clients.  Br. 32-33.  But the term "relationships" is not

limited to adviser-client relationships.  The Commission has consistently regulated the

relationship between private-fund advisers and private-fund investors.  *E.g.*, 17 C.F.R.

275.206(4)-1 (concerning marketing to investors in a private fund); *id.* 275.206(4)-8

(prohibiting adviser misconduct with respect to investors in private funds).  And

26

petitioners do not dispute that private-fund investors and advisers are parties to funds' governing agreements; that investors negotiate the terms of their investments with advisers; or that advisers market, sell, and operate the funds. Petitioners highlight these "relationships" when they explain how investors negotiate investment terms with advisers and call advisers for information. *See, e.g.*, Br. 8, 49, 50, 58, 65. While a private-fund adviser may not owe federal fiduciary duties to a fund investor as it would to the fund client, the adviser and the investor still have a ongoing and significant financial relationship—the private-fund investor engages with the fund's advisor for the life cycle of the investment and relies entirely on the adviser for the success of the investment. *See* R.63210.

Petitioners also argue that performance and fee information are not relationship "terms." Br. 33. But Section 211(h)(1) "does not limit a 'term' of the relationship only to the provisions in a contract" signed by an advisory client. R.63222. Moreover, "fees and performance are essential to the relationship between" private-fund investors and advisers, *id.*, particularly because the adviser charges expenses to the fund and tracks performance. *See supra* pp.4-5; *see also* R.63229-30. "Performance is implicitly or explicitly part of the terms of many fund contracts"— especially when it determines compensation—and performance compensation terms "are often negotiated by the adviser and the investors and form the core economic term of their relationship." R.63222. Thus, the rule will allow "investors to better understand * * * the terms of their relationship with the adviser." *Id.*

**B.    Congress authorized the Commission to adopt the rules pursuant to Section 206(4).**

The Commission also had authority to adopt the new rules under Section 206(4). This antifraud provision bars advisers from engaging "in any act, practice, or course of business which is fraudulent, deceptive, or manipulative," and authorizes the Commission to "prescribe means reasonably designed to prevent[] such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative." 15 U.S.C. 80b-6(4). Section 206(4) grants prophylactic rulemaking authority—reasonably designed to *prevent* means reasonably designed "[t]o keep from happening," *Webster's New International Dictionary* (2d ed. 1952). Interpreting a nearly identical grant of authority, the Supreme Court held that the Commission may regulate acts that are "not themselves fraudulent" if the restriction is "reasonably designed to prevent" fraud or deception. *United States v. O'Hagan*, 521 U.S. 642, 673 (1997) (cleaned up).

Each of the new rules is a means reasonably designed to prevent fraudulent or deceptive acts, conduct, and/or courses of business. The Commission described the problems that justified each prophylactic rule. *See, e.g.*, R.63213-17, 63222-23, 63239, 63257, 63261, 63273, 63279, 63285. For instance, the quarterly-statement rule requires disclosures that will improve the ability of investors to "assess and monitor fees, expenses, and performance" and thus detect misconduct or conflicts, which "will decrease the likelihood that investors will be defrauded, deceived, or manipulated." R.63222; *see* R.63216 n.99, 63239. The Commission cited past enforcement actions

28

regarding undisclosed fees and noted, as an example, that when an adviser charges

investors a management fee and then also allocates a similar fee to the fund, without

disclosing the double-charging, there is an undisclosed conflict of interest that is

fraudulent or deceptive. R.63223.

The Commission similarly justified the four remaining rules under its Section

206(4) authority. As to the adviser-led secondaries and audit rules, the Commission

explained that when investors receive the benefit of a third-party check on valuation

and are aware of any conflicts of interest between the independent opinion provider

and the adviser, investors are less likely to be deceived by an adviser's conflicted

valuation. R.63257; *see* R.63216 n.99, 63261. And the Commission explained that the

restricted-activities and preferential-treatment rules "prevent advisers from engaging

in certain activities that could result in fraud and investor harm" absent

disclosure/consent. R.63216 n.99. Among other things, "[r]estricting the ability of an

adviser to borrow from a private fund client would help prevent fraud, deception, and

manipulation that can occur when an adviser engages in this practice," R.63273, and

"disclosure of significant governance rights provided to one investor * * * will guard

against other investors being misled about the terms of their investment and how

preferential treatment provided to certain, but not all, investors impacts those terms."

R.63285 n.871; *see* R.63279.

Petitioners do not, and cannot, dispute that Section 206(4) applies to private-

fund advisers or that its reach includes fraudulent conduct targeting investors in

private funds. *See, e.g.*, R.63217, citing 17 C.F.R. 275.206(4)-8. They rely instead on vague arguments that the rules do not fit under Section 206(4), but their two-paragraph response, Br. 36-37, ignores the statutory text and the bulk of what the Commission wrote in its release. For instance, petitioners contend that the Commission did not explain how the rules would prevent fraud, but the Commission offered a detailed discussion of the fraudulent, deceptive, and manipulative conduct targeted by the rules, and how those provisions will help to prevent such conduct. *See supra* pp.28-29.

Petitioners also argue that the Commission already polices fraud under existing laws, and the rules may "captur[e]" unspecified "legitimate practices." Br. 36. But the rules are not invalid just because some conduct may be prohibited by other securities laws. *Cf. Wagner v. FEC*, 793 F.3d 1, 15 (D.C. Cir. 2015) (en banc). A "prophylactic measure, because its mission is to prevent, typically encompasses more than the core activity prohibited." *O'Hagan*, 521 U.S. at 672–73. Thus, the Commission "has the latitude to adopt prophylactic rules to prevent potential problems before they arise." *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1143 (D.C. Cir. 2022) (cleaned up).

Finally, petitioners claim that that the rules are misdirected because, in petitioners' view, private-fund investors can protect themselves. Br. 37. But even sophisticated investors can be harmed given how private funds operate. *See, e.g.*, R.63224, 63323, 63327. Plus, private-fund investors come in many sizes; the sector's growth is partly attributable to an influx in funds from smaller institutional investors,

which have less access to information and less bargaining power. *See supra* p.5. And even then, increased investment is not an implicit endorsement of the status quo. *See, e.g.*, R.63297 (discussing private-fund investors' inability "to walk away from bad terms"). In light of the Commission's experience and evidence, including comments from private-fund investors, the Commission reasonably found that private-fund investors will benefit from the rules. *See supra* pp.28-29; AR.95 (Council of Institutional Investors on behalf of employee-benefit funds, state and local entities investing public assets, and foundations); AR.139 (Institutional Limited Partners Association on behalf of nearly 600 investors).[3]

## C. The major questions doctrine does not apply here.

Petitioners struggle to demonstrate that this an "extraordinary case[]" where the major questions doctrine applies because, in adopting these moderate rules, the Commission did not assert a "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). In terms of authority, Congress significantly expanded the regulation of private-fund advisers in Dodd-Frank. *Compare FDA v. Brown &*

---

[3] Petitioners err in asserting, Br. 36-37, that the Commission did not identify "fraud prevention" as an economic benefit of the rules. *See, e.g.*, R.63326-27 (explaining how the quarterly-statement rule will help investors determine "if adviser fees comply with the fund's governing agreements"), 63352, 63356 (explaining how the audit and adviser-led secondaries rules will benefit investors particularly "where there is broadly a higher risk of * * * fraud").

*Williamson Tobacco Corp.*, 529 U.S 120 (2000) (holding that Congress precluded the FDA from regulating tobacco). In contrast to the agencies in *Brown & Williamson* and *West Virginia*, the Commission has authorization "for the power it claims"—Congress included private-fund advisers and investors in Sections 211(h) and 206(4), which is "plain on the face of the [Advisers] Act." *Fair Bd. Recruitment*, 85 F.4th at 256, 258 (cleaned up); *see supra* pp.18-22, 29-30.

Petitioners mischaracterize the rules as "dramatically alter[ing] the regulatory regime of private funds." Br. 38 (cleaned up). The rules govern private-fund advisers, not private funds, and they are flexible disclosure and conduct requirements for advisers subject to Commission oversight, some of which already follow the rules as a matter of best practices. *See, e.g.*, R.63329, 63331, 63333, 63350. Petitioners point to the total amount of assets under management in the sector, Br. 37, but that is the wrong metric; the rules affect how private-fund advisers operate, but do not halt or limit the ability of private funds to exist or to invest in myriad enterprises. The Commission's assertion of regulatory authority here is "unremarkable"—the Commission has long required disclosures and regulated conflicts of interest by advisers—and, unlike a "ban[ on] tobacco products" or "a nationwide eviction moratorium," the Commission is not attempting to regulate "daily life across America." *Fair Bd. Recruitment*, 85 F.4th at 256-57 (cleaned up).

Petitioners have to dig over a hundred pages into the adopting release to unearth a supposed assertion of the Commission's "virtually unrestricted authority" to

restructure private funds.  Br. 37, citing R.63338.  But the Commission did not claim

such authority.  Rather, at the cited pages, the Commission discussed how specific

types of fees are handled by specific business models, how a change from proposal to

a disclosure requirement mitigated the effects of the rule, and how most advisers are

already "well-positioned to come into compliance with the final rule."  R.63338.

These details are not the stuff of the major questions doctrine, and requiring advisers

to disclose information to investors is hardly a "transformative expansion" of a

hitherto "unheralded power."  *West Virginia*, 142 S. Ct. at 2610 (cleaned up).

## III.    The Commission satisfied the APA's procedural requirements because the final rules are a logical outgrowth of the proposed rules.

The Commission provided the public with a meaningful opportunity to

participate in the rulemaking process.  Consistent with the APA, 5 U.S.C. 553(b)-(c),

the Commission proposed rules, received hundreds of comments, and revised the

proposed rules in response.  *See supra* pp.7-8; R.63211-13.  Petitioners claim that parts

of the restricted-activities and quarterly-statement rules were not logical outgrowths of

the proposed rules, Br. 39-42, but the record demonstrates otherwise.

A final rule must "be a logical outgrowth of the rule proposed," and the logical-

outgrowth issue is "one of fair notice."  *Long Island Care at Home, Ltd. v. Coke*, 551 U.S.

158, 174 (2007) (cleaned up).  A proposing release must "adequately frame the

subjects for discussion such that the affected party should have anticipated the

[Commission's] final course in light of the initial notice."  *Huawei Techs.*, 2 F.4th at 447

(cleaned up). That is "all the APA demands," and the Commission "need not specifically identify every precise proposal which [it] may ultimately adopt as a final rule." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989) (cleaned up). An agency's adoption of changes that respond to comments "underlines that the rule logically emerged from the rulemaking." *Huawei*, 2 F.4th at 449.

The record establishes that the disclosure/consent component of the final restricted-activities rule is a logical outgrowth of the proposed rule. At proposal, the Commission asked whether it should allow certain restricted activities, "[i]nstead of prohibiting" them, if the adviser provides "disclosure to investors in all relevant funds" or obtains investor consent. 87 Fed. Reg. at 16921; *see also id.* at 16928, 16959. Among other commenters, petitioner Alternative Investment Management Association Limited (AIMA) suggested a "disclosure and express consent model" rather than "prohibitions." AR.221:72-73; *accord* AR.218:10-11 (Investment Adviser Association); AR.224:12 (academics and former Commissioners/staff). Similarly, the Commission requested comment on whether it should allow funds to bear "fees and expenses if fully disclosed and consented to by the private fund investors." 87 Fed. Reg. at 16923. And again, AIMA and others responded that it would be appropriate for a private fund to bear them "as long as these expenses are fully disclosed." AR.221:74-75 (AIMA) (emphasis omitted); *accord* AR.163:73-74; AR.180:11 (additional comments). The Commission relied on such comments in adopting the rule, *e.g.*, R.63264 n.634, and when "changes reflected in the final rule were instigated by

industry comments," the final rule is a logical outgrowth of the proposal. *Chem. Mfrs.*
*Ass'n*, 870 F.2d at 203.

The final quarterly-statement rule was also procedurally proper. The
Commission asked at proposal whether it should require disclosure of "performance
measures *with* the impact of fund-level subscription facilities"—*i.e.*, certain types of
debt— or whether it should "require advisers to disclose performance with and
without the impact of subscription facilities." 87 Fed. Reg. at 16906. This provided
fair notice; petitioner American Investment Council and others commented that the
Commission should not require performance disclosure without the impact of fund-
level subscription facilities. AR.145:App'x ¶¶ 114-17; *accord* AR.139:10; AR.243:3
(additional comments). The Commission modified the proposal in response to these
comments and required performance disclosure with and without the impact of
subscription facilities to help investors better understand how these facilities affect
their returns, which demonstrates that no logical outgrowth issue exists.

## IV.    The Commission reasonably explained its decision to adopt the rules.

The Commission "reasonably considered the relevant issues and reasonably
explained [its] decision[s]." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158
(2021). That is "all the APA requires." *Huawei Techs.*, 2 F.4th at 452. Petitioners
claim that the Commission failed to identify the problem it was trying to solve and
that three of the rules are unnecessary or unduly burdensome, but petitioners fail to

carry their "burden of proving that the [the rules are] arbitrary and capricious." *Fair Bd. Recruitment*, 85 F.4th at 258 (cleaned up).

### A.    The Commission substantiated the problems that the rules are designed to solve.

In its "extensive experience in overseeing and regulating private fund advisers," bolstered by a decade of post-Dodd Frank reporting that improved its visibility into how private-fund advisers operate, the Commission observed that "lack of transparency, conflicts of interest, and lack of governance mechanisms" posed risks to investors that persisted "[d]espite [the Commission's] enforcement and examination efforts." R.63209. The Commission cited information collected from private-fund advisers;[4] examinations of private-fund advisers;[5] enforcement actions against advisers;[6] comments from private-fund investors;[7] academic literature;[8] and pension plan documents.[9] As examples, the Commission pointed to examinations and enforcement actions that identified problematic fee and expense allocations by

---

[4] *E.g.*, R.63209, 63302-22.

[5] *E.g.*, R.63226-27 & n.223, 63267 & n.666, 63281 & n.825, 63284 & n.859, 63289 & n.926.

[6] *E.g.*, R.63209 & nn. 26-31, 63212 & n.60, 63219 & n.146, 63222 & n.170, 63223 & nn.177-78, 63226 & nn.218-22, 63251-52 & n.492, 63267 & nn.666-68, 63273 & nn.732-34, 63275 & n.757, 63276 & n.779, 63277 & n.781, 63279 & nn.797-803.

[7] *E.g.*, R.63209 & n.25, 63210 & n.36, 63211 & nn.43-48, 63223 & nn.182-84, 63226 & n.208.

[8] E.g., R.63295, 63251-52 & n.492, 63299 & n.1033, 6330 & n.1046, 63364 & n.1762.

[9] *E.g.*, R.63297 n.1013.

private-fund advisers, *e.g.*, R.63209 & nn.26, 30, which were also highlighted by

private-fund investors, *e.g.*, R.63210 n.36; and academics, *e.g.*, R.63295

n.983. Similarly, the Commission cited examinations and enforcement actions

concerning problematic preferential treatment by private-fund advisers. *E.g.*, R.63212

n.60, 63281 n.825; *see also* 15 U.S.C. 80b-13(a) ("The findings of the Commission as to

the facts, if supported by substantial evidence, shall be conclusive.").

Petitioners ignore most of this large record, glibly asserting that the

Commission cited only "a few dozen examples of alleged wrongdoing." Br. 43. But a

few *dozen* examples *is* significant evidence, and those examples are only part of the

evidentiary record. *See, e.g.*, *Nasdaq Stock Mkt.*, 38 F.4th at 1142 (concluding that the

Commission properly relied on experience and comment letters in substantiating the

problem it sought to address). And even if the record were more limited, the

Commission need not force investors to "suffer the flood before building the levee."

*Id.* at 1143 (cleaned up).

Moreover, petitioners' effort to minimize the importance of the cited actions is

unpersuasive. They contend that settled actions are irrelevant, Br. 44-45, but

settlements reflect the Commission's findings that an adviser violated the securities

laws, and no precedent holds that an agency errs by considering settled actions. *See,*

*e.g.*, *In the Matter of Cherokee Investment Partners, LLC and Cherokee Advisers, LLC*, IA Rel.

No. 4258, at 2 (Nov. 5, 2015) (describing the Commission's findings). Petitioners

highlight one enforcement action cited in the release, which they describe as

irrelevant, Br. 45, but the Commission was describing how advisers have conflicts of interest when they allocate compliance costs to funds, and the Commission justifiably pointed to an action where an adviser misallocated other types of costs, breaching its duty to its client fund.  R.63264 & n.641, citing *In the Matter of NB Alternatives Advisers LLC*, IA Rel. No. 5079 (Dec. 17, 2018).[10]

Ultimately, petitioners deny the need for the rules based on their assertion that "the sharpest investors" invest in private funds.  Br. 46.  But simply identifying a few large investors overlooks that even those investors need information to make decisions, that their size does not immunize them from harm, and that many of the myriad smaller entities investing in private funds "lack experience with the complexity of private funds and the practices of their advisers," which produces bargaining and information asymmetries.  R.63301, 63305-06.

### B.     The Commission provided reasoned explanations for the three rules that petitioners challenge.

While petitioners misdescribe the rules' moderate adjustments as a "sea change," Br. 47, they limit their APA challenge to only three provisions—the preferential-treatment rule, the expenses provisions of the restricted-activities rule,

---

[10] Similarly, while petitioners claim that the Commission erred by citing examples of misconduct by unregistered advisers, Br. 45, registration status does not minimize the force of the example as showing a risk of investor harm.

and the quarterly-statement rule—thus forfeiting any such challenge to the other provisions. Br. 47-58. Petitioners' arguments lack merit.

### 1. The Commission reasonably explained its decision to adopt the preferential-treatment rule.

The restriction that petitioners challenge, Br. 47-51, covers only redemption and certain informational preferences that an adviser reasonably expects to have a material, negative effect on other fund investors. The Commission proposed to prohibit such preferences as "harmful to the fund and its investors," R.63281-82, which some private-fund investors supported, R.63277 & nn.787-89. But the Commission moderated its approach in response to other comments. It allowed such preferential treatment when offered to all fund investors, 17 C.F.R. 275.211(h)(2)-3(a)(1), to balance the "policy goals of protecting against potential fraud and deception and certain conflicts of interest, while preserving investor choice regarding liquidity and price." R.63282. Other preferential treatment is permitted if disclosed to investors. 17 C.F.R. 275.211(h)(2)-3(b).

Petitioners argue that some advisers will not rely on the exception, but petitioners' conjecture alone does not make the exception "illusory," Br. 48, or undermine the Commission's choice. Commenters, including some petitioners, supported giving investors a choice of various liquidity options and disclosing those options in fund documents. R.63281 & n.832. The Commission reasonably chose to ensure that investors have the ability to see the full menu of redemption and

informational rights offered to others if those preferences could have a material, negative effect on them. And, as the Commission noted, some investors may not prioritize obtaining preferential liquidity terms that are offered to them over other investment terms, such as lower fees. R.63281 n.833.

Petitioners also take issue with the disclosure requirement, claiming that it is infeasible because investors and advisers negotiate terms until the "final moments" before the deal closes. Br. 48-49. But petitioners overstate the effects of the rule, ignoring that investors already have an incentive to wait for the latest possible opportunity to close, R.63349-50. And while the Commission recognized that advanced disclosure could present timing issues, it balanced that concern against the need for investors to have transparency regarding preferential terms. R.63285-86. To ameliorate timing concerns, the rule limits advanced disclosures to material economic terms, which will limit the amount of information that advisers must disclose before investment. R.63286. Ensuring that investors understand important terms of their investment is critical, and the possibility of last-minute negotiations does not render advance notice infeasible.

Finally, petitioners claim that the rule would "bar * * * normal investor communications," but the "preferential treatment" at issue is not taking one investor's phone call before another's, as petitioners suggest. Br. 50. Rather, the disclosure requirement concerns the terms of the investment. *See* 17 C.F.R. 275.211(h)(2)-3(b)(1) (requiring that prospective investors receive advance notice, before

investment, of "any preferential treatment related to any material economic terms" provided to other investors).  It ensures that "investors learn whether other investors are receiving a better or different deal and whether any such arrangements pose potential conflicts of interest."  R.63286.  Contrary to petitioners' suggestion, Br. 50, the Commission was not silent; it addressed commenters but concluded that the rule was justified, particularly in light of the Commission's long-standing concerns about selective disclosure of information to investors.  R.63282-83.

### 2.    The Commission reasonably explained its adoption of disclosure and consent requirements for expenses.

The Commission reasonably adopted the provisions of the restricted-activities rule that (i) allow advisers to charge funds for the advisers' regulatory or compliance expenses only if they disclose the charges to investors and (ii) require an adviser to obtain investor consent before passing along expenses related to government investigations of the adviser or its related persons.  17 C.F.R. 275.211(h)(2)-1(a)(1)-(2).  The Commission proposed prohibiting such pass-through expenses entirely, but then changed course in response to comments, and adopted a disclosure/consent system.

Regarding the consent requirement for investigation expenses, petitioners' arguments only underscore the need for the rule.  Br. 52.  Investors "may have questions" about an investigation they are being asked to fund, and they may "request more information," *id.*, but that is a feature of the rule, not a bug.  If an adviser can force investors to pay for "an investigation related to its own misfeasance" without

41

investor consent, the adviser has "adverse incentives" to engage in misconduct and run up fees, knowing investors will foot the bill.  R.63270-71.

Petitioners also fail to uncover any issue regarding the disclosure process for regulatory compliance expenses.  Petitioners dislike that advisers must disclose "'each specific category of fee or expense.'"  Br. 53, quoting R.63263 n.630.  But investors may be "deceived if advisers describe such fees and expenses so generically as to conceal their true nature and extent," a point that petitioners do not dispute.  R.63264 & n.642.  Moreover, petitioners do not show why advisers cannot disclose each specific *category* of fee or expense that fund investors use to track performance and expenses.  Even if such disclosures are "not commonly used," that does not render them "unworkable."  Br. 53-54.

### 3.    The Commission reasonably explained its adoption of quarterly-reporting requirements.

The Commission acted reasonably in requiring registered advisers to provide investors with quarterly statements about performance, fees, and expenses.  17 C.F.R. 275.211(h)(1)-2.  Petitioners argue that advisers already provide disclosures to investors, Br. 54-55, but the Commission identified a "lack of transparency in * * * investment advisers' disclosure regarding private fund fees, expenses, and performance."  R.63211; *see supra* p.9.  The Commission based its finding partly on the views of commenters, including investors, who agreed that the rule "would provide increased transparency to private fund investors who may not currently

receive sufficiently detailed, comprehensible, or regular fee, expense, and performance information." R.63223 & nn.182-84.

Petitioners also contend that the rule will harm investors because it provides too much information. Br. 55. But the rule does not force disclosure of minutiae; investors will receive crucial information at the fund level that will allow them to evaluate their investments. *E.g.*, 17 C.F.R. 275.211(h)(1)-2(b)(1) (requiring disclosure of a "detailed accounting of all compensation, fees, and other amounts allocated or paid to the investment adviser" by the fund). And there is no indication that sophisticated private-fund investors will be overwhelmed by disclosures; commenters noted that many investors seek more transparency regarding this information. R.63311 & n.1188. Moreover, petitioners' argument that the quarterly-statement rule "deprive[s] investors of the tailored disclosures they actually want," Br. 56, is flawed because advisers can provide, and investors can request, additional information beyond that required by the rule. R.63334.

Petitioners' adviser-oriented arguments fare no better. Br. 56. The Commission did not ignore the quarterly-statement rule's impact on small advisers. Rather, the Commission declined to exempt such advisers because their investors should "receive sufficiently detailed, comprehensible, and regular information" regarding fund fees, expenses, and performance. R.63224-25. The Commission was justified in finding that a registered adviser's size should not determine whether an

investor should receive "the basic set of information that is generally necessary for private fund investors to evaluate accurately and confidently" their investments." *Id.*

Finally, it is not unreasonable to require advisers to disclose information about "related persons." Br. 56-57. Many advisers provide services to private funds through multiple legal entities and affiliated personnel, and the definition of "related person" is designed to capture all those individuals and entities that may incur expenses and charge fees. R.63228; *see* 17 C.F.R. 275.211(h)(1)-1 (defining "Related person"). While conflicts are heightened when an adviser controls a related person, compensation paid to any related persons can pose conflicts, and requiring disclosure of this information is "consistent" with existing obligations that already apply to private-fund advisers. R.63228.

## V.    The Commission reasonably considered the rules' likely economic effects.

The Commission satisfied its obligation under Section 202(c) of the Advisers Act to "consider, in addition to the protection of investors, whether the [rules] will promote efficiency, competition, and capital formation." 15 U.S.C. 80b-2(c). Over the course of 78 pages, the Commission addressed broad economic considerations, including market failures and information asymmetries affecting private-fund investors, R.63293-301, and established an economic baseline against which it measured the rules, R.63301-23. The Commission evaluated the costs and benefits of each rule, R.63323-58, summarized its findings with regard to efficiency, competition,

and capital formation, R.63358-64, and considered alternatives to the rules, R.63364-70. Petitioners do not engage with most of the Commission's analysis and offer scattershot arguments, Br. 66-72, that misapprehend both the Commission's statutory obligation and its reasoning.

A.    Petitioners' contention that the Commission did not consider efficiency, competition, and capital formation, Br. 66-67, simply pretends that a large portion of the release does not exist.  The Advisers Act requires the Commission to "consider" "whether the action will promote" three economic factors.  15 U.S.C. 80b-2(c).  The Commission did exactly that: it found that the rules will likely enhance efficiency and promote market integrity by providing more information to investors and reducing conflicts of interest, R.63358-60; that the rules will have pro-competitive effects, R.63360-61; and that the rules will facilitate capital formation by producing more efficient management of private funds and mitigating restricted activities that may deter investment, R. 63362-64; *see also* R.63209 ("The adopted rules will * * * promote[] efficiency, competition and capital formation.").  In erroneously arguing that the rules will "stifle" efficiency, competition, and capital formation, Br, 66-67, petitioners ignore the majority of the Commission's analysis where it assessed the economic implications in detail, and from numerous angles, including the considerations addressed in Section 202(c).  15 U.S.C. 80b-2(c).

As petitioners note, the Commission also discussed how the rules could have adverse consequences for the three statutory factors, as well as the ways in which

those effects may be mitigated. R.63358-64. For instance, petitioners focus on the analysis regarding small advisers, Br. 70-71, but they misstate the Commission's findings. The Commission explained that "enhanced transparency" may increase competition if more disclosure induces private-fund investors to consider "newer or smaller advisers" they would not have otherwise considered. R.63360. The Commission noted, however, that the costs of compliance may cause some smaller advisers to exit the market. R.63361. And the Commission further explained that any such impact would be "mitigated" for advisers who do not have to register because their assets under management do not cross the statutory threshold. *Id.* The Commission's recognition that the rules could have some negative effects is the hallmark of the mandated analysis, not evidence of its absence. *See Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105, 1114 (D.C. Cir. 2022) (declining to "re-weigh the technically complex trade-offs the Commission carefully considered").

B.     Petitioners also erroneously criticize the Commission's method of analysis, focusing on its use of qualitative analysis and conditional statements. Br. 68-70. To begin with, petitioners ignore the quantitative data upon which the Commission relied. *E.g.*, R.63302-06, 63316-22, 63352-54. Throughout its analysis, the Commission, "where feasible," provided "a quantified estimate of the economic effects." R.63293. For instance, the Commission quantified the frequency of private-fund audits in response to concerns that auditors would not be able to accommodate the new requirement, R.63316-22, and it evaluated data regarding the concentration of

law firms representing advisers and consultants representing investors to evaluate how their roles in the negotiation process can affect information and bargaining asymmetries between advisers and investors, R.63295-96.

While petitioners criticize the Commission for not balancing the benefits and costs with complete certainty, that is not the applicable legal standard.  Br. 66-67.  The Commission does not have to "conduct a rigorous, quantitative economic analysis unless the statute explicitly directs it to do so," which it does not.  *Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016) (cleaned up).  Moreover, petitioners' complaints ring hollow because Section 202(c) does not require the Commission "to undertake a quantitative analysis to determine a proposed rule's economic implications," even if "quantitative methods [are] feasible."  *Chamber of Com. v. SEC*, 85 F.4th 760, 773 (5th Cir. 2023).

Consistent with the APA, the Commission explained why it was "unable to quantify certain economic effects."  R.63293.  In some instances, the Commission lacked "information necessary to provide estimates or ranges of costs," and in other instances, "quantification would require numerous assumptions to forecast" the reaction to the rules, and how those reactions "would in turn affect the broader markets."  *Id.*  Petitioners fail to identify any feasible quantitative analysis suggested by commenters that the Commission did not consider, and "[i]t is within the [Commission's] discretion to determine the mode of analysis that most allows it to determine as best it can the economic implications of the rule it has proposed."

*Chamber of Com.*, 85 F.4th at 774 (cleaned up).  In arguing otherwise, petitioners cite the same precedents that this Court found do not restrict "the SEC's ability to rely on a qualitative analysis for its determination of economic impact." *Id.* at 773, citing *Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011), and *Chamber of Com. v. SEC*, 412 F.3d 133 (D.C. Cir. 2005).

The Commission did not ignore "already-existing data identified in comments," as petitioners claim.  Br. 68.  The only "data" that petitioners identify is a single industry analysis regarding the pass-through business model.  *Id.*, citing AR.182:App'x A, ¶ 58.  The Commission discussed the economic consequences of the rules for pass-through models and assessed comments on this subject, including the letter petitioners cite.  R.63307-08 & n.1143, 63337-38 & nn.1461-62.  Petitioners do not claim, much less show, that the study undercuts the Commission's analysis.  To the contrary, the final rules substantially allow funds to continue employing pass-through-expense models, and the Commission found that advisers to funds employing these models are already well-positioned to come into compliance with the rules without changing their business models.  R.63337-38.

In any event, the Commission need not "respond to every comment made," *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013), or to "every study," *Tex.*

*Office of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 328 n.7 (5th Cir. 2001).[11]  Rather, the

Commission must respond to those comments that "can be thought to challenge a

fundamental premise underlying the proposed agency decision," and the Commission

accomplished that task here.  *Chamber of Com*, 85 F.4th at 774 (cleaned up).

Petitioners also complain that the Commission's analysis included "conditional

statements."  Br. 68-69.  But the Commission's role is to "determine as best it can the

economic implications" of the rules it adopts, not reach a mathematical certainty

about the effects of the rules.  *Chamber of Comm. v. SEC*, 412 F.3d 133, 143 (D.C. Cir.

2005), cited at Br. 68.  Thus, the Commission can "conduct a general analysis based

on informed conjecture," *Nasdaq Stock Mkt.*, 34 F.4th at 1111 (cleaned up), and make

"a reasonable predictive judgment based on the evidence it ha[s]," *Prometheus Radio*,

141 S. Ct. at 1160.  Conditional statements are a necessary feature of predictive

analysis; "when an agency's decision is primarily predictive, [courts] require * * * that

the agency acknowledge factual uncertainties and identify the considerations it found

persuasive."  *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 536 (D.C. Cir. 2020) (cleaned up).

---

[11] Contrary to the arguments made by amicus Committee on Capital Markets
Regulation, the Commission did not ignore any evidence.  The Commission, for
instance, evaluated CCMR's submission, but found that it failed to consider
bargaining inefficiencies, and the Commission discussed the research on fees and
returns that CCMR cited.  *Compare* CCMR Br. 7, 12-16, 21-24 *with* R.63294-97, 63299-
300 & n.1046, 63312-15 & n.1204, 63327, 63332, 63361.

The Commission's recognition that the future holds some uncertainty does not support petitioners' conclusion that the Commission failed "'to hazard a guess' about the likely economic effects" of the rules.  Br. 68, quoting *Chamber*, 412 F.3d at 143. The Commission discussed the economic effects in depth, and the authority on which petitioners rely addresses circumstances in which an agency must express its view on "'which of * * * competing estimates * * * is correct.'"  *Chamber*, 412 F.3d at 143, quoting *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1221 (D.C. Cir. 2004).  But petitioners do not identify any "competing estimates" that the Commission failed to assess.

C.      Finally, petitioners argue that the Commission improperly failed to consider the potential economic impacts of "pending proposals."  Br. 71-72.  But there is no requirement that the Commission do so, and the only authority cited by petitioners, Br. 71, is inapposite.  *In Alliance for Hippocratic Medicine v. FDA*, 78 F.4th 210 (5th Cir. 2023), this Court faulted FDA for failing to consider preexisting changes to regulations, not proposed changes.  *Id.* at 246.  The Commission reasonably considered "existing regulatory requirements, including recently adopted rules, as part of its economic baseline."  R.63301; *see* R.63214 n.80, 63324.  But in considering the baseline—how "the world would look in the absence" of the rules—the Commission "typically does not include recently proposed actions, because doing so would improperly assume" their adoption.  R.63301 n.1073.  Petitioners offer no explanation

of why this is an unreasonable way to proceed or how the Commission could

meaningfully assess pending proposals that may never become law.

## VI.   The Commission reasonably interpreted the Advisers Act.

The Commission's interpretations of the Advisers Act are consistent with the

APA.  "An interpretive rule is one that clarifies, rather than creates, law," and it

advises "the public of the agency's construction of the statutes and rules which it

administers."  *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 240 (5th Cir. 2023)

(cleaned up).  Interpretive rules "do not have the force and effect of law."  *Shalala v.*

*Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995).  The adopting release interpreted the

Advisers Act as it pertains to advisers waiving liability and advisers charging fees for

unperformed services.  Petitioners fail to show that either interpretation is

unreasonable.

### A.   The Commission properly reaffirmed its interpretation that waivers of liability may violate the Advisers Act.

Instead of adopting a legislative rule to prohibit private-fund advisers from

limiting or eliminating their liability to the fund or its investors for certain adviser

misconduct, the Commission clarified its "views on how an adviser's fiduciary duty

applies to its private fund clients" and how the antifraud provision of the Advisers

Act applies to the "adviser's dealings with clients and fund investors."  R.63276.

Relying on a 2019 interpretive rule, 84 Fed. Reg. 33669 (Jul. 12, 2019), the

Commission reaffirmed that the legality of "hedge clauses"—*i.e.*, contractual

limitations on an adviser's liability—depends "on the particular facts and circumstances." R.63276. It then provided "examples, partly based on staff observations," of how the 2019 interpretation applies to specific situations, including when a contract purports to waive all of an adviser's fiduciary duties (or, specifically, an adviser's federal fiduciary duty), or when an adviser seeks reimbursement, indemnification, or exculpation for breaching its federal fiduciary duty, which effectively waives that duty in violation of the Advisers Act. R.63276-77.

Contrary to petitioners' misunderstanding, this interpretation is reasonable and consistent with the statute. Br. 61-62. To begin with, petitioners' belief that the Commission differentiated between private-fund advisers and "advisers to investment companies with retail customers" is incorrect. Br. 61. On its face, the interpretation applies to all advisers to private funds, mutual funds, and retail customers alike. R.63276-77.

The interpretation does not stray from the legislative path. Section 206 "establishes federal fiduciary standards to govern the conduct of investment advisers," *Transamerica*, 444 U.S. at 17 (cleaned up), and a violation of Section 206 may rest on a showing of negligence, *Robare Group, Ltd. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019). This federal fiduciary standard—and its component duties of care and loyalty— cannot be waived. 15 U.S.C. 80b-15(a). Petitioners cite, Br. 61, Section 17(i) of the Investment Company Act, 15 U.S.C. 80a-17(i), arguing that because it can be read to allow advisers to limit liability for negligence in contracts, the Commission is wrong to

impose what they view as a more onerous restriction on private-fund advisers. But Section 17(i) does not mention the federal fiduciary duty and does not allow what the Advisers Act prohibits; there is no support for the notion that Congress allowed waivers of the federal fiduciary duty.

The current interpretation and the 2019 interpretation are in accord. In 2019, the Commission stated that a hedge clause may violate the Advisers Act depending "on all of the surrounding facts and circumstances." 84 Fed. Reg. at 33762 n.31. In 2023, the Commission said the same thing: whether a hedge clause "would violate the Advisers Act's antifraud provisions will be determined based on the particular facts and circumstances." R.63276. The Commission then addressed particular facts and circumstances, namely provisions requiring reimbursement, indemnification, or exculpation for breach of fiduciary duty, that "would operate effectively as a waiver, which would be invalid under the [Advisers] Act." R.63277. Requiring a client to release an adviser from liability or shoulder the costs of an adviser's breach is the same thing as waiving that duty, and the Commission made clear in 2019 "that an adviser's federal fiduciary duty may not be waived." 84 Fed. Reg. at 33762 n.31, citing 15 U.S.C. 80b-15(a).

While there is no law requiring an agency to substantiate a specific problem before offering its interpretation of a statute, petitioners overlook what the Commission identified as the impetus for its interpretation. Br. 63-64. The Commission cited a settled action involving a hedge clause, an earlier comment

regarding increased use of hedge clauses, and a Commission staff alert identifying

hedge clauses as a compliance issue for private-fund advisers.  R.63276-77 & n.781.

While petitioners advert to supposed "heavy costs" of the interpretation, they cite a

single comment letter that was responding to the unadopted prohibition and that

agreed with the Commission that an "adviser's status as a fiduciary under the Advisers

Act is inviolate and cannot be subject to a blanket or general waiver."  AR.182:17.

**B.    The Commission reasonably interpreted fees for unperformed services as inconsistent with an adviser's fiduciary duty.**

As with waivers of liability, the interpretation regarding unperformed services

arose from a proposed prohibition.  The Commission proposed a legislative rule that

would have prohibited an adviser from charging fees for services it never expects to

provide.  87 Fed. Reg. at 16949.  The Commission declined to adopt this provision,

reasoning that such conduct is "already is inconsistent with the adviser's fiduciary

duty" because it often involves a misrepresentation regarding what the client is being

charged for and creates conflicts of interest.  R.63274-76.  It is difficult to understand

why petitioners believe that it is consistent with an adviser's fiduciary duty to charge

money and not expect to provide anything in return.

The Commission's interpretation is reasonable.  The Commission explained

why charging fees for services one does not expect to provide is deceptive,

inconsistent with an adviser's fiduciary duty, and a conflict of interest.  R.63274-76.

And the Commission cited 11 comment letters addressing fees for unperformed

services, R.63274 nn.744-48, and seven enforcement actions evidencing the problem of advisers improperly charging fees, R.63275 nn.757, 759.  Contrary to petitioners' understanding, Br. 65-66, such fees can harm investors by reducing the value of the investment, and diminishing the amount distributed to investors.  And because the adviser is conflicted—it receives the fees—it cannot consent on the fund's behalf.  R.63275.  Petitioners complain that the Commission is trying to prohibit monitoring fees, Br. 65, but the Commission expressly stated that if an adviser expects to provide monitoring services, the adviser can charge for them.  R.63275.

## VII.  The rules should not be vacated.

Petitioners offer no legitimate rationale for a complete vacatur of all the rules.  Br. 73-74.  Petitioners do not mention the audit or adviser-led secondaries rules, three of the five provisions of the restricted activities rule, or the two amended rules.  Even if this Court were to invalidate one rule—or a provision within a rule—there is no basis to set aside the remaining rules and provisions.  Under the APA, "courts may 'set aside' only the part of a rule found to be invalid," and it would "exceed the statutory scope of review for a court to set aside an entire rule where only a part is invalid," let alone to invalidate a separate rule simply because it was adopted in the same release. *Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C. Cir. 1994).

Severability also precludes vacatur.  *See Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990) ("[T]he presumption is always in favor of severability.").  In the release, the Commission indicated that it "would have adopted

the same disposition regarding the unchallenged portion if the challenged portion were subtracted," and the rules each "can function sensibly without the [other rules]." *Nasdaq Stock Mkt.*, 38 F.4th at 1144 (cleaned up).  The Commission treated each rule as distinct, stating that one provision's invalidity "shall not affect other provisions * * * that can be given effect without the invalid provision."  R.63293.  And each new rule would still properly regulate private-fund advisers if others fall.

## CONCLUSION

The petition should be transferred because petitioners lack standing.  But should the Court reach the merits, the petition should be denied.

Respectfully submitted,

MEGAN BARBERO
*General Counsel*

MICHAEL A. CONLEY
*Solicitor*

JEFFREY A. BERGER
*Assistant General Counsel*

*/s/ Ezekiel L. Hill*
EZEKIEL L. HILL
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202.551.7724 (Hill)
hillez@sec.gov

December 15, 2023

## CERTIFICATE OF SERVICE AND FILING

I certify that on December 15, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit through the Court's CM/ECF system. Service on counsel of record will be accomplished through the Court's CM/ECF system.

I further certify that this electronic filing is an exact copy of the paper document, that any privacy redactions have been made, and that this electronic filing was scanned for, and found to be free of, viruses.

/s/ Ezekiel L. Hill
Ezekiel L. Hill

Dated: December 15, 2023

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,976 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I further certify that the foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, Roman-style, 14-point typeface.

*/s/ Ezekiel L. Hill*
Ezekiel L. Hill

Dated: December 15, 2023