No. 23-60471

# United States Court of Appeals
# for the Fifth Circuit

———————————————

NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS; ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION, LIMITED; AMERICAN INVESTMENT COUNCIL; LOAN SYNDICATIONS AND TRADING ASSOCIATION; MANAGED FUNDS ASSOCIATION; and NATIONAL VENTURE CAPITAL ASSOCIATION,

*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

———————————————

On Petition for Review of an Order of the
Securities & Exchange Commission

## REPLY BRIEF FOR PETITIONERS

STEPHEN J. HAMMER
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201-2923
(214) 698-3100

EUGENE SCALIA
  *Counsel of Record*
HELGI C. WALKER
BRIAN A. RICHMAN
MAX E. SCHULMAN
ROBERT A. BATISTA
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioners*

January 22, 2024

**CERTIFICATE OF INTERESTED PERSONS**
No. 23-60471

NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS; ALTERNATIVE
INVESTMENT MANAGEMENT ASSOCIATION, LIMITED; AMERICAN
INVESTMENT COUNCIL; LOAN SYNDICATIONS AND TRADING ASSOCIATION;
MANAGED FUNDS ASSOCIATION; and NATIONAL VENTURE CAPITAL
ASSOCIATION,

*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

---

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Further, pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record certifies that there are no corporations that are parents of any Petitioner or that own stock in the Petitioners.

**A.    Petitioners**

National Association of Private Fund Managers

## CERTIFICATE OF INTERESTED PERSONS
### (continued)

Alternative Investment Management Association, Limited

American Investment Council

Loan Syndications and Trading Association

Managed Funds Association

National Venture Capital Association

Others who are not participants in this matter but may be financially interested in its outcome include members of the National Association of Private Fund Managers, Alternative Investment Management Association, Limited, American Investment Council, Loan Syndications and Trading Association, Managed Funds Association, and National Venture Capital Association.

**B.    Attorneys for Petitioners**

Eugene Scalia                              Stephen J. Hammer
Helgi C. Walker                            Gibson, Dunn & Crutcher LLP
Brian A. Richman                          2001 Ross Avenue, Suite 2100
Max E. Schulman                           Dallas, TX  75201-2923
Robert A. Batista
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306

**C.    Respondent**

Securities and Exchange Commission

## CERTIFICATE OF INTERESTED PERSONS
### (continued)

**D.    Attorneys for Respondent**

Megan Barbero, General Counsel
Michael A. Conley, Solicitor
Jeffrey Berger, Senior Litigation Counsel
Ezekiel L. Hill, Appellate Counsel
Securities and Exchange Commission
100 F Street, NE
Washington, D.C.  20549-1090


Dated:  January 22, 2024              Respectfully Submitted,

_/s/ Eugene Scalia_____

EUGENE SCALIA
*Counsel of Record for Petitioners*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..........................................i

TABLE OF AUTHORITIES .................................................................. vi

INTRODUCTION ................................................................................. 1

ARGUMENT ....................................................................................... 3

I.    Standing Is Clear. ...................................................................... 3

II.   The Commission Misreads Dodd-Frank and Other Statutory Law........................................................................................... 5

    A.    The Commission Effectively Concedes That Its Approach Contravenes the Statutory Framework Governing Private Funds.......................................................... 5

    B.    The Commission's Reading of Section 913 of Dodd-Frank and Section 206(4) of the Advisers Act Contravenes the Text of Multiple Provisions and Is Implausible. ................................................................. 9

        1.    The Commission's Reading of Section 913 Is Untenable. ........................................................... 9

        2.    The Rule Is Not Authorized by Section 206(4). .......... 15

    C.    The Commission's Takeover of the Private-Funds Industry Presents a Major Question. ................................... 19

III.  The Commission Essentially Admits It Deprived Petitioners of a Meaningful Opportunity to Comment. .................................... 20

IV.   The Commission Fails to Show That the Rule Is the Product of Reasoned Decisionmaking or Otherwise Lawful. ..................... 24

    A.    The Commission Cannot Explain Why It Undertook This Rulemaking. ................................................................. 24

    B.    The Commission's Defense of Three Key Provisions Does Not Withstand Scrutiny............................................... 27

    C.    The Interpretive Rules Are Baseless. ................................. 29

# TABLE OF CONTENTS
*(continued)* **Page**

V.   The Commission Cannot Save Its Flawed Economic Analysis.................................................................... 32

VI.   Vacatur Is Appropriate. ................................................ 35

**CONCLUSION** .......................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. FDA*,
  78 F.4th 210 (5th Cir. 2023) ................................................................ 34

*Alon Refin. Krotz Springs, Inc. v. EPA*,
  936 F.3d 628 (D.C. Cir. 2019) .............................................................. 4

*Am. Trucking Ass'ns v. FMCSA*,
  724 F.3d 243 (D.C. Cir. 2013) .............................................................. 3

*AMG Cap. Mgmt., LLC v. FTC*,
  593 U.S. 67 (2021) ................................................................................ 15

*Anderson v. Bean*,
  172 N.E. 647 (Mass. 1930) ................................................................... 31

*Ascendium Educ. Sols., Inc. v. Cardona*,
  78 F.4th 470 (D.C. Cir. 2023) .............................................................. 15

*Axon Enter., Inc. v. FTC*,
  598 U.S. 175 (2023) .............................................................................. 26

*Bus. Roundtable v. SEC*,
  905 F.2d 406 (D.C. Cir. 1990) .............................................................. 8

*Chamber of Com. v. SEC*,
  412 F.3d 133 (D.C. Cir. 2005) ................................................... 5, 33, 34

*Chamber of Com. v. SEC*,
  88 F.4th (5th Cir. 2023) ....................................................................... 35

*Chem. Mfrs. Ass'n v. EPA*,
  870 F.2d 177 (5th Cir. 1989) ............................................................... 22

*Chipser v. Kohlmeyer & Co.*,
  600 F.2d 1061 (5th Cir. 1979) ............................................................. 31

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Conn. Light & Power Co. v. NRC*,
   673 F.2d 525 (D.C. Cir. 1982) ............................................................. 22

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
   45 F.4th 846 (5th Cir. 2022) ............................................................... 35

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) ........................................................................ 16

*DiRienzo v. Lichtenstein*,
   2013 WL 5503034 (Del. Ch. Sept. 30, 2013) ..................................... 31

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018) ............................................................................ 10

*Everett v. Phillips*,
   43 N.E.2d 18 (N.Y. 1942) ................................................................... 31

*Fertilizer Inst. v. EPA*,
   935 F.2d 1303 (D.C. Cir. 1991) .......................................................... 22

*Flannery v. SEC*,
   810 F.3d 1 (1st Cir. 2015) ................................................................... 26

*Goldstein v. SEC*,
   451 F.3d 873 (D.C. Cir. 2006) ............................................. 6, 7, 8, 14, 16

*Lowe v. SEC*,
   472 U.S. 181 (1985) .............................................................................. 7

*Mock v. Garland*,
   75 F.4th 563 (5th Cir. 2023) .......................................................... 21, 23

*Motor Vehicle Mfrs. Ass'n, Inc. v.*
   *State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .................................................................... 17, 18, 31

*Nat'l Fuel Gas Supply Corp. v. FERC*,
   468 F.3d 831 (D.C. Cir. 2006) ...................................... 24, 25, 27, 33

# TABLE OF AUTHORITIES
*(continued)*                                                    **Page(s)**

*R.J. Reynolds Vapor Co. v. FDA*,
  65 F.4th 182 (5th Cir. 2023) ....................................................... 4

*Regents of Univ. of Cal. v. Credit Suisse First Bos.*,
  482 F.3d 372 (5th Cir. 2007) ..................................................... 16

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977) .................................................................. 9

*Schreiber v. Burlington N., Inc.*,
  472 U.S. 1 (1985) ..................................................................... 11

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ................................................... 17, 25, 27

*SEC v. Washington Inv. Network*,
  475 F.3d 392 (D.C. Cir. 2007) ................................................. 16

*Tex. Ass'n of Mfrs. v. CPSC*,
  989 F.3d 368 (5th Cir. 2021) .............................................. 21, 22

*Texas v. NRC*,
  78 F.4th 827 (5th Cir. 2023) ................................................. 3, 4

*Thibodeaux v. Grasso Prod. Mgmt. Inc.*,
  370 F.3d 486 (5th Cir. 2004) ................................................... 11

*Tilton v. SEC*,
  824 F.3d 276 (2d Cir. 2016) .................................................... 26

*United States v. O'Hagan*,
  521 U.S. 642 (1997) .......................................................... 15, 19

# TABLE OF AUTHORITIES
*(continued)*                                        <u>Page(s)</u>

**Statutes**

15 U.S.C.
§ 80a-13 ................................................................................ 21
§ 80a-15 .................................................................................. 5
§ 80a-17 ................................................................................ 30
§ 80a-18 .................................................................................. 6
§ 80a-22 .................................................................................. 6
§ 80a-29 .................................................................................. 5
§ 80b-2 .................................................................................... 8
§ 80b-5 .................................................................................. 14
§ 80b-6 ............................................................... 8, 9, 15, 16
§ 80b-11 ............................................................. 8, 9, 12, 13

Dodd-Frank Wall Street Reform and Consumer Protection
   Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010)
§ 404.......................................................................................9
§ 406.......................................................................................7
§ 502.....................................................................................13
§ 913 ........................................................................... 9, 10, 12

**Other Authorities**

*Asensio & Co.*,
   2012 WL 6642666 (SEC Dec. 20, 2012)............................... 27

*Black's Law Dictionary* (11th ed. 2019)................................... 13

California State Teachers' Retirement System, Annual
   Comprehensive Financial Report (2023),
   bit.ly/3SsxjNL..................................................................... 12

*Cherokee Inv. Partners*,
   Advisers Act Release No. 4258 (SEC Nov. 5, 2015),
   bit.ly/3MjTgLg.................................................................... 26

# TABLE OF AUTHORITIES
*(continued)*                                                                    **Page(s)**

*Commission Interpretation Regarding Standard of Conduct
    for Investment Advisers*,
    84 Fed. Reg. 33,669 (July 12, 2019) ...................................................... 31

Dissent of Comm'r Peirce (Aug. 23, 2023),
    bit.ly/44WDa0J.................................................................... 10, 11, 19, 27

Dissent of Comm'r Uyeda (July 26, 2023),
    bit.ly/3U5G95e ...................................................................................... 20

*Form CRS Relationship Summary*,
    84 Fed. Reg. 33,492 (July 12, 2019) ...................................................... 11

*Form PF*,
    87 Fed. Reg. 53,832 (Sept. 1, 2022)........................................................ 35

*Howard Perles*,
    2002 WL 507029 (SEC Apr. 4, 2002)...................................................... 27

*Private Fund Advisers; Documentation of Registered
    Investment Adviser Compliance Reviews*,
    88 Fed. Reg. 63,206 (Sept. 14, 2023) ......................................... *passim*

*Private Fund Advisers; Documentation of Registered
    Investment Adviser Compliance Reviews*,
    87 Fed. Reg. 16,886 (Mar. 24, 2022)...................................................... 21

Public School Teachers' Pension and Retirement Fund of
    Chicago, Popular Annual Financial Report (2022),
    bit.ly/48GM5pS ...................................................................................... 12

*Sabra Cap. Partners*,
    Advisers Act Release No. 5594 (SEC Sept. 25, 2020),
    bit.ly/4929z8G ........................................................................................ 17

*State Street Bank & Tr. Co.*,
    2010 WL 421154 (SEC Feb. 4, 2010)...................................................... 26

# TABLE OF AUTHORITIES
*(continued)* <u>**Page(s)**</u>

Statement of Comm'r Crenshaw (Aug. 23, 2023),
   bit.ly/3tU4bpf ........................................................................... 3

Unif. Ltd. P'ship Act (2013) ........................................................ 8

## INTRODUCTION

The Commission's brief and those of its *amici* show what the Rule is really about:  strengthening the bargaining position and investment terms of some of the world's most powerful financial institutions—all because the Commission is dissatisfied with the contract-based model Congress established for investing in private funds.

Not surprisingly, then, the Rule conflicts with the structure, text, and purpose of the governing statutes.  The Commission would have the Court believe that even though Congress expressly and with precision refined the Commission's "oversight of private-fund advisers" in Title IV of Dodd-Frank, Congress then—five titles and 250 pages away, in a section of the Act that does not even mention private funds—obliquely authorized the Commission to adopt sweeping regulations wholly unconnected to everything Congress had said about private funds in the title addressing them.

The Commission arrives at that improbable conclusion by distorting the statutory phrases on which it purports to rely and ignoring the statutory structure.  As the Commission acknowledges, Congress decided to regulate private-fund advisers in their capacity as advisers; this

1

advisory relationship exists only between the adviser and its client, the fund itself.  Yet the Commission unabashedly presses regulations not of the adviser-fund relationship but of the relationship between advisers and *investors in the fund*.  The Commission cites no authority for this intervention in the internal affairs of private funds, nor confronts Congress's express decision to *exempt* private funds from this type of regulation.

This deeply flawed Rule is the product of a flawed process.  The Commission admits that it had to "change course" from its original proposal, but in its haste, it failed to seek public input on those changes.  And while the Commission continues to claim that the Rule addresses a litany of supposed industry misconduct, it cannot substantiate that claim.  The few dozen enforcement actions it identifies over a thirty-year span are trivial in the scheme of things and, in reality, show that the Commission's existing authority is sufficient.  The Commission, likewise, cannot wave away its failure to even *attempt* to project the Rule's impact on competition and capital formation.  The agency's repeated assertion that "to the extent that predicate X obtains, then conclusion Y 'may' follow," is the opposite of genuine predictive judgments.  It is giving up.

The Rule—singular, as the Commissioners call it, *e.g.*, Statement of Comm'r Crenshaw (Aug. 23, 2023), bit.ly/3tU4bpf; *contra* SEC-Br.8—exceeds the Commission's statutory authority and is arbitrary and capricious and otherwise unlawful on numerous levels.  It must be vacated in full.

## ARGUMENT

## I.     Standing Is Clear.

Petitioners' standing is "self-evident." *Texas v. NRC*, 78 F.4th 827, 835 (5th Cir. 2023).  The Rule "regulate[s] private-fund advisers."  SEC-Br.4.  As "the administrative record" shows, *Texas*, 78 F.4th at 835; *see* Petrs.-Br.3—and the Commission has admitted—each Petitioner "represent[s] … [private-]fund adviser[s]," 88 Fed. Reg. 63,206, 63,293/3-63,294/1 & n.969 (Sept. 14, 2023) (AIMA); *see id.* at 63,294/1 & n.970 (AIMA, AIC, MFA); *id.* at 63,252/3 & n.502 (LSTA); AR.412 (NVCA); Reply-App'x-A22 (AIMA, NAPFM); *see also* AR.397, 400, 407, 449, 486 (listing members).  Petitioners have "an obvious interest in challenging [a] rulemaking that directly—and negatively—impacts [their] members." *Am. Trucking Ass'ns v. FMCSA*, 724 F.3d 243, 247 (D.C. Cir. 2013).

The Commission effectively concedes that standing exists, proposing (at 15-16) that the case be "transfer[red]" to the D.C. Circuit because standing is supposedly not evident only for the Petitioner that resides in this Circuit, the National Association of Private Fund Managers.

The Commission is triply wrong. *First*, this Court has already rejected the premise of the Commission's argument, holding that jurisdiction exists and venue is proper when at least one party has standing and another resides in the Circuit. *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 188 (5th Cir. 2023). As noted, the Commission has not contested the standing of the other Petitioners. *Second*, NAPFM's standing is self-evident. An organization need not identify particular members "when '*all* the members of [an] organization are affected'" because the challenged rule targets an entire "industry." *Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 665 (D.C. Cir. 2019). *Third*, since "standing was challenged," Petitioners are submitting evidence to remove any possible concern about standing. *Texas*, 78 F.4th at 835; *see* Reply-App'x-A9-19.

## II. The Commission Misreads Dodd-Frank and Other Statutory Law.

The Commission's brief is a master class in two ways agencies seek to seize power Congress never gave them:  ignore statutory structure and context, and read narrow terms as granting boundless authority.

### A. The Commission Effectively Concedes That Its Approach Contravenes the Statutory Framework Governing Private Funds.

The Commission makes two critical concessions that independently establish that the Rule contravenes the statutory framework governing private funds.  Petrs.-Br.25-29.

*First*, the Commission admits (at 4) that Congress "excluded" private funds from regulation under the Investment Company Act.  Thus, by congressional design, private funds are exempt from federal regulation of their internal "governance structure." *Chamber of Com. v. SEC*, 412 F.3d 133, 139 (D.C. Cir. 2005).  Unlike retail-oriented funds, private funds can freely negotiate fund agreements concerning investor access to periodic financial reports, *cf.* 15 U.S.C. § 80a-29(e), investor input on advisory fees chargeable to the fund, *cf. id.* § 80a-15(a)(1), and terms (including redemption terms) available to particular investors, *cf., e.g.*, *id.*

5

§§ 80a-22, 80a-18. The Rule, however, *reverses* Congress's decision to exempt private funds from such requirements. *See* SEC-Br.9-10, 42 (acknowledging the Rule overrides "private-fund governance" terms, including on investor access to financial reports, "input" on fees, and access to terms, such as "redemption terms").

The Commission engages in sleight of hand when it insists (at 4) that "[t]he rules under review do not regulate private funds; they regulate private-fund advisers." In truth, through the workaround of claiming that the obligation is imposed on the adviser, the Rule is legislating requirements comparable to (indeed, more stringent than) those from which private funds are exempted.

*Second*, the Commission concedes (at 16, 21-22) that Congress decided to regulate private-fund advisers in the Advisers Act as "investment advisers," and that this advisory relationship exists *only* between the adviser and the adviser's "client"—*i.e.*, "the fund" itself. SEC-Br.5; *see Goldstein v. SEC*, 451 F.3d 873, 880 (D.C. Cir. 2006). Again, the Rule undoes Congress's choice. Per congressional design, private-fund "advisers *do not owe a duty to private fund investors*." 88 Fed. Reg. at 63,217/2 (emphasis added); *accord* SEC-Br.27. Congress in Dodd-Frank forbade

6

the Commission from piercing the advisory relationship and treating "investor[s] in a private fund" as if *they*, rather than the fund itself, were the adviser's "client."  Pub. L. No. 111-203, § 406, 124 Stat. 1376, 1574 (2010).  Yet the Rule imposes *de facto* duties between advisers and investors anyway.

Piercing the advisory relationship, and for the explicit purpose of adjusting the "governance mechanisms" of private funds, 88 Fed. Reg. at 63,284/3, the Rule imposes obligations that, on their face, flow not between the adviser and its client (the fund), but between the adviser and fund *investors*.  *E.g.*, *id.* at 63,388/1-2 (§ 275.211(h)(1)-2) ("distribute … to … investors"); *id.* at 63,389/1 (§ 275.211(h)(2)-1) ("unless the investment adviser requests each investor … to consent"); *id.* at 63,389/3 (§ 275.211(h)(2)-3) ("except … [i]f the investment adviser has offered … to all other existing investors").

The Commission argues that its authority "is not limited to adviser-client relationships" (SEC-Br.26)—but "adviser-client relationship[s]" are the *only* relationships the Advisers Act regulates, *Goldstein*, 451 F.3d at 880 (quoting *Lowe v. SEC*, 472 U.S. 181, 210 (1985)).  In *every* provision

7

of that Act the Commission cites, Congress regulated the activity of "investment advisers," 15 U.S.C. §§ 80b-6(4), 80b-11(h)(1)-(2)—a term that, in the private-fund context, Congress defined in terms of "direct[]" provision of advice to clients, *id.* § 80b-2(a)(11); *see Goldstein*, 451 F.3d at 879-80. This "type of direct relationship" exists only between the adviser and the fund, *not* between private-fund advisers and investors. *Id.* at 880.

The Commission stresses (at 25) that private-fund advisers have *other* relationships with fund investors. But as the Commission recognizes (at 25, 27), those relationships arise under state ("not … federal") law. The investors are limited partners in the fund, and the relations between and among the partners and fund are governed by agreements negotiated within the parameters of state limited-partnership acts. SEC-Br.25; ILPA-Br.5-7; *see* Unif. Ltd. P'ship Act § 105(a)(1) (2013) (cited at SEC-Br.25) ("partnership agreement governs … relations among the partners as partners and between the partners and the limited partnership"). The Commission has no authority to meddle in the "internal affairs" of state-law partnerships. *Bus. Roundtable v. SEC*, 905 F.2d 406, 412 (D.C. Cir. 1990) ("except where federal law *expressly*" says otherwise, "investors commit their funds" to entities on "the understanding" that

8

state law "govern[s]" the entity's "internal affairs" (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977))). In fact, as discussed above, the Investment Company Act affirmatively prohibits such intermeddling.

### B. The Commission's Reading of Section 913 of Dodd-Frank and Section 206(4) of the Advisers Act Contravenes the Text of Multiple Provisions and Is Implausible.

Ignoring the statutory framework, the Commission focuses myopically on Section 913 of Dodd-Frank and Section 206(4) of the Advisers Act. SEC-Br.16-31. Both provisions, however, govern "investment advisers," 15 U.S.C. §§ 80b-6(4), 80b-11(h)(1)-(2), and as shown, the Rule regulates *outside* the advisory relationship. *Supra* pp.6-9. So the Commission's arguments are beside the point. They fail regardless.

### 1. The Commission's Reading of Section 913 Is Untenable.

The Commission does not dispute that Title IV of Dodd-Frank—the "Private Fund Investment Advisers Registration Act," 124 Stat. at 1570—provides the agency new powers regarding private-fund advisers, including, *e.g.*, the authority to *confidentially* review the "side letters," § 404, 124 Stat. at 1572, that, in this rulemaking, the Commission effectively bans by requiring they be *disclosed* and offered to everyone, Petrs.-

9

Br.47-48. Yet, tellingly the Commission does not base *any* part of the Rule on its Title IV authorities. Instead, it jumps five titles away to a provision (Section 913) that focuses entirely on retail investment and does not even *mention* private funds. Congress did not tuck into that provision "an elephant that tramples" the regulatory framework Congress designed for private funds. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 515-16 (2018).

    **a.** Section 913 has nothing to do with private funds. From stem to stern, its "undeniable focus" is the "standards of conduct as they apply to retail investors." Dissent of Comm'r Peirce (Aug. 23, 2023), bit.ly/44WDa0J ("Peirce"); *see* Reply-App'x-A1-7; *see also* Petrs.-Br.29-30; Securities-Law-Scholars-Br.6-8; Chamber-of-Commerce-Br.15-17. The section uses the term "retail customers" "over 30 times" (SEC-Br.19), and applies equally to "investment advisers" and "brokers" or "dealers," which makes sense in the retail context.

    The Commission has but one response: Congress used the word "investors" in the two sentences of Section 913 the Commission relies upon. SEC-Br.17. But Congress switched to "investors" in those sentences because they refer to interactions (*e.g.*, "sales practices") between

financial professionals and retail investors "*before* they become customers," Peirce, *supra* (emphasis added); as the Commission has recognized, switching from "customer" to "investor" indicates an intent to reach "an earlier stage" of the retail relationship, *Form CRS Relationship Summary*, 84 Fed. Reg. 33,492, 33,542/2 (July 12, 2019).  Congress did not switch to *investor* "in the middle of a provision otherwise devoted" to retail investment, *Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 12 (1985), to grant the Commission sweeping authority over private funds.

The heading ("Other Matters") confirms the point.  The Commission argues (at 21) that "other" indicates an intent to "cover more than retail customers."  But the subject covered must "have some resemblance to what preceded." *Thibodeaux v. Grasso Prod. Mgmt. Inc.*, 370 F.3d 486, 491 n.5 (5th Cir. 2004).  And what preceded was a discussion of the interaction between financial professionals and "retail customers."  The "similar" relationship—the one encompassed by "other," *id.*—is the relationship between financial professionals and "prospective" retail customers, 84 Fed. Reg. at 33,542/2-3, not between private-fund advisers and, say, the California State Teachers' Retirement System, a $300 billion

11

pension fund with over 1,200 staff, and one of the *amici* here, *see* Annual

Comprehensive Financial Report 7 (2023), bit.ly/3SsxjNL.[1]

**b.**     The Commission fails to justify the Rule under Section 913 for

other reasons, too.

*First*, the Commission argues (at 26-27) that the quarterly-report-

ing requirement fits under the Commission's authority to "facili-

tate … disclosures to investors regarding the terms of their relationships

with … investment advisers."  15 U.S.C. § 80b-11(h)(1).  But the Com-

mission does not argue that this provision grants rulemaking authority.

Chamber-of-Commerce-Br.18-19.  Even apart from the fact that the

Rule's disclosures pertain to the funds themselves, not to investors' "re-

lationships with … investment advisers," 15 U.S.C. § 80b-11(h)(1), the

---

[1] The Commission and its *amici* conflate the "indirect[]" beneficiaries in private funds, *e.g.*, "firefighters" (SEC-Br.5), with the sophisticated fiduciaries who serve them.  Those fiduciaries manage billions of dollars and include *amici* the Public School Teachers' Pension and Retirement Fund of Chicago ($11.8 billion, Popular Annual Financial Report 2 (2022), bit.ly/48GM5pS) and District of Columbia Retirement Board ($11.4 billion, AR.123:1).  To be sure, these investors do not have the market power to always get their way in negotiations—even monopolists lack that.  But nowhere does the Commission or its *amici* contend that private-fund investors lack the wherewithal to discern a good deal, a bad deal, and a deal they should walk away from because they lack information to judge it.

Commission has no serious response to the fact that details about past performance and fees are *not* "the terms," Petrs.-Br.33.  The Commission argues that the word "term" is not limited "to the provisions in a contract" (SEC-Br.27), but "contractual stipulation" is "term['s]" *definition*, *Black's Law Dictionary* (11th ed. 2019).

*Second*, the Commission argues that restrictions on side arrangements are justified under the Commission's authority to regulate "certain sales practices."  SEC-Br.22.  But the terms of an investment are not the method by which it is sold.  Petrs.-Br.34.  Indeed, other provisions in Dodd-Frank distinguish "sales practices" and contract terms, such as "rates" or "premiums."  § 502(a), 124 Stat. at 1584.

*Third*, the Commission claims (at 24) that requirements regarding side arrangements, adviser-led secondaries, audits, and restricted activities are justified under the Commission's authority to "prohibi[t] or restric[t]" "certain … compensation schemes" or "conflicts of interest."  15 U.S.C. § 80b-11(h)(2).  But the Commission reads each of those terms so expansively that each renders the others superfluous.  *Compare, e.g.*, SEC-Br.23 (the "restricted activities" are "compensation schemes"), *with id.* at 24 (they're also "conflicts of interest").  The Commission, moreover,

13

does not explain how charging a fee is a "compensation scheme"; Congress knows how to regulate fees if it wants to. *E.g.*, 15 U.S.C. § 80b-5(a). And the purported conflict between advisers and investors is not one the Advisers Act regulates. *Cf. Goldstein,* 451 F.3d at 881 (investment advisers "cannot" be made "the servants of two masters in this way").

The Commission's examples (at 25-26) of its supposedly reasonable reading of these statutory terms illustrate the boundless authority it is claiming. If an adviser receives money from any part of a business relationship, this can be regulated as a "sales practice" and "compensation scheme." Likewise, if an adviser benefits from a contract—thereby putting an investor "at a disadvantage"—there's a "conflict of interest" that authorizes the Commission to intrude. And since parties on opposite sides of the bargaining table will always have interests that conflict—and will always, as they do in this bargaining context, win some points and lose others—the Commission will always have authority, on its view, to regulate that bargaining relationship and even the terms of the bargain itself.

It is an absurd reading of Dodd-Frank that in a section dedicated to protecting retail investors, Congress handed the Commission the keys to

such wholesale regulation of private-fund investing by sophisticated investors.

### 2.     The Rule Is Not Authorized by Section 206(4).

The Commission's interpretation of Section 206(4) of the Advisers Act is equally unavailing.

**a.**     As the Commission acknowledges, in Title IV of Dodd-Frank Congress expressly "expanded Commission oversight of private-fund advisers." SEC-Br.13. The Commission cannot explain why Congress would have done that if Section 206(4), enacted decades earlier, *already* "allowed the Commission to" adopt sweeping regulations of private-fund advisers. *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 77 (2021).

**b.**     The Commission claims (at 28) compliance with Section 206(4)'s requirement that rules be "reasonably designed." But "reasonable" design requires a "sensible" fit within the "statutory context," *Ascendium Educ. Sols., Inc. v. Cardona*, 78 F.4th 470, 482 (D.C. Cir. 2023)—a "close nexus" with the "statutory aims," *United States v. O'Hagan*, 521 U.S. 642, 676 (1997).

That nexus is absent, *first*, because the Rule contravenes the statutory design on numerous levels. *Supra* pp.5-9; Petrs.-Br.25-29.

15

*Second*, the Rule lacks a "close nexus" to the terms of Section 206(4). The Commission's brief illustrates this, repeatedly conflating (at 28) a lack of "disclosure[]" with "fraud[]" or "decepti[on]." But a failure to disclose "'cannot be deceptive'" without a "'duty to disclose.'" Chamber-of-Commerce-Br.23 (quoting *Regents of Univ. of Cal. v. Credit Suisse First Bos.*, 482 F.3d 372, 386 (5th Cir. 2007)). And while private-fund advisers—as "investment advisers"—"*have* a duty to disclose," that duty, which arises under the Advisers Act, runs only to their "clients," *SEC v. Washington Inv. Network*, 475 F.3d 392, 404 (D.C. Cir. 2007) (emphasis added), *i.e.*, to "the fund[s]" themselves, "not … [to] the investors in the fund[s]," *Goldstein*, 451 F.3d at 880.

    **c.**    The briefs of the Commission and its *amici* confirm that the Rule's claim to be an anti-fraud measure is "pretext[ual]." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2574 (2019).

The Commission fails to explain *how* the Rule would prevent fraud (which the Commission never "define[s]," 15 U.S.C. § 80b-6(4)). Petrs.-Br.36; SIFMA-Br.21. The Commission observes that the Adopting Release "described the problems that justified" the Rule and "cited past en-

forcement actions." SEC-Br.28-29.  But that in no way articulates a "rational connection between" fraud and any particular requirement the Commission "cho[se]" to adopt.  *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  How, for instance, would requiring private-fund advisers to prepare periodic reports concerning their fees and performance "prevent," 88 Fed. Reg. at 63,223/1, false statements in periodic reports concerning their fees and performance, *see Sabra Cap. Partners, LLC*, Advisers Act Release No. 5594 (SEC Sept. 25, 2020), bit.ly/4929z8G (cited at 88 Fed. Reg. at 63,223/1 n.177)?  Does the Commission expect bad actors to "announce their fraud"?  SIFMA-Br.21.  The Commission does not say.

Its lawyers' speculation cannot cure that deficiency now.  *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943).  The Commission had a duty to address every "important aspect of the problem," *State Farm*, 463 U.S. at 43, including *how* the Rule would prevent fraud.  It never did.

The truth is the Rule is not about fraud prevention.  The Commission's *amici* cite other supposed benefits.  *E.g.*, ILPA-Br.24 ("[s]tripping out [the] inefficiency" of "haggling over terms"); Americans-for-Financial-Reform-Educ.-Fund-Br.16 (remedying "competitive imbalance").  And

when assessing the Rule's economic effects, the Commission itself predicted no fraud-prevention benefits *at all*. Petrs.-Br.36. It implicitly concedes as much with respect to the requirements regarding side arrangements and other restricted activities. *See* SEC-Br.31 n.3.

While the Commission tries to locate fraud-prevention findings with respect to other aspects of the Rule, that effort fails. SEC-Br.31 n.3. "[C]ompl[iance] with the fund's governing agreements" is not fraud. *Id.* Nor is disagreement over "discretion[ary]" valuations. 88 Fed. Reg. at 63,356/2. The Commission says there is "'broadly a higher risk of … fraud'" (SEC-Br.31 n.3), but it draws no connection between *the Rule* and that risk. There are, in fact, *other* methods of preventing fraud, but, tellingly, the Commission rejected them because, "[i]mportantly," for example, the audit requirement mandates distributing financial statements that "provid[e] investors with *additional information*" for "*better understand[ing] the private fund's operations and financial position*." 88 Fed. Reg. at 63,251/2 (emphases added). This is not about combatting fraud.

**d.** Citing *O'Hagan*, the Commission claims that a prophylactic rule can apply to "acts that are 'not themselves fraudulent.'" SEC-Br.28.

18

But in *O'Hagan*, the Commission showed the challenged rule was "reasonably designed" because, although *some* covered conduct could theoretically be lawful, most was unlawful.  521 U.S. at 676.  Further, "viewed in the context of th[at] case," prophylaxis was necessary because it was "almost impossible" to apply the Commission's existing enforcement authority.  *Id.* at 647, 675.

Here, the opposite is true.  Petrs.-Br.36-37.  The Commission can (and does) apply its existing enforcement authority.  Peirce, *supra*; Petrs.-Br.36.  And although *some* covered activity could theoretically involve fraud—the Commission claims to "ha[ve] observed" misconduct (SEC-Br.1) by about 0.05% of advisers (AR.119:13)—the Rule applies to "*all* private fund advisers," 88 Fed. Reg. at 63,218/3 (emphasis added).  A rule that disrupts the business of 1,999 law-abiding advisers to target one wrongdoer is not reasonably designed.

## C.    The Commission's Takeover of the Private-Funds Industry Presents a Major Question.

Although the Rule is itself a significant regulation with sweeping impacts on the private-funds industry, the Commission misses the larger point:  a major question is measured by the import of the agency's claimed

authority.  Petrs.-Br.37.  Here, that claimed authority is enormous.  Private-fund assets total $26 trillion.  *Id.*  And the Commission claims that it can regulate the "terms" (including the price) of all those investments (SEC-Br.22-23), along with any acts that "affect the valuation of assets" or cause "advisers [to] generate revenue" (SEC-Br.23).  That asserted authority, as well as the Rule itself, presents a major question.

## III.  The Commission Essentially Admits It Deprived Petitioners of a Meaningful Opportunity to Comment.

The Commission is in a hurry, seeking to finalize an enormous number of controversial rules in an ever-shorter period of time.  Petrs.-Br.12-13.  This has resulted in impossibly short comment periods, staff dragooned to assist with immensely consequential rules, *id.*, and—as here—an effort by the Commission to repair flawed proposed rules on the fly, without additional public comment, *see* Dissent of Comm'r Uyeda (July 26, 2023), bit.ly/3U5G95e (objecting to the "pattern" of releasing proposals with "outlandish components," only to "pivot[] to a different approach" without public input).

**A.**    The Commission acknowledges that, here, it "proposed" one set of regulations ("prohibiting" certain adviser activities "entirely"), "but then changed course in response to comments, and adopted" a different

set ("a disclosure/consent system").  SEC-Br.34, 41.[2]  The Commission

views this "significant modification[]" as a defense of its action (SEC-

Br.8); it is a confession.  When "comments indicate[]" that a proposed re-

quirement is "so unworkable" that it "need[s] to be replaced" with a dif-

ferent requirement, "the proper process [is] to start the notice-and-com-

ment process again."  *Mock v. Garland*, 75 F.4th 563, 584, 586 (5th

Cir. 2023).

The Commission skipped that step.  Its only excuse is that buried

in the Proposing Release's "over 900 questions" (AR.145 (Cover Letter at

2)) it asked whether, "[i]nstead of prohibiting these activities," the Com-

mission should set "certain governance and other conditions" (87 Fed.

Reg. 16,886 16,921/1 (Mar. 24, 2022); *see* SEC-Br.34).  That is not the fair

notice the APA demands.  The Commission failed to "describe" the dis-

close-and-consent regime with "reasonable specificity."  *Mock*, 75 F.4th

at 584.  It made no mention of the "agency's rationale for" adopting such

a regime.  *Tex. Ass'n of Mfrs. v. CPSC*, 989 F.3d 368, 382-83 (5th Cir.

---

[2] Shareholder-consent requirements are the type of Investment
Company Act governance constraint from which private funds are
exempted.  *See* 15 U.S.C. § 80a-13 (requiring shareholder consent).

21

2021).  And it failed to incorporate that regime into the proposal's economic analysis, leaving a critical assumption—that advisers could actually use the disclose-and-consent regime—untested by public comment. It would make a mockery of the APA if rulemaking participants had to prepare comments that addressed not only what the agency proposed, but every conceivable alternative presented by every stray question dropped into a voluminous Federal Register filing.  Commenters need not "play hunt the peanut." *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 530 (D.C. Cir. 1982).

The Commission points to a handful of comments (out of "more than 350," SEC-Br.8), but comments are "of little significance" when it comes to fair notice. *Tex. Ass'n of Mfrs.*, 989 F.3d at 383 n.121 (quoting *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991)).  The agency "'must *itself* provide notice of a regulatory proposal,'" and "'[h]aving failed to do so, it cannot bootstrap notice from … comment[s].'" *Fertilizer Inst.*, 935 F.2d at 1312.  That is why *Chemical Manufacturers Ass'n v. EPA* mentioned "industry comments" only *after* it had concluded that the agency itself provided the requisite notice.  870 F.2d 177, 203 (5th Cir. 1989);

22

*accord Mock*, 75 F.4th at 584 (agency "does not have carte blanche to establish a rule contrary to its original proposal simply because it receives suggestions to alter it during the comment period"). Regardless, none of the cited comments proposed an unworkable rule requiring consent for each specific investigation-related fee.

**B.**   The Commission admits that it significantly "changed course" (SEC-Br.41) by requiring illiquid funds to disclose *both* unlevered and levered returns (Petrs.-Br.41-42).

The Commission, again, argues there was fair notice of this change because the Commission "asked" a single question about it, and because comments discussed levered returns. SEC.Br.35. But, again, a single question, or another comment, does not suffice, *see supra* pp.21-23, particularly where the cited Petitioner comment did *not* suggest requiring disclosure of *both* unlevered and levered returns; it said only that levered returns provide accurate information. AR.145:App'x 1, ¶¶ 114-17.

23

## IV. The Commission Fails to Show That the Rule Is the Product of Reasoned Decisionmaking or Otherwise Lawful.

### A. The Commission Cannot Explain Why It Undertook This Rulemaking.

To justify the Rule, the Commission relied on assertions that it "ha[d] observed" "problematic practices" in the private-funds industry. 88 Fed. Reg. at 63,209/1, 63,220/2, 63,223/1, 63,224/1, 63,227/1, 63,229/2, 63,252/1, 63,267/3 n.666, 63,268/1, 63,279/2, 63,281/1 n.826, 63,284/2, 63,289/3 & n.926, 63,300/1, 63,307/2, 63,308/3, 63,309/1-63,310/1, 63,322/1, 63,342/3. The Commission's brief doubles down on that claim. SEC-Br.1, 36-37. But the Commission still has not substantiated the alleged "record of abuse," *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (Kavanaugh, J.), an especially difficult showing in a market that investors are flocking to and where investor returns are *rising*, Comm.-on-Capital-Mkts.-Regulation-Br.14.

The Commission cites dozens of Federal-Register pages. But it nowhere explains how "this large record" (SEC-Br.37)—consisting mainly of general background information (at 36 & nn.4, 9), "academic" musings (at 36 & n.8), and investors' wish-list comments (at 36 n.7)—substanti-

24

ates its assertion that "*the Commission* has observed problematic practices by private-fund advisers" (at 1 (emphasis added)), the ground on which the Commission relied, and on which the Rule must be reviewed, *Nat'l Fuel*, 468 F.3d at 839-40 (citing *Chenery*, 318 U.S. at 95).

The Commission cites "enforcement actions" emerging from "examinations," and asserts (at 36-37) that "'a few dozen'" of these actions "*is* significant evidence" of a real problem. But the Commission never addresses the point that—in the words of a former Commissioner, now Stanford Law School professor—case counts are "meaningless" without context. AR.119:12. Even assuming all SEC enforcement actions are meritorious, the examples cited in the Proposing Release represent less than 5.33 millionths of the industry's assets under management, and consume 17 one-hundredths of one percent of the Commission's enforcement docket. *Id.* at 14. The Commission does not explain how this evidences a real problem, as opposed to industry's compliance and the Commission's ability to deter bad actors under existing authority. Petrs.-Br.43. Indeed, the Commission concedes, "investigations of advisers … are uncommon." 88 Fed. Reg. at 63,272/1.

25

The enforcement actions are not evidence of anything anyway. The actions were "settled," without admissions of liability. SEC-Br.37. Defendants often settle non-meritorious cases to avoid "betting the farm" in the Commission's (unconstitutional) administrative proceedings. *Tilton v. SEC*, 824 F.3d 276, 298 n.5 (2d Cir. 2016) (Droney, J., dissenting); *see Axon Enter., Inc. v. FTC*, 598 U.S. 175, 216 & n.4 (2023) (Gorsuch, J., concurring in the judgment) (discussing this "regulatory extortion"). Compare *State Street Bank & Tr. Co.*, 2010 WL 421154, at *10 (SEC Feb. 4, 2010) (announcing settlement for "misleading" communications), with the First Circuit's ruling that the exact communications were "not misleading," *Flannery v. SEC*, 810 F.3d 1, 12 (1st Cir. 2015).

The Commission nonetheless touts (at 37) the settlements as Commission "findings," but even the settlements say their "find[ings]" are "[s]olely for the purpose of" settlement, *Cherokee Inv. Partners*, Advisers Act Release No. 4258, at 1, 2 n.1 (SEC Nov. 5, 2015), bit.ly/3MjTgLg (cited at SEC-Br.37). Disregarding this limitation, the Commission declares that "no precedent holds that an agency errs by considering settled actions." SEC-Br.37. But under Commission precedent, when a settlement order states it is "solely for the purpose of the respective proceeding," that

settlement "should not … be[] considered" for a *different* purpose. *Howard Perles*, 2002 WL 507029, at *10 & n.40 (SEC Apr. 4, 2002); *accord Asensio & Co.*, 2012 WL 6642666, at *5 n.25 (SEC Dec. 20, 2012) ("settlement may not be considered").

Shifting ground, the Commission speculates that the Rule could be justified by the "potential for abuse." *Nat'l Fuel*, 468 F.3d at 841. But Commission action must be justified on the grounds the Commission cited—not the grounds it might have given. *Chenery*, 318 U.S. at 95. The Commission "did not seek to justify the [Rule] based *solely* on [a] theoretical danger," *Nat'l Fuel*, 468 F.3d at 839. It "claimed [a] record of abuse." *Id.* Without evidence of that record, the Rule "cannot [be] up[held]." *Id.* at 839-40.

## B. The Commission's Defense of Three Key Provisions Does Not Withstand Scrutiny.

*1. Side Arrangements.* The Commission acknowledges (at 39) that it would not have been appropriate to prohibit side arrangements, where investors in a fund negotiate different rights than other investors. But the Commission did so anyway. It has no response to the fact that "[c]onditioning preferential rights on offering them to everyone" amounts to "a ban on offering preferential rights." Peirce, *supra*.

27

Further, though the Commission acknowledges (at 40) "timing" concerns raised by commenters, it did not meaningfully address those concerns in the Rule. Commenters explained that because side arrangements are negotiated until the moment of closing, it would be infeasible to alert each investor to arrangements negotiated by every other investor. Petrs.-Br.48-49. The Commission says (at 40) it "balanced that concern against" investors' need for the information. But it is not reasoned decisionmaking to acknowledge that something cannot be done, but to order it anyway because the (unachievable) result would be beneficial.

**2. *Pass-Through Expenses.*** The Commission, again, acknowledges (at 39) that its proposed prohibition on passing through certain expenses was unwarranted. But, again, it imposed a *de facto* prohibition anyway. On investigatory expenses, for example, the Commission concedes (at 41) that investors will "have questions" and "request more information" about each investigatory expense the adviser seeks reimbursement for. But as Petitioners explained (at 52-53), advisers will not subject themselves to that, nor run the risk that consent for reimbursement will be denied. Instead, advisers will stop passing through investigatory expenses and will raise management fees (Petrs.-Br.52-53), the

28

exact result the Commission admitted would harm investors, 88 Fed. Reg. at 63,271/3.

Moreover, the premise of the Commission's prohibition is nonsensical. No one who anticipates being investigated and facing potentially crippling fines (and irreparable reputational damage) has an "incentive[]" to "engage in misconduct" because "investors will foot the [legal] bill." SEC-Br.42.

***3. Quarterly Statements.*** The Commission does not dispute (at 43) that private-fund investors *already* receive tailored disclosures regarding their funds. But in denying that its one-size-fits-all reporting requirement will crowd out and displace the existing tailored disclosures, the Commission contradicts a premise of the Rule. The Commission says (at 43) that, even with the new reporting requirement, private-fund investors will still be able to negotiate the bespoke reporting arrangements they value. But, if that is true, the Commission cannot explain why its quarterly-reporting mandate is needed in the first place.

### C.    The Interpretive Rules Are Baseless.

In response to the backlash against two of its proposed prohibitions, the Commission sought to ban the targeted activities under the guise of

"[i]nterpretive rules" slipped into the Adopting Release.  SEC-Br.51.  The Commission's brief confirms that each rule is based on a false premise. Both should be vacated.  Petrs.-Br.58-66.

1.     It is a hallmark of the Rule's overreach that the Commission seeks to restrict private-fund advisers from obtaining limitations on liability for negligence, even though those limitations are permitted—under Section 17 of the Investment Company Act, 15 U.S.C. § 80a-17(i)—for advisers to mutual funds and other, more highly regulated retail-oriented investment vehicles.  The Commission cannot explain how a "congressionally permitted practice for mutual-fund advisers" can "become fraudulent when followed by private-fund advisers."  Petrs.-Br.62.

The Commission's brief grudgingly acknowledges (at 52-53) that Section 17 "can be read" (as in, *is* read (*see* AR.145:35-36 & n.181)) "to allow advisers to limit liability for negligence in contracts" with mutual funds serving retail customers.  But, it cryptically argues (at 53), Section 17 "does not allow what the Advisers Act prohibits."  That circular, citation-free assertion is merely the SEC's litigators talking—it is not

30

what the Commission said in adopting the Rule.  As with other "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, the Commission ignored it.

More fundamentally, the Commission errs in claiming that indemnification by the fund for certain negligent conduct is "the same thing" as an impermissible waiver of an adviser's fiduciary duty.  SEC-Br.53.  In truth, as the Commission acknowledged in 2019, private-fund advisers "may" (like everyone else) "shape[]" their fiduciary duty "by agreement." *Commission Interpretation Regarding Standard of Conduct for Investment Advisers*, 84 Fed. Reg. 33,669, 33,672/2 n.31 (July 12, 2019); *accord id.* at 33,671/3.  The freedom to "modif[y]" or "[]define[]" the fiduciary relationship, *Chipser v. Kohlmeyer & Co.*, 600 F.2d 1061, 1066-67 (5th Cir. 1979), including through a limitation on liability, predates the Advisers Act, *e.g.*, *Everett v. Phillips*, 43 N.E.2d 18, 22 (N.Y. 1942); *Anderson v. Bean*, 172 N.E. 647, 653-54 (Mass. 1930), and is widely recognized today, *e.g.*, *DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *15 (Del. Ch. Sept. 30, 2013).

**2.**    In defending its prohibition on fees for so-called "unperformed services," the Commission posits that advisers "charge money and [do]

31

not … provide anything in return." SEC-Br.54. That continues to be "a mischaracterization." AR.176:5. As commenters explained without contradiction, some advisers charge fees for monitoring the fund's investments. AR.145:App'x 1, ¶¶ 58-59. The fee is negotiated in advance, and is usually paid "over time," *id.* ¶ 61, with a caveat: if the fund exits an investment early, payment for the entire fee is accelerated, *id.* ¶ 62; Petrs.-Br.15-16, 64. "It is difficult to understand why [the Commission] believe[s]" it is "deceptive" (SEC-Br.54) for investors to "enter[] into [fee] arrangements" in arm's length transactions (88 Fed. Reg. at 63,307/2), and the Commission offers no explanation, other than *ipse dixit*.

## V.    The Commission Cannot Save Its Flawed Economic Analysis.

The Commission protests that it should not be required to project a rule's economic effects "with complete certainty." SEC-Br.44, 47. This dodges the point. The Commission's failure is not a lack of certainty, but its repeated, purposeful refusal to settle on a projection of the Rule's ultimate effects on competition and capital formation.

The Commission does not dispute that it relied almost exclusively on dozens of "conditional assertions that, 'to the extent' that predicate X

obtains, then conclusion Y 'may' follow." Petrs.-Br.69. "The Administrative Procedure Act does not tolerate that kind of truism as the basis for" Commission action, *Nat'l Fuel*, 468 F.3d at 844, and none of the Commission's cases is to the contrary. *Chamber of Commerce*, for example, *faulted* the Commission for failing to "make tough choices" "in face of uncertainty." 412 F.3d at 143. The Commission's "to-the-extent" statements avoid making *any* choices.

The Commission complains that Petitioners "do not identify any 'competing estimates' that the Commission failed to assess." SEC-Br.50. But the Release itself identified numerous possibilities that the Commission was obligated to (but did not) choose between. To take just one example, "[t]o the extent compliance costs or other effects of the rules cause certain smaller advisers to exit, the rules may result in reduced diversity of investment advisers"—but then again, "[t]o the extent that smaller or newer advisers benefit from [alleged] pro-competitive effects, because smaller or newer advisers are disproportionately women-owned and minority-owned, these benefits will therefore disproportionately accrue to women- and minority-owned advisers." 88 Fed. Reg. at 63,361/3, 63,362/2 n.1747. Which is it? *See also id.* at 63,362/3, 63,364/1 (observing that the

Rule "may reduce U.S. capital formation, to the extent it is more difficult for certain domestic investors … to deploy capital," but also that the Rule "may lead to enhanced capital formation" "[t]o the extent" that it "reduce[s] the cost of intermediation between investors and portfolio investments"); *id.* at 63,359/1-2 (the Rule may "improve" efficiency, "[t]o the extent that investors currently bear costs of searching for fund advisers who do not engage" in activities prohibited by the Rule, but there also "may be losses of efficiency," "to the extent that investors currently benefit from those activities" and now will "incur costs of searching for … alternative investments").

Talking around an issue *ad nauseum* is not a substitute for predicting a rule's consequences "as best" as the agency "can." *Chamber of Com.*, 412 F.3d at 143.

The Commission doubles down on its erroneous refusal to consider the "cumulative effect" of related rulemakings. *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 246 (5th Cir. 2023), *cert. granted*, 2023 WL 8605746 (U.S. Dec. 13, 2023). With no authority besides its own say-so, the Commission asserts that "pending" proposals need never be considered because they "may never become law." SEC.Br.50-51. But when pending

rules address the same issues, AR.368:8-23; SIFMA-Br.29-30; *e.g.*, *Form PF*, 87 Fed. Reg. 53,832, 53,876/1 (Sept. 1, 2022) (purporting to address "conflicts of interest" in private-fund structures), they are obvious potential alternatives, and must be considered in relation to each other. The statute demands complete analysis—not rote reliance on paper distinctions about rules' procedural status.

## VI.  Vacatur Is Appropriate.

The Commission does not dispute that the APA's "default" remedy is vacatur. Petrs.-Br.73-74. Nor does the Commission contend that this is one of the "rare cases" in which departure "from that default rule is justifiable," *Chamber of Com. v. SEC*, 88 F.4th at 1115, 1118 (5th Cir. 2023); the Commission has thus "forfeited [that] argument," *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 860 (5th Cir. 2022).

Instead, the Commission argues (at 55-56) that the Court should vacate only portions of the Rule. But Petitioners sought review of the entire "order" promulgating the Rule. Pet. 1. The Commission, moreover, overlooks multiple overarching errors Petitioners raised: The *entire* Rule exceeds the Commission's statutory authority. Petrs.-Br.25-38. The

*entire* Rule lacks evidence of a real problem.  Petrs.-Br.42-47.  And the

*entire* Rule suffers from a deficient economic analysis.  Petrs.-Br.66-72.

## CONCLUSION

The Rule should be vacated in whole.

Dated:  January 22, 2024

Respectfully Submitted,

 */s/ Eugene Scalia*

STEPHEN J. HAMMER
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201-2923
(214) 698-3100

EUGENE SCALIA
   *Counsel of Record*
HELGI C. WALKER
BRIAN A. RICHMAN
MAX E. SCHULMAN
ROBERT A. BATISTA
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioners*

# CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2024, I caused the foregoing brief to be electronically filed with the United States Court of Appeals for the Fifth Circuit by using the Court's CM/ECF system.

Dated:  January 22, 2024          Respectfully Submitted,

                                   */s/ Eugene Scalia*
                                  EUGENE SCALIA
                                    *Counsel of Record for Petitioners*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts exempted under Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, it contains 6,489 words.

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point New Century Schoolbook LT.

I further certify that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: January 22, 2024                    Respectfully Submitted,

                                            */s/ Eugene Scalia*
                                           EUGENE SCALIA
                                             *Counsel of Record for Petitioners*

No. 23-60471

# United States Court of Appeals
# for the Fifth Circuit

———————————————

NATIONAL ASSOCIATION OF PRIVATE FUND MANAGERS; ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION, LIMITED; AMERICAN INVESTMENT COUNCIL; LOAN SYNDICATIONS AND TRADING ASSOCIATION; MANAGED FUNDS ASSOCIATION; and NATIONAL VENTURE CAPITAL ASSOCIATION,

*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

———————————————

On Petition for Review of an Order of the
Securities & Exchange Commission

## STATUTORY ADDENDUM & APPENDIX TO
## REPLY BRIEF FOR PETITIONERS

STEPHEN J. HAMMER
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201-2923
(214) 698-3100

EUGENE SCALIA
  *Counsel of Record*
HELGI C. WALKER
BRIAN A. RICHMAN
MAX E. SCHULMAN
ROBERT A. BATISTA
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
(202) 955-8500
EScalia@gibsondunn.com

*Counsel for Petitioners*

January 22, 2024

# TABLE OF CONTENTS

| Tab | Description | Page |
|-----|-------------|------|
| 1 | Section 913, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), including amendment to Advisers Act § 211(h) | A1 |
| 2 | 15 U.S.C. § 80b-6, codifying Advisers Act § 206 | A8 |
| 3 | Declaration of Simon Lorne, on behalf of the National Association of Private Fund Managers | A9 |
| 4 | Declaration of Isaac Haas, on behalf of the National Association of Private Fund Managers | A13 |
| 5 | Declaration of Rebekah Goshorn Jurata, on behalf of the American Investment Council | A17 |
| 6 | SEC Opp'n to Amici Curiae's Motion for Leave to File, *SEC v. LG Capital Funding, LLC*, No. 1:22-cv-3353 (E.D.N.Y. July 19, 2023), ECF No. 43 | A20 |

# TAB 1

Section 913, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), including amendment to Advisers Act § 211(h)

"(B) disclosing the action, if any, the Commission intends to take with respect to the finding or recommendation.

"(h) COMMITTEE FINDINGS.—Nothing in this section shall require the Commission to agree to or act upon any finding or recommendation of the Committee.

"(i) FEDERAL ADVISORY COMMITTEE ACT.—The Federal Advisory Committee Act (5 U.S.C. App.) shall not apply with respect to the Committee and its activities.

"(j) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated to the Commission such sums as are necessary to carry out this section.".

## SEC. 912. CLARIFICATION OF AUTHORITY OF THE COMMISSION TO ENGAGE IN INVESTOR TESTING.

Section 19 of the Securities Act of 1933 (15 U.S.C. 77s) is amended by adding at the end the following:

"(e) EVALUATION OF RULES OR PROGRAMS.—For the purpose of evaluating any rule or program of the Commission issued or carried out under any provision of the securities laws, as defined in section 3 of the Securities Exchange Act of 1934 (15 U.S.C. 78c), and the purposes of considering, proposing, adopting, or engaging in any such rule or program or developing new rules or programs, the Commission may—

"(1) gather information from and communicate with investors or other members of the public;

"(2) engage in such temporary investor testing programs as the Commission determines are in the public interest or would protect investors; and

"(3) consult with academics and consultants, as necessary to carry out this subsection.

"(f) RULE OF CONSTRUCTION.—For purposes of the Paperwork Reduction Act (44 U.S.C. 3501 et seq.), any action taken under subsection (e) shall not be construed to be a collection of information.".

## SEC. 913. STUDY AND RULEMAKING REGARDING OBLIGATIONS OF BROKERS, DEALERS, AND INVESTMENT ADVISERS.

15 USC 78o note.

(a) DEFINITION.—For purposes of this section, the term "retail customer" means a natural person, or the legal representative of such natural person, who—

(1) receives personalized investment advice about securities from a broker or dealer or investment adviser; and

(2) uses such advice primarily for personal, family, or household purposes.

15 USC 78o note.

(b) STUDY.—The Commission shall conduct a study to evaluate—

(1) the effectiveness of existing legal or regulatory standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers for providing personalized investment advice and recommendations about securities to retail customers imposed by the Commission and a national securities association, and other Federal and State legal or regulatory standards; and

(2) whether there are legal or regulatory gaps, shortcomings, or overlaps in legal or regulatory standards in the protection of retail customers relating to the standards of care

for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers for providing personalized investment advice about securities to retail customers that should be addressed by rule or statute.

(c) CONSIDERATIONS.—In conducting the study required under subsection (b), the Commission shall consider— <span>15 USC 78o note.</span>

(1) the effectiveness of existing legal or regulatory standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers for providing personalized investment advice and recommendations about securities to retail customers imposed by the Commission and a national securities association, and other Federal and State legal or regulatory standards;

(2) whether there are legal or regulatory gaps, shortcomings, or overlaps in legal or regulatory standards in the protection of retail customers relating to the standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers for providing personalized investment advice about securities to retail customers that should be addressed by rule or statute;

(3) whether retail customers understand that there are different standards of care applicable to brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers in the provision of personalized investment advice about securities to retail customers;

(4) whether the existence of different standards of care applicable to brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers is a source of confusion for retail customers regarding the quality of personalized investment advice that retail customers receive;

(5) the regulatory, examination, and enforcement resources devoted to, and activities of, the Commission, the States, and a national securities association to enforce the standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers when providing personalized investment advice and recommendations about securities to retail customers, including—

(A) the effectiveness of the examinations of brokers, dealers, and investment advisers in determining compliance with regulations;

(B) the frequency of the examinations; and

(C) the length of time of the examinations;

(6) the substantive differences in the regulation of brokers, dealers, and investment advisers, when providing personalized investment advice and recommendations about securities to retail customers;

(7) the specific instances related to the provision of personalized investment advice about securities in which—

(A) the regulation and oversight of investment advisers provide greater protection to retail customers than the regulation and oversight of brokers and dealers; and

(B) the regulation and oversight of brokers and dealers provide greater protection to retail customers than the regulation and oversight of investment advisers;

(8) the existing legal or regulatory standards of State securities regulators and other regulators intended to protect retail customers;

(9) the potential impact on retail customers, including the potential impact on access of retail customers to the range of products and services offered by brokers and dealers, of imposing upon brokers, dealers, and persons associated with brokers or dealers—

(A) the standard of care applied under the Investment Advisers Act of 1940 (15 U.S.C. 80b–1 et seq.) for providing personalized investment advice about securities to retail customers of investment advisers, as interpreted by the Commission and the courts; and

(B) other requirements of the Investment Advisers Act of 1940 (15 U.S.C. 80b–1 et seq.);

(10) the potential impact of eliminating the broker and dealer exclusion from the definition of "investment adviser" under section 202(a)(11)(C) of the Investment Advisers Act of 1940 (15 U.S.C. 80b–2(a)(11)(C)), in terms of—

(A) the impact and potential benefits and harm to retail customers that could result from such a change, including any potential impact on access to personalized investment advice and recommendations about securities to retail customers or the availability of such advice and recommendations;

(B) the number of additional entities and individuals that would be required to register under, or become subject to, the Investment Advisers Act of 1940 (15 U.S.C. 80b–1 et seq.), and the additional requirements to which brokers, dealers, and persons associated with brokers and dealers would become subject, including—

(i) any potential additional associated person licensing, registration, and examination requirements; and

(ii) the additional costs, if any, to the additional entities and individuals; and

(C) the impact on Commission and State resources to—

(i) conduct examinations of registered investment advisers and the representatives of registered investment advisers, including the impact on the examination cycle; and

(ii) enforce the standard of care and other applicable requirements imposed under the Investment Advisers Act of 1940 (15 U.S.C. 80b–1 et seq.);

(11) the varying level of services provided by brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers to retail customers and the varying scope and terms of retail customer relationships of brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers with such retail customers;

(12) the potential impact upon retail customers that could result from potential changes in the regulatory requirements

PUBLIC LAW 111–203—JULY 21, 2010          124 STAT. 1827

or legal standards of care affecting brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers relating to their obligations to retail customers regarding the provision of investment advice, including any potential impact on—

(A) protection from fraud;

(B) access to personalized investment advice, and recommendations about securities to retail customers; or

(C) the availability of such advice and recommendations;

(13) the potential additional costs and expenses to—

(A) retail customers regarding and the potential impact on the profitability of their investment decisions; and

(B) brokers, dealers, and investment advisers resulting from potential changes in the regulatory requirements or legal standards affecting brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers relating to their obligations, including duty of care, to retail customers; and

(14) any other consideration that the Commission considers necessary and appropriate in determining whether to conduct a rulemaking under subsection (f).

(d) REPORT.—

(1) IN GENERAL.—Not later than 6 months after the date of enactment of this Act, the Commission shall submit a report on the study required under subsection (b) to—

(A) the Committee on Banking, Housing, and Urban Affairs of the Senate; and

(B) the Committee on Financial Services of the House of Representatives.

(2) CONTENT REQUIREMENTS.—The report required under paragraph (1) shall describe the findings, conclusions, and recommendations of the Commission from the study required under subsection (b), including—

(A) a description of the considerations, analysis, and public and industry input that the Commission considered, as required under subsection (b), to make such findings, conclusions, and policy recommendations; and

(B) an analysis of whether any identified legal or regulatory gaps, shortcomings, or overlap in legal or regulatory standards in the protection of retail customers relating to the standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers for providing personalized investment advice about securities to retail customers.

(e) PUBLIC COMMENT.—The Commission shall seek and consider public input, comments, and data in order to prepare the report required under subsection (d).

(f) RULEMAKING.—The Commission may commence a rulemaking, as necessary or appropriate in the public interest and for the protection of retail customers (and such other customers as the Commission may by rule provide), to address the legal or regulatory standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers for providing personalized

15 USC 78o note.

15 USC 78o note.

15 USC 78o note.

investment advice about securities to such retail customers. The Commission shall consider the findings conclusions, and recommendations of the study required under subsection (b).

(g) AUTHORITY TO ESTABLISH A FIDUCIARY DUTY FOR BROKERS AND DEALERS.—

(1) SECURITIES EXCHANGE ACT OF 1934.—Section 15 of the Securities Exchange Act of 1934 (15 U.S.C. 78o) is amended by adding at the end the following:

"(k) STANDARD OF CONDUCT.—

"(1) IN GENERAL.—Notwithstanding any other provision of this Act or the Investment Advisers Act of 1940, the Commission may promulgate rules to provide that, with respect to a broker or dealer, when providing personalized investment advice about securities to a retail customer (and such other customers as the Commission may by rule provide), the standard of conduct for such broker or dealer with respect to such customer shall be the same as the standard of conduct applicable to an investment adviser under section 211 of the Investment Advisers Act of 1940. The receipt of compensation based on commission or other standard compensation for the sale of securities shall not, in and of itself, be considered a violation of such standard applied to a broker or dealer. Nothing in this section shall require a broker or dealer or registered representative to have a continuing duty of care or loyalty to the customer after providing personalized investment advice about securities.

"(2) DISCLOSURE OF RANGE OF PRODUCTS OFFERED.—Where a broker or dealer sells only proprietary or other limited range of products, as determined by the Commission, the Commission may by rule require that such broker or dealer provide notice to each retail customer and obtain the consent or acknowledgment of the customer. The sale of only proprietary or other limited range of products by a broker or dealer shall not, in and of itself, be considered a violation of the standard set forth in paragraph (1).

"(l) OTHER MATTERS.—The Commission shall—

"(1) facilitate the provision of simple and clear disclosures to investors regarding the terms of their relationships with brokers, dealers, and investment advisers, including any material conflicts of interest; and

"(2) examine and, where appropriate, promulgate rules prohibiting or restricting certain sales practices, conflicts of interest, and compensation schemes for brokers, dealers, and investment advisers that the Commission deems contrary to the public interest and the protection of investors.".

(2) INVESTMENT ADVISERS ACT OF 1940.—Section 211 of the Investment Advisers Act of 1940, is further amended by adding at the end the following new subsections:

15 USC 80b–11.

"(g) STANDARD OF CONDUCT.—

"(1) IN GENERAL.—The Commission may promulgate rules to provide that the standard of conduct for all brokers, dealers, and investment advisers, when providing personalized investment advice about securities to retail customers (and such other customers as the Commission may by rule provide), shall be to act in the best interest of the customer without regard to the financial or other interest of the broker, dealer, or investment adviser providing the advice. In accordance with such

rules, any material conflicts of interest shall be disclosed and may be consented to by the customer. Such rules shall provide that such standard of conduct shall be no less stringent than the standard applicable to investment advisers under section 206(1) and (2) of this Act when providing personalized investment advice about securities, except the Commission shall not ascribe a meaning to the term 'customer' that would include an investor in a private fund managed by an investment adviser, where such private fund has entered into an advisory contract with such adviser. The receipt of compensation based on commission or fees shall not, in and of itself, be considered a violation of such standard applied to a broker, dealer, or investment adviser.

"(2) RETAIL CUSTOMER DEFINED.—For purposes of this subsection, the term 'retail customer' means a natural person, or the legal representative of such natural person, who—

"(A) receives personalized investment advice about securities from a broker, dealer, or investment adviser; and

"(B) uses such advice primarily for personal, family, or household purposes.

"(h) OTHER MATTERS.—The Commission shall—

"(1) facilitate the provision of simple and clear disclosures to investors regarding the terms of their relationships with brokers, dealers, and investment advisers, including any material conflicts of interest; and

"(2) examine and, where appropriate, promulgate rules prohibiting or restricting certain sales practices, conflicts of interest, and compensation schemes for brokers, dealers, and investment advisers that the Commission deems contrary to the public interest and the protection of investors.".

(h) HARMONIZATION OF ENFORCEMENT.—

(1) SECURITIES EXCHANGE ACT OF 1934.—Section 15 of the Securities Exchange Act of 1934, as amended by subsection (g)(1), is further amended by adding at the end the following new subsection:

<span style="float:right">15 USC 78o.</span>

"(m) HARMONIZATION OF ENFORCEMENT.—The enforcement authority of the Commission with respect to violations of the standard of conduct applicable to a broker or dealer providing personalized investment advice about securities to a retail customer shall include—

"(1) the enforcement authority of the Commission with respect to such violations provided under this Act; and

"(2) the enforcement authority of the Commission with respect to violations of the standard of conduct applicable to an investment adviser under the Investment Advisers Act of 1940, including the authority to impose sanctions for such violations, and

the Commission shall seek to prosecute and sanction violators of the standard of conduct applicable to a broker or dealer providing personalized investment advice about securities to a retail customer under this Act to same extent as the Commission prosecutes and sanctions violators of the standard of conduct applicable to an investment advisor under the Investment Advisers Act of 1940.".

(2) INVESTMENT ADVISERS ACT OF 1940.—Section 211 of the Investment Advisers Act of 1940, as amended by subsection

(g)(2), is further amended by adding at the end the following new subsection:

"(i) HARMONIZATION OF ENFORCEMENT.—The enforcement authority of the Commission with respect to violations of the standard of conduct applicable to an investment adviser shall include—

"(1) the enforcement authority of the Commission with respect to such violations provided under this Act; and

"(2) the enforcement authority of the Commission with respect to violations of the standard of conduct applicable to a broker or dealer providing personalized investment advice about securities to a retail customer under the Securities Exchange Act of 1934, including the authority to impose sanctions for such violations, and

the Commission shall seek to prosecute and sanction violators of the standard of conduct applicable to an investment adviser under this Act to same extent as the Commission prosecutes and sanctions violators of the standard of conduct applicable to a broker or dealer providing personalized investment advice about securities to a retail customer under the Securities Exchange Act of 1934.".

<div style="margin-left:0"><em>15 USC 80b–11 note.</em></div>

## SEC. 914. STUDY ON ENHANCING INVESTMENT ADVISER EXAMINATIONS.

(a) STUDY REQUIRED.—

<div style="margin-left:0"><em>Review.</em></div>

(1) IN GENERAL.—The Commission shall review and analyze the need for enhanced examination and enforcement resources for investment advisers.

(2) AREAS OF CONSIDERATION.—The study required by this subsection shall examine—

<div style="margin-left:0"><em>Time period.</em></div>

(A) the number and frequency of examinations of investment advisers by the Commission over the 5 years preceding the date of the enactment of this subtitle;

(B) the extent to which having Congress authorize the Commission to designate one or more self-regulatory organizations to augment the Commission's efforts in overseeing investment advisers would improve the frequency of examinations of investment advisers; and

(C) current and potential approaches to examining the investment advisory activities of dually registered broker-dealers and investment advisers or affiliated broker-dealers and investment advisers.

(b) REPORT REQUIRED.—The Commission shall report its findings to the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate, not later than 180 days after the date of enactment of this subtitle, and shall use such findings to revise its rules and regulations, as necessary. The report shall include a discussion of regulatory or legislative steps that are recommended or that may be necessary to address concerns identified in the study.

## SEC. 915. OFFICE OF THE INVESTOR ADVOCATE.

Section 4 of the Securities Exchange Act of 1934 (15 U.S.C. 78d) is amended by adding at the end the following:

"(g) OFFICE OF THE INVESTOR ADVOCATE.—

"(1) OFFICE ESTABLISHED.—There is established within the Commission the Office of the Investor Advocate (in this subsection referred to as the 'Office').

# TAB 2

15 U.S.C. § 80b-6,
codifying Advisers Act § 206

empt from registration pursuant to section 80b–3(b) of this title,'' and struck out ''make use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to'' after ''shall'' and ''to'' after ''in any way''.

Subsec. (e). Pub. L. 111–203, §418, inserted at end ''With respect to any factor used in any rule or regulation by the Commission in making a determination under this subsection, if the Commission uses a dollar amount test in connection with such factor, such as a net asset threshold, the Commission shall, by order, not later than 1 year after July 21, 2010, and every 5 years thereafter, adjust for the effects of inflation on such test. Any such adjustment that is not a multiple of $100,000 shall be rounded to the nearest multiple of $100,000.''

Subsec. (f). Pub. L. 111–203, §921(b), added subsec. (f).

1996—Subsec. (b)(4), (5). Pub. L. 104–290, §210(1), added pars. (4) and (5).

Subsec. (e). Pub. L. 104–290, §210(2), added subsec. (e).

1987—Pub. L. 100–181 completely revised and expanded provisions on investment advisory contracts, changing structure of section from a single unlettered paragraph to one consisting of four subsections lettered (a) to (d).

1980—Pub. L. 96–477 provided that par. (1) of this section was not to apply with respect to any investment advisory contract between an investment adviser and a business development company so long as the compensation provided for in such contract did not exceed 20 per cent of the realized capital gains upon the funds of the business development company and such business development company did not have outstanding any option, warrant, or right issued pursuant to section 80a–60(a)(3)(B) of this title and did not have a profit-sharing plan.

1970—Pub. L. 91–547 substituted reference to section ''80b–3(b)'' for ''80b–3'' of this title in first sentence, redesignated as second sentence former third sentence, designating existing provisions as cl. (A) and adding cl. (B) and items (i) and (ii) and provision respecting compensation based on asset value of company or fund under management averaged over a specified period in relation to investment record of an index of securities or such other measure of investment performance specified by Commission rules, regulations, or orders, inserted third sentence provision respecting point from which compensation is to be measured, substituted in fourth, formerly third, sentence ''paragraphs (2) and (3) of this section'' for ''this section'' and in definition of ''investment advisory contract'' the words ''account of another person other than an investment company registered under subchapter I of this chapter'' for ''account for a person other than an investment company''.

1960—Pub. L. 86–750 substituted ''unless exempt from registration pursuant to'' for ''registered under''.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by sections 921(b) and 928 of Pub. L. 111–203 effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking.

Amendment by section 418 of Pub. L. 111–203 effective 1 year after July 21, 2010, except that any investment adviser may, at the discretion of the investment adviser, register with the Commission under the Investment Advisers Act of 1940 during that 1-year period, subject to the rules of the Commission, and except as otherwise provided, see section 419 of Pub. L. 111–203, set out as a note under section 80b–2 of this title.

#### EFFECTIVE DATE OF 1970 AMENDMENT

Amendment by Pub. L. 91–547 effective on expiration of one year after Dec. 14, 1970, see section 30(1) of Pub. L. 91–547, set out as a note under section 80a–52 of this title.

### Executive Documents

#### TRANSFER OF FUNCTIONS

For transfer of functions of Securities and Exchange Commission, with certain exceptions, to Chairman of such Commission, see Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out under section 78d of this title.

## § 80b–6. Prohibited transactions by investment advisers

It shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

(3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction; or

(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

(Aug. 22, 1940, ch. 686, title II, §206, 54 Stat. 852; Pub. L. 86–750, §§8, 9, Sept. 13, 1960, 74 Stat. 887; Pub. L. 111–203, title IX, §985(e)(2), July 21, 2010, 124 Stat. 1935.)

### Editorial Notes

#### AMENDMENTS

2010—Par. (3). Pub. L. 111–203 inserted ''or'' at end.

1960—Pub. L. 86–750, §8, struck out ''registered under section 80b–3 of this title'' from introductory text.

Par. (4). Pub. L. 86–750, §9, added par. (4).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking.

## § 80b–6a. Exemptions

The Commission, by rules and regulations, upon its own motion, or by order upon application, may conditionally or unconditionally exempt any person or transaction, or any class or classes of persons, or transactions, from any provision or provisions of this subchapter or of

# TAB 3

Declaration of Simon Lorne,
on behalf of the National Association of Private Fund
Managers

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NATIONAL ASSOCIATION OF PRIVATE FUND
MANAGERS; ALTERNATIVE INVESTMENT
MANAGEMENT ASSOCIATION, LIMITED;
AMERICAN INVESTMENT COUNCIL; LOAN
SYNDICATIONS AND TRADING ASSOCIATION;
MANAGED FUNDS ASSOCIATION; and NATIONAL
VENTURE CAPITAL ASSOCIATION,

*Petitioners*,

v.

No. 23-60471

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

## DECLARATION OF SIMON LORNE

1.    My name is Simon Lorne, and I am President of the National Association of Private Fund Managers (NAPFM).  NAPFM is one of the Petitioners in this case, and I am submitting this declaration in support of Petitioners' standing in this case.

2.    NAPFM is a non-profit organization whose membership is composed entirely of investment advisers in the private fund management industry.  NAPFM is a Texas non-profit corporation that is headquartered in Fort Worth, Texas.  NAPFM was founded for, among other

things, providing education to its members and representing their legal and economic interests before the government and in the courts.  As part of this mission, NAPFM has submitted comments on behalf of its members in rulemakings—including in the administrative proceedings below. NAPFM represents investment advisers with total net assets under management of over $600 billion as of July 2023.

3.    In addition to serving as President of NAPFM, I also serve as Vice Chairman & Chief Legal Officer of Millennium Management, LLC. Millennium Management is a global investment management firm and registered investment adviser with the SEC (CRD # 158117 / SEC # 801-73884).  As has been publicly reported, Millennium Management is a member of NAPFM.  Millennium Management has continuously been a member of NAPFM since before the Commission adopted the Private Fund Advisers Rule at issue here.

4.    As an investment adviser to private funds, Millennium Management is directly regulated and harmed by the Private Fund Advisers Rule.  Among other things, the Rule:

- restricts Millennium Management's ability to enter into the type of side arrangements it currently enters into, 17 C.F.R. § 275.211(h)(2)-3(a)(1)-(2);

- prohibits Millennium Management from charging private funds for the type of regulatory, compliance, examination, and investigation fees or expenses it currently charges, barring Commission-mandated disclosure, and in some cases consent, which is impractical to obtain under the circumstances, *id.* 275.211(h)(2)-1(a)(1)-(2);

- prohibits Millennium Management from reducing a contractual obligation to return performance-based compensation based on taxes applicable to Millennium Management barring Commission-mandated disclosure, *id.* § 275.211(h)(2)-1(a)(3);

- prohibits Millennium Management from charging certain of the fees it currently charges related to a portfolio investment on a non-pro rata basis barring a vaguely defined "fair and equitable" allocation and Commission-mandated disclosure, *id.* § 275.211(h)(2)-1(a)(4);

- prohibits Millennium Management from borrowing money or taking a loan from a fund it advises, barring Commission-mandated disclosure and consent, *id.* § 275.211(h)(2)-1(a)(5);

- requires Millennium Management to provide investors with quarterly statements containing detailed information regarding fees, expenses, and performance for the private funds its advises, *id.* § 275.211(h)(1)-2, in a manner that Millennium Management does not currently do;

- interprets the Advisers Act to bar Millennium Management from continuing to seek reimbursement, indemnification, exculpation,

or limitation of liability from the private funds its advises, depending on the circumstances, Final Rule, 88 Fed. Reg. 63,206, 63,277/1 & n.783 (Sept. 14, 2023);

- requires Millennium Management to cause the private funds it advises to undergo audits, 17 C.F.R. § 275.206(4)-10, in a manner that Millennium Management does not currently do; and

- compels Millennium Management to retain books and records related to the new Rule, *id.* § 275.204-2(a)(20)-(24).

Each of these provisions directly regulates Millennium Management's activities in ways that impede the operation of its business, impose new costs on it, or require it to expend additional employee time. In all of these ways, Millennium Management is directly harmed by the Rule.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of January 2024 at Austin, Texas.

Simon Lorne

On behalf of the National Association of Private Fund Managers

# TAB 4

Declaration of Isaac Haas,
on behalf of the National Association of Private Fund
Managers

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NATIONAL ASSOCIATION OF PRIVATE FUND
MANAGERS; ALTERNATIVE INVESTMENT
MANAGEMENT ASSOCIATION, LIMITED;
AMERICAN INVESTMENT COUNCIL; LOAN
SYNDICATIONS AND TRADING ASSOCIATION;
MANAGED FUNDS ASSOCIATION; and NATIONAL
VENTURE CAPITAL ASSOCIATION,

*Petitioners*,

v.

No. 23-60471

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

## DECLARATION OF ISAAC HAAS

1.    My name is Isaac Haas, and I am Secretary of the National
Association of Private Fund Managers (NAPFM).  NAPFM is one of the
Petitioners in this case, and I am submitting this declaration in support
of Petitioners' standing in this case.

2.    NAPFM is a non-profit organization whose membership is
composed entirely of investment advisers in the private fund manage-
ment industry.  NAPFM is a Texas non-profit corporation that is head-
quartered in Fort Worth, Texas.  NAPFM was founded for, among other

things, providing education to its members and representing their legal and economic interests before the government and in the courts. As part of this mission, NAPFM has submitted comments on behalf of its members in rulemakings—including in the administrative proceedings below. NAPFM represents investment advisers with total net assets under management of over $600 billion as of July 2023.

3.    In addition to serving as Secretary of NAPFM, I also serve as General Counsel of HBK Capital Management. HBK is a global investment management firm headquartered in Dallas, Texas and a registered investment adviser with the SEC (CRD # 115079 / SEC # 801-70632). As has been publicly reported, HBK is a member of NAPFM. HBK has continuously been a member of NAPFM since before the Commission adopted the Private Fund Advisers Rule at issue here.

4.    As an investment adviser to private funds, HBK is directly regulated and harmed by the Private Fund Advisers Rule. Among other things, the Rule:

- restricts HBK's ability to enter into the type of side arrangements it currently enters into, 17 C.F.R. § 275.211(h)(2)-3(a)(1)-(2);

- prohibits HBK from charging private funds for the type of regulatory, compliance, examination, and investigation fees or expenses it currently charges, barring Commission-mandated disclosure, and in some cases consent, which is impractical to obtain under the circumstances, *id.* 275.211(h)(2)-1(a)(1)-(2);

- prohibits HBK from charging certain of the fees it currently charges related to a portfolio investment on a non-pro rata basis barring a vaguely defined "fair and equitable" allocation and Commission-mandated disclosure, *id.* § 275.211(h)(2)-1(a)(4);

- requires HBK to provide investors with quarterly statements containing detailed information regarding fees, expenses, and performance for the private funds its advises, *id.* § 275.211(h)(1)-2, in a manner that HBK does not currently do;

- interprets the Advisers Act to bar HBK from continuing to seek reimbursement, indemnification, exculpation, or limitation of liability from the private funds its advises, depending on the circumstances, Final Rule, 88 Fed. Reg. 63,206, 63,277/1 & n.783 (Sept. 14, 2023);

- obligates HBK to provide independent fairness or valuation opinions when offering investors the option to cash out or move their investments to different funds it advises, *id.* § 275.211(h)(2)-2, in a manner that HBK does not currently do;

- compels HBK to retain books and records related to the new Rule, *id.* § 275.204-2(a)(20)-(24).

Each of these provisions directly regulates HBK's activities in ways that impede the operation of its business, impose new costs on it, or require it to expend additional employee time. In all of these ways, HBK is directly harmed by the Rule.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this **22** day of January 2024 at Dallas, Texas.

Isaac Haas

On behalf of the National Association of Private Fund Managers

4

# TAB 5

Declaration of Rebekah Goshorn Jurata,
on behalf of the American Investment Council

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NATIONAL ASSOCIATION OF PRIVATE FUND
MANAGERS; ALTERNATIVE INVESTMENT
MANAGEMENT ASSOCIATION, LIMITED;
AMERICAN INVESTMENT COUNCIL; LOAN
SYNDICATIONS AND TRADING ASSOCIATION;
MANAGED FUNDS ASSOCIATION; and NATIONAL
VENTURE CAPITAL ASSOCIATION,

*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

No. 23-60471

## DECLARATION OF REBEKAH GOSHORN JURATA

1.    My name is Rebekah Goshorn Jurata, and I serve as General Counsel for the American Investment Council (AIC).  The AIC is an advocacy, communications, and research organization established to advance access to capital, job creation, retirement security, innovation, and economic growth by promoting responsible long-term investment.  AIC Comment Letter at 1 (Apr. 25, 2022) (AR.145:1).

2.    The AIC's members are the world's leading private equity and private credit firms, united by their commitment to growing and

strengthening the businesses in which they invest.  AIC Comment Letter at 1 (AR.145:1); *see* SEC Memorandum Regarding Videoconference with Representatives of the American Investment Council (June 16, 2022) (AR.400) (identifying AIC members).  The AIC's members represent approximately 80% of the assets under management in the global private-equity industry.

3.    The AIC's members are directly regulated and harmed by the Private Fund Advisers Rule.  Each of the Rule's provisions directly regulates the AIC's members in ways that impede the operation of their businesses, impose new costs on them, or require them to expend additional employee time.  Among other things, the Rule interprets the Advisers Act to prohibit the AIC's members from charging fees for supposedly "unperformed services" to the private funds they advise.  Final Rule, 88 Fed. Reg. 63,206, 63,274/3 (Sept. 14, 2023).  In line with market practice, many of the AIC's members have assessed accelerated monitoring fees, although a fund's share of such fees is typically 100% offset by a corresponding reduction in management fees.  It appears that the Commission intended to restrict this practice with its interpretation.  AIC Comment

Letter at 37 (AR.145:37).  It is for this reason that the AIC, on behalf of its members, opposed this proposed restriction in its rulemaking comments.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this 22 day of January 2024 at Washington, D.C.

Rebekah Goshorn Jurata

On behalf of the American Investment Council

# TAB 6

SEC Opp'n to Amici Curiae's Motion for Leave to File, *SEC v. LG Capital Funding, LLC*, No. 1:22-cv-3353 (E.D.N.Y. July 19, 2023), ECF No. 43

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | |
| **LG CAPITAL FUNDING, LLC, and JOSEPH I. LERMAN,** | **Civil Action No.** |
| **Defendants,** | **22-cv-3353-WFK-JRC** |
| **and** | |
| **DANIEL GELLMAN, BORUCH GREENBERG, and ELI SAFDIEH,** | |
| **Relief Defendants.** | |

**PLAINTIFF'S OPPOSITION TO AMICI CURIAE'S MOTION FOR LEAVE TO FILE BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this Opposition to Amici Curiae's Motion for Leave to File Brief in Support of Defendants' Motion to Dismiss. (ECF No 39). Amici's[1] motion should be denied for two reasons: (1) Amici do not offer any unique or relevant perspective on the issues in this case; and (2) the brief is untimely.

**I.      AMICI'S PROPOSED BRIEF WILL NOT ASSIST THE COURT AND DOES NOT OFFER A UNIQUE PERSPECTIVE.**

In determining whether to accept an amicus brief, district courts have noted that "[t]here is no governing standard, rule or statute prescribing the procedure for obtaining leave to file an

---

[1] "Amici" collectively refers to Alternative Investment Management Association, Ltd. ("AIMA"), Trading and Markets Project, Inc. ("TMP"), and National Association of Private Fund Managers ("NAPFM").

amicus brief in the district court, and so deciding whether to permit an individual to act as amicus curiae lies in the firm discretion of the district court." *King v. Amazon.com Servs.*, No. 22-cv-01479, 2022 WL 17083273, at *5, n. 6 (E.D.N.Y. Nov. 18, 2022) (citing *SEC v. Ripple Labs, Inc*., No. 20-cv-10832, 2021 WL 4555352, at *5 (S.D.N.Y. Oct. 4, 2021)). That said, district courts look "to the Federal Rules of Appellate Procedure, which provides a rule for the filing of an amicus brief, and also considers the instances when an amicus brief serves a laudable, rather than distractive, purpose." *Lehman XS Trust, Series 2006-GP2 v. Greenpoint Mortg. Funding*, *Inc.*, No. 12 Civ. 7935, 2014 WL 265784, at *1 (S.D.N.Y. Jan. 23, 2014).

Federal Rule of Appellate Procedure 29 provides that amicus curiae "may file a brief only by leave of court or if the brief states that all parties have consented to its filing." Fed. R. App. P. 29(a)(2). "A court may grant leave to appear as an amicus if the information offered is 'timely and **useful**.'" *Lehman XS Trust,* 2014 WL 265784, at *2 (emphasis added) (quoting *Waste Mgmt. of Pa., Inc. v. City of York*, 162 F.R.D. 34, 36 (M.D. Pa. 1995)). The circumstances under which an amicus brief is considered useful are limited:

> An amicus brief should normally be allowed when a party is not represented competently or is not represented at all, when the amicus has an interest in some other case that may be affected by the decision in the present case ..., or when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide. Otherwise, leave to file an amicus curiae brief should be denied.

*Lehman XS Trust*, 2014 WL 265784, at *2 (quoting *Ryan v. CFTC*, 125 F.3d 1062, 1063 (7th Cir. 1997)). *See also Best Payphones, Inc. v. Dobrin,* 410 F. Supp.3d 457, 465 n.3 (E.D.N.Y. 2019) (quoting *Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*, 471 F. Supp. 2d 295, 311 (W.D.N.Y. 2007)). *Muchmore's Cafe, LLC v. City of N.Y.*, No. 14-cv-5668, 2016 WL 11469539, at *6 (E.D.N.Y. Sept. 29, 2016) (quoting same).

The LG Defendants are represented by competent counsel that can raise (and have raised) all relevant arguments to the Court, and Amici do not offer a unique perspective. Amici's proposed brief primarily argues that the SEC's litigation position in cases brought against convertible note businesses expands the statutory definition of "dealer," as set forth in Section 3(a)(5) of the Securities Exchange Act of 1934. (ECF No. 39-2 at 2-3, 7-14). But the LG Defendants spent half of their opening brief making that precise argument. (ECF No. 27 at 12-25). Amici also argues that hedge funds would be affected by the Court's decision here. (ECF No. 39-2 at 3-7). But this too was addressed by the LG Defendants. (ECF No. 27 at 12-13). Finally, like the LG Defendants, Amici invokes the major questions doctrine. (*Compare* ECF No. 39-2 at 15-19 (discussing *W.Va. v. EPA*, 142 S.Ct. 2587, 2609, 2614 (2022)) *with* ECF No. 27 at 24-25 (same))). The SEC responded to these arguments in its opposition to the LG Defendants' moving brief. (ECF No. 28 at 18-21 (statutory interpretation and historical meaning of words), 22-24 (hedge funds), 24 n.25 (major questions doctrine)). There is nothing unique about Amici's arguments here, and their proposed brief would not be helpful in addressing the issues raised in the LG Defendants' motion to dismiss.

Setting aside that Amici's proposed brief merely reiterates arguments already competently raised by the LG Defendants, the Court should deny their motion because their presence in this case would unnecessarily complicate and expand the scope of the SEC's action. The SEC sued one business (LG Capital) whose exclusive activity was purchasing convertible notes, converting them into newly-issued shares, and selling those new shares into the market—and alleges the business was a "dealer" under the plain language of the Exchange Act. (ECF No. 1 (Compl.) at ¶¶ 2-7; ECF No. 28 (SEC MTD Opp. Br.) at 6-12). Nothing about this case concerns the registered adviser or investment vehicles represented by Amici that may or may not be covered by the

Exchange Act and other regulatory regimes.[2] (ECF No. 39-2 at 5-7). Indeed, in its motion to dismiss, LG Capital made a point of distinguishing itself from registered investment advisers and argued it was not required to register under the Investment Company Act. (ECF. No. 27 at 1, 12-13). For this additional reason, the Court should deny Amici's motion for leave. *See Petersen Energía Inversora, S.A.U. v Argentine Republic*, No. 15-cv-2739, 2022 WL 3536117, at *2 (S.D.N.Y. Aug. 18, 2022) (citing *Waste Mgmt. of Pa.,* 162 F.R.D. at 36 ("The named parties should always remain in control, with the amicus merely responding to the issues presented by the parties. An amicus cannot initiate, create, extend or enlarge issues . . . .")).

Here, the burden to the Court and the parties in accepting Amici's proposed brief, without supplemental briefing by the SEC, outweighs any benefit the Court might derive from Amici's offering.

## II.     **THE MOTION FOR LEAVE IS UNTIMELY.**

Defendants' motion to dismiss the Complaint was fully briefed nearly nine months ago on October 27, 2022. As explained below, Amici have been aware of this case and the parties' briefing since at least at least December 2022. Amici's motion for leave is therefore untimely, and the Court should deny it for that independent reason.

The information offered by an amicus must be "**timely** and useful." *Lehman XS Trust*, 2014 WL 265784 at *2 (emphasis added) (quoting *Waste Mgmt. of Pa., Inc.*, 162 F.R.D. at 36). Although

---

[2] Amici's positions will be heard because they have filed similar amicus briefs in other SEC actions against convertible note businesses. *See* Amicus Brief for AIMA, NAPFM, and TMP, *SEC v. Morningview Fin., LLC*, No. 1:22-cv-8142, Dkt. No. 33 (S.D.N.Y. filed July 6, 2023); Amicus Brief for NAPFM, *SEC v. Keener*, 22-14237, Dkt. No. 34 (11th Cir. filed June 7, 2023); Amicus Brief for AIMA, *SEC v. Keener*, 22-14237, Dkt. No. 36 (11th Cir. filed June 7, 2023); Amicus Brief for AIMA and NAPFM, *SEC v. Almagarby*, No. 21-13755, Dkt. No. 35 (11th Cir. filed July 8, 2022). Unlike here, all these briefs were filed either within the time limits of the Appellate Rules and/or were unopposed by the parties.

not bound by the 7 day deadline of Fed. R. App. P. 29, district courts in this circuit have routinely denied leave to file an amicus curiae brief where, as here, amici seek to file papers in support of a party's motion well after the motion has been fully briefed "because, as a general matter, the parties to the case or controversy before the Court should have the opportunity to engage with the arguments and perspectives of amici without resorting to supplemental briefing, which might unduly delay the proceedings, or unduly prejudice one or more of the parties." *Petersen Energía*, 2022 WL 3536117, at *1 (denying leave to file an amicus brief six weeks after the parties completed summary judgment briefing).

Defendants' motion to dismiss has been pending, and the briefs have been available on this Court's public docket, since October 27, 2022. (ECF. No. 27, 28). Amici's claim that they "only recently became aware of the status of this case" (ECF No. 39-1 at ¶ 5), is simply not true— they have known about it for at least seven months, since December 2022. In *SEC v. Almagarby*, No. 21-13755 (11th Cir.), an SEC case with facts similar to the SEC's allegations here, and in which the SEC prevailed in district court at the motion to dismiss and summary judgment stages, two of the proposed amici here—AIMA and NAPFM—filed an amicus brief on July 8, 2022 and moved to file a reply brief on December 2, 2022. *See* Amicus Brief for AIMA and NAPFM, *SEC v. Almagarby*, No. 21-13755, Dkt. No. 35 (11th Cir. filed July 8, 2022); AIMA and NAPFM Mot. for Leave to File Reply Brief of *Amici Curiae*, *Almagarby*, No. 21-13755, Dkt. No. 50 (11th Cir. filed Dec. 2, 2022). In their proposed reply, AIMA and NAPFM cited to the SEC's Opposition to the LG Defendants' Motion to Dismiss here. *Id*. at Dkt. No 50-2 at 12 (citing *SEC v. LG Capital Funding,* LLC, No. 22-cv-3353 (S.D.N.Y.), ECF No. 28).

Amici's claim that they only recently learned about this case is belied by their own briefing in the *Almagarby* appeal, and they offer no other explanation for the tardiness of their filing. For

this reason alone, this Court should deny Amici's motion. *See U.S. v. Yaroshenko*, 86 F. Supp. 289, 290 (S.D.N.Y. 2015) (denying as untimely amici's motion for leave filed 10 months after defendant filed his motion, and well after briefing was complete on that motion, stating that "[t]his is reason alone to deny the application"); *In re Calpine Corp.*, No. 08-cv-1286, 2008 WL 2462035, at *1 (S.D.N.Y. June 9, 2008) (denying amicus brief when leave was requested over two months from date when party's principal brief was due); *cf. Andersen v. Leavitt*, No. 03-cv-6115, 2007 WL 234672, at *6 (E.D.N.Y. Aug. 13, 2007) (excusing 5 month delay where the record demonstrated that the amicus acted promptly after learning of the action and there was no indication that it should have acted sooner).

### III.   <u>CONCLUSION</u>

For these reasons, the Court should deny Amici's Motion for Leave. If the Court grants Amici's Motion, the SEC requests 21 days from the date the brief is docketed to file a response brief.

Respectfully submitted,

Dated:  July 19, 2023
            Washington, D.C.

SECURITIES AND EXCHANGE COMMISSION

By:   */s/ Suzanne J. Romajas*
        _____
        Suzanne J. Romajas
        Elliot J. Weingarten
        U.S. Securities and Exchange Commission
        100 F Street, NE
        Washington, D.C. 20549-5971
        Tel: 202-551-4473 (Romajas)
        Email: RomajasS@sec.gov
        Tel: 202-551-7665 (Weingarten)
        Email: Weingartenel@sec.gov

        *Attorneys for Plaintiff*
        *Securities and Exchange Commission*