# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 5, 2024

Lyle W. Cayce
Clerk

No. 23-60471

_____

Nᴀᴛɪᴏɴᴀʟ Aꜱꜱᴏᴄɪᴀᴛɪᴏɴ ᴏꜰ Pʀɪᴠᴀᴛᴇ Fᴜɴᴅ Mᴀɴᴀɢᴇʀꜱ;
Aʟᴛᴇʀɴᴀᴛɪᴠᴇ Iɴᴠᴇꜱᴛᴍᴇɴᴛ Mᴀɴᴀɢᴇᴍᴇɴᴛ Aꜱꜱᴏᴄɪᴀᴛɪᴏɴ,
Lɪᴍɪᴛᴇᴅ; Aᴍᴇʀɪᴄᴀɴ Iɴᴠᴇꜱᴛᴍᴇɴᴛ Cᴏᴜɴᴄɪʟ; Lᴏᴀɴ
Sʏɴᴅɪᴄᴀᴛɪᴏɴꜱ ᴀɴᴅ Tʀᴀᴅɪɴɢ Aꜱꜱᴏᴄɪᴀᴛɪᴏɴ; Mᴀɴᴀɢᴇᴅ Fᴜɴᴅꜱ
Aꜱꜱᴏᴄɪᴀᴛɪᴏɴ; Nᴀᴛɪᴏɴᴀʟ Vᴇɴᴛᴜʀᴇ Cᴀᴘɪᴛᴀʟ Aꜱꜱᴏᴄɪᴀᴛɪᴏɴ,

*Petitioners,*

*versus*

Sᴇᴄᴜʀɪᴛɪᴇꜱ ᴀɴᴅ Exᴄʜᴀɴɢᴇ Cᴏᴍᴍɪꜱꜱɪᴏɴ,

*Respondent.*

_____

Petition for Review of an Order of the Securities & Exchange Commission
Agency No. 17 CFR Part 275 No. IA-6383

_____

Before Sᴏᴜᴛʜᴡɪᴄᴋ, Eɴɢᴇʟʜᴀʀᴅᴛ, and Wɪʟꜱᴏɴ, *Circuit Judges*.
Kᴜʀᴛ D. Eɴɢᴇʟʜᴀʀᴅᴛ, *Circuit Judge*:

The Securities and Exchange Commission ("Commission") adopted a rule to enhance the regulation of private fund advisers, designed to protect investors who invest in private funds and to prevent fraud, deception, or manipulation by the investment advisers to those funds. *Private Fund Advisors; Documentation of Registered Investment Adviser Compliance Reviews*, 88 Fed. Reg. 63206 (Aug. 23, 2023) (to be codified at 17 C.F.R. pt. 275) [hereinafter

No. 23-60471

"Final Rule"]. We consider a challenge to the Final Rule by petitioners National Association of Private Fund Managers, Alternative Investment Management Association, Ltd., American Investment Council, Loan Syndications and Trading Association, Managed Funds Association, and the National Venture Capital Association (collectively "Private Fund Managers"). For the following reasons, we VACATE the Final Rule.

I.

A.[1]

Private funds are pooled investment vehicles that are (as implied) private, not part of the public securities market. *See* Final Rule at 63207–08. Unlike familiar public pooled investment vehicles, like mutual funds, private funds are generally not accessible to non-professional investors, known as retail customers. Instead, they are generally open to some of the most sophisticated and wealthiest investors—e.g., Abu Dhabi Investment Authority, Yale University endowment, Hong Kong Monetary Authority, Stanford Management Company, and Harvard Management Company. Smaller investors, including state and local pension funds, have also helped the growth of the private fund sector. *Id.* Individuals—such as firefighters, public school educators, and law enforcement officers—have indirect exposure to private funds through their participation in public and private pension plans, which invest directly in private funds. *Id.* at 63208.There are many types of private funds, including private-equity funds, hedge funds, private credit funds, real estate funds, venture-capital funds, and collateralized loan obligations.

Each private fund is managed by an adviser—typically a firm—that often serves as a general partner, or managing partner, and receives a fixed

---

[1] Background information on private funds is taken from the parties' briefs, the Administrative Record, and the Final Rule.

fee and percentage of gross profits. *Id.* They typically have exclusive authority over the private fund's affairs, and private fund officers, if any, are employees of the advisor. *Id.* A private fund adviser drafts the fund's governing documents, markets the fund, negotiates with investors, manages investments, charges fees and expenses to the fund, and provides fund information to investors. *Id.* Conversely, the fund's investors typically become limited partners, taking no part in management. Yet, unlike investors in mutual funds, private fund investors have a significant hand in determining the terms on which they invest, often negotiating vigorously before making an investment. AR.145:21.[2] Private fund investors engage expert counselors, often including their own investment advisers, and typically conduct extensive diligence. AR.145:21; AR.182:11–12. Private funds are able to draw investments by generating strong returns through these tailored commercial arrangements.

Over the past decade, the number of private funds has increased from 32,717 to 100,947, and the value has grown from $9.8 trillion in 2012 to $26.6 trillion in 2022. Final Rule at 63207. Amongst pension funds, the median allocation to private equity has risen from less than 1 percent in 2001 to approximately 9 percent in 2020. AR.145:2. And over the past 20 years, pension funds have earned returns of 9.25% per year in private equity, as opposed to only 5.4% per year in the public markets. AR.145:1 n.6.

### B.

Investment companies, such as mutual funds and other publicly pooled investment vehicles, are subject to extensive regulation under the Investment Company Act of 1940, Pub. L. No. 76-768, 54 Stat. 789 (1940) (codified as amended at 15 U.S.C. § 80a-1 *et seq.*) [hereinafter "ICA"]. These

---

[2] "AR" refers to the "Administrative Record."

types of investment vehicles are required to register with the Commission because these funds are open to retail customers. 15 U.S.C. § 80a-3(a)(1). The ICA governs virtually every aspect of the investment companies' operations, including boards of directors, functions and activities, size, contractual relationships, capital structure, dividend payments, lending relationships, distributions, and reports and financial statements. *See* 15 U.S.C. §§ 80a-10, 80a-12, 80a-14, 80a-15, 80a-16, 80a-18, 80a-19, 80a-21, 80a-22, 80a-29. Private funds are excluded from the definition of "investment company" because they satisfy certain statutory requirements. 15 U.S.C. §§ 80b-2(a)(29), 80a-3(c)(1), (7). Congress originally exempted private funds that do not make or propose to make a public offering of securities and do not have more than 100 beneficial owners. *Id.* § 80a-3(c)(1); ICA § 3, 54 Stat. at 798. Then, in 1996, Congress expanded the number of private funds by eliminating the 100-investor threshold for funds whose securities are owned exclusively by "qualified purchasers." 15 U.S.C. § 80a-3(c)(7); *see id.* § 80a-2(a)(51) (definition of "qualified purchaser"); National Securities Markets Improvement Act of 1996, Pub. L. No. 104-290, § 209, 110 Stat. 3417, 3433–35 (1996).

Advisers to private funds, however, may be regulated in specific, limited respects through the Investment Advisers Act of 1940, Pub. L. No. 76-768, 54 Stat. 847 (1940) (codified as amended at 15 U.S.C. § 80b-1 *et seq.*) [hereinafter "Advisers Act"]. The Advisers Act was the last in a series of statutes to eliminate certain abuses in the securities industry. It was preceded by the Securities Act of 1933, the Securities Exchange Act of 1934, and for present purposes, the ICA. The ICA and Advisers Act are "sister statutes," having been simultaneously enacted as Titles I and II.

The Advisers Act recognizes a fiduciary duty between an investment adviser and his client. 15 U.S.C. § 80b-6. In the private fund context, that client is the fund itself—not the fund's investors. *See Goldstein v. SEC*, 451

F.3d 873, 881 (D.C. Cir. 2006). A private fund adviser must be concerned with the fund's performance, not with each investor's financial condition. *Id.* Before 2010, most private fund advisers were exempt from registration with the Commission, but the Dodd-Frank Act[3] eliminated this "private adviser" exemption making most private fund advisers subject to the same limited requirements as other investment advisers. *See* Dodd-Frank Act, § 404, 124 Stat. at 1571–72. Such limited requirements include subjecting private fund advisers to reporting, recordkeeping, and examination requirements, and added new provisions applicable to all investment advisers, including private fund advisers. *Id.*; *see also* 15 U.S.C. § 80b-4(b).

## C.

In this case, in promulgating the Final Rule, the Commission relies on preexisting antifraud rulemaking authority found in section 206 of the Advisers Act, as amended, 15 U.S.C. § 80b-6, as discussed in Part I.C.1. below. Final Rule at 63213. The Commission also cites section 913(h) of the Dodd-Frank Act, codified at section 211(h) in the Advisers Act, as amended, 15 U.S.C. § 80b-11(h), claiming that section 211(h) covers private fund advisers and investors. *Id.* at 63213. For the purpose of the parties' arguments, a brief explanation of the construction of the Dodd-Frank Act is warranted, set forth in Part I.C.2.

### 1.

Under the Advisers Act, "[i]nvestment adviser[s]," include "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities

---

[3] Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 (2010). The Dodd-Frank Act was enacted in wake of the 2007–2008 financial crisis. Final Rule at 63207.

or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11). The Advisers Act defines a "private fund" as an issuer that would be an investment company but does not offer securities to the public and "whose outstanding securities . . . are beneficially owned by not more than one hundred persons (or, in the case of a qualifying venture capital fund, 250 persons)," *see id.* § 80a-3(c)(1), or whose investors are "qualified" high net-worth individuals or institutions, *see id.* § 80a-3(c)(7). *Id.* § 80b-2(a)(29) (defining the term "private fund").[4] Investment advisers are required to register with the Commission unless they are specifically exempted. *Id.* § 80b-3(a)–(b). Through registration, "[e]very investment adviser who makes use of the mails or of any means or instrumentality of interstate commerce in connection with his or its business as an investment adviser . . . shall make and keep . . . records." *Id.* § 80b-4(a).[5]

Section 80b-4(b) specifically addresses "[r]ecords and reports of private funds." That section states that "[t]he Commission may require any investment adviser registered under this subchapter . . . to maintain such records of, and file with the Commission such reports regarding, private funds advised by the investment adviser, as necessary and appropriate in the public interest and for the protection of investors." *Id.* § 80b-4(b)(1)(A). The rest of section 80b-4(b) addresses reporting, recordkeeping, and examination requirements of private fund advisers. *Id.* § 80b-4(b)(2)–(6). "Every

---

[4] A "[q]ualified purchaser" means "any natural person . . . who owns not less than $5,000,000 in investments," or "any person, acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in investments." 15 U.S.C. § 80a-2(a)(51)(A).

[5] "Records" means "accounts, correspondence, memorandums, tapes, discs, papers, books, and other documents or transcribed information of any type, whether expressed in ordinary or machine language." 15 U.S.C. § 78c(a)(37); *see id.* § 80b-4(a) (defining "records" as found in section 78c(a)(37)).

investment adviser subject to section 80b-4 of this title shall establish, maintain, and enforce written policies and procedures . . . to prevent the misuse [of material, nonpublic information] in violation of this chapter." *Id.* § 80b-4a. The Commission "as it deems necessary or appropriate in the public interests or for the protection of investors, shall adopt rules or regulations to require specific policies or procedures reasonably designed to prevent misuse in violation of this chapter . . . of material, nonpublic information." *Id.*

The Commission relies in part on section 206(4) of the Advisors Act, as amended, 15 U.S.C. § 80b-6(4), to adopt rules designed to prevent fraudulent acts of private fund advisors. Final Rule at 63213. Section 206, as amended, titled "[p]rohibited transactions by investment advisers," states:

> It shall be unlawful for *any investment advisor* by use of the mails or any means of instrumentality of interstate commerce, directly or indirectly—
>
>         *      *      *
>
> (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 80b-6(4) (emphasis added). This section was introduced prior to the Dodd-Frank Act. Pertinent to this case, and also relied on by the Commission, the Dodd-Frank Act added section 211(h) of the Advisers Act, as amended, 15 U.S.C. § 80b-11(h).

Section 211, as amended, authorizes the Commission "to make, issue, amend, and rescind such rules and regulations and such orders as are necessary or appropriate to the exercise of the functions and powers conferred upon the Commission elsewhere in this subchapter." 15 U.S.C. § 80b-11(a). The Commission is directed to issue rules "only after appropriate notice and

No. 23-60471

opportunity for hearing . . . [and] [n]otice to interested persons, if any, other than parties may be given in the same manner or by publication in the Federal Register." *Id.* § 80b-11(c). This section also sets forth the Commission's obligation to "promulgate rules to establish the form and content of the reports required to be filed with the Commission under [section] 80b-4(b)," which is the section setting forth requirements for private fund advisers. *Id.* § 80b-11(e). Section 80b-11(g) addresses rules for investment advisers "when providing personalized investment advice about securities to retail customers"[6] and precludes the Commission from defining "customer" to "include an investor in a private fund managed by an investment adviser."

The next subsection, section 211(h) of the Advisers Act, as amended, states:

> (h) Other matters
>
> The Commission shall—
>
> (1) facilitate the provision of simple and clear disclosures to investors regarding the terms of their relationships with brokers, dealers, and investment advisers, including any material conflicts of interest; and
>
> (2) examine and, where appropriate, promulgate rules prohibiting or restricting certain sales practices, conflicts of interest, and compensation schemes for brokers, dealers, and investment advisers that the Commission deems contrary to the public interest and the protection of investors.

---

[6] "[R]etail customer" under section 80b-11(g) means "a natural person . . . , who— (A) received personalized investment advice about securities from a broker, dealer, or investment adviser; and (B) uses such advice primarily for personal, family, or household purposes." 15 U.S.C. § 80b-11(g)(2).

*Id.* § 80b-11(h). The Commission has enforcement authority with respect to violations under section 80b-11. *Id.* § 80b-11(i). When engaged in rulemaking, the Commission is "required to consider or determine whether an action is necessary or appropriate in the public interest." *Id.* § 80b-2(c). The "Commission shall also consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation." *Id.* An aggrieved party under the Advisers Act may file a petition for review within sixty days of entry of Commission rules in any circuit court wherein such person resides or has his principal place of business. *Id.* § 80b-13(a). Section 913(h) of the Dodd-Frank Act contains the language regarding "[o]ther matters" in which the Commission relies on in part to promulgate the Final Rule.

2.

At 849 pages, and spanning 16 different titles, the Dodd-Frank Act covered a multitude of topics relating to the financial system. Only Title IV explicitly dealt with private fund advisers, bearing the heading "Regulation of Advisers to Hedge Funds and Others" and the suggestion it be cited as the "Private Fund Investment Advisers Registration Act of 2010." §§ 401, 404, 124 Stat. at 1570. Under Title IV, the Dodd-Frank Act imposed registration and carefully limited reporting and recordkeeping requirements on some private fund advisers, along with limited rulemaking authority. §§ 403–404, 124 Stat. at 1571–74 (found at 15 U.S.C. §§ 80b-2(a)(29), (a)(30), 80b-4(b), 80b-11(e)). "The primary purpose of [the Dodd-Frank Act] was to require advisers to 'private funds' to register under the Advisers Act." *Exemptions for Advisers to Venture Capital Funds, Private Fund Advisers with Less Than $150 Million in Assets Under Management, and Foreign Private Advisers*, 76 Fed. Reg. 39646, 39646 (July 6, 2011) (to be codified at 17 C.F.R. pt. 275). The section relied upon by the Commission—section 913(h) of the Dodd-Frank Act, found in section 211(h) of the Advisers Act—for its rulemaking authority

over private funds is not located in Title IV; instead, the Commission skips over 250 pages of statutory text, found in Title IX. § 913, 124 Stat. at 1824.

Section 913 starts off by defining the term "retail customer" and directs the Commission to "conduct a study to evaluate" the existing legal or regulatory standards of investment advisers "for providing investment advice and recommendations about securities to retail customers." § 913(a)–(b), 124 Stat. at 1824. The Commission is also directed to study "whether there are legal or regulatory gaps . . . in the protection of retail customers relating to the standard of care for . . . investment advisers." § 913(b), 124 Stat. at 1824–25. The rest of the section identifies thirteen items to "consider" concerning "retail customers," *see* § 913(c), 124 Stat. at 1825–27, and further instructs the Commission to draft and report about "retail customers," *see* § 913(d), 124 Stat. at 1827. Section 913(a)–(e) mentions "retail customers" 30 times. Section 913(f) also authorizes the Commission to "commence a rulemaking" for the protection of retail customers, *see* § 913(f), 124 Stat. at 1827–28. And, in section 913(g), the Commission is enabled to promulgate rules related to the standard of care "when providing personalized investment advice about securities to retail customers (and such other customers as the Commission may by rule provide)." 124 Stat. at 1828. Section 913(g) also forbids the Commission from "ascrib[ing] a meaning to the term 'customer' that would include an investor in a private fund managed by an investment adviser, where such private fund has entered into an advisory contract with such adviser." 124 Stat. at 1829. Section 913(h) contains the language regarding "[o]ther matters" on which the Commission relies in part to promulgate the Final Rule. 124 Stat. at 1829.

### D.

On February 9, 2022, the Commission proposed a new rule under the Advisers Act regarding private fund advisers. *Private Fund Advisers;*

No. 23-60471

*Documentation of Registered Investment Adviser Compliance Reviews*, 87 Fed. Reg. 16886 (proposed Mar. 24, 2022) (to be codified at 17 C.F.R. pt. 275) [hereinafter "Proposed Rule"]. The Commission determined that, after a decade of experience overseeing, regulating, and collecting data on private fund advisers, "there [was] a need to enhance the regulation of private fund advisers to protect investors, promote more efficient capital markets, and encourage capital formation." Proposed Rule at 16889–90. The Proposed Rule was intended "to protect those who directly or indirectly invest in private funds"—such as firefighters, law enforcement officials, and other public workers that participate in pension funds—"by increasing visibility into certain practices, establishing requirements to address certain practices that have the potential to lead to investor harm, and prohibiting advisor activity that [the Commission] believe[s] is contrary to the public interest and the protection of investors." *Id.* at 16890.

The Commission received hundreds of comments on the Proposed Rule. The Commission moderated the Proposed Rule in response to comments and, on August 23, 2023, by a 3-2 vote, adopted the Final Rule. The Private Fund Managers describe three major changes to the regulation of private funds in the Final Rule: (1) the preferential treatment rule; (2) the restricted activities rule; and (3) the quarterly statement rule. Final Rule at 63388–89. The Final Rule also includes the adviser-led secondaries rule, the audit rule, and two rule amendments. *Id.* at 63386–87, 63389.

First, the preferential treatment rule prohibits advisers from providing certain investors preferential redemption terms or access to information regarding a fund's portfolio holdings or exposures if the fund's adviser reasonably expects that doing so will have a material, negative effect on other fund investors, unless an exception applies. Final Rule at 63389–90. The rule also prohibits advisers from providing any other preferential treatment to any private fund investor unless the adviser provides written disclosures to

prospective and current investors in a private fund regarding all preferential treatment the adviser is providing to other investors in the same fund. *Id.* The preferential treatment rule sharply limits so-called "side arrangements" investors can enter. Side arrangements are a common practice by which investors negotiate specialized terms that differ from those in the fund's governing documents. *Id.* at 63276.

Second, the restricted activities rule prohibits, *inter alia*, private fund advisers from charging private funds for fees or expenses associated with investigations of the advisor, or for regulatory and compliance fees or expenses. *Id.* at 63389. In contrast to the Proposed Rule, the Commission omitted the proposed prohibition on fees for "unperformed services" and on advisers seeking reimbursement, indemnification, exculpation, or limitation of liability from the fund. *Id.* at 63212. The Commission added two exceptions: the disclosure-and-consent based exception and the disclosure-based exception. *Id.* at 63263. The disclosure-and-consent based exception permits an adviser to charge for fees and expenses associated with an examination or investigation only if "the investment adviser requests each investor of the private fund to consent to, and obtains written consent from at least a majority in interest of the private fund's investors that are not related persons of the adviser for, such charge or allocation." *Id.* at 63389. The Commission further added the disclosure-based exception to the prohibition of regulatory or compliance fees; advisers may charge such fees only if "the investment adviser distributes written notice of any such fees or expenses . . . within 45 days after the end of the fiscal quarter in which the charge occurs." *Id.*

Third, the quarterly statement rule requires that private fund advisers prepare and distribute quarterly-reporting statements containing detailed information disclosing fund-level information about performance, adviser compensation, and other fund fees and expenses. *Id.* at 63388. The Commission added to this rule by expanding the requirements for "illiquid funds." The

No. 23-60471

Proposed Rule required advisers to disclose only "unlevered returns," i.e., performance metrics "without the impact of fund-level subscription facilities." Proposed Rule at 16903–04, 16972. Fund-level subscription facilities are loans that advisers use to make investments for the fund.[7] The Commission commented that levered returns "often do not reflect the fund's actual performance and have the potential to mislead investors." *Id.* at 16903. The Final Rule thus requires that advisers to illiquid funds disclose "levered returns" and "unlevered returns," meaning "with and without the impact of fund-level subscription facilities." Final Rule at 63388.

Last, the Commission adopted the adviser-led secondaries rule, the audit rule, and two rule amendments. *Id.* at 63386–89. The adviser-led secondaries rule requires registered private fund advisers to obtain and distribute to investors an independent fairness or valuation opinion and disclose any relationship with the opinion provider. *Id.* at 63389. The Commission claims that this rule "will help prevent investors from being defrauded, manipulated, and deceived when the adviser is on both sides of the transaction." *Id.* at 63212. The audit rule requires registered private fund advisers to cause the private funds they advise to undergo audits. *Id.* at 63386–87. This rule will "help prevent fraud and deception by the adviser." *Id.* at 63211. The two amendments address annual compliance documentation and retention of books. *Id.* at 63386.

In total, the Commission estimated that the Final Rule will cost $5.4 billion and require millions of hours of employee time. Final Rule at 63330,

---

[7] The Commission defined "fund-level subscription facilities" as "any subscription facilities, subscription line financing, capital call facilities, or other indebtedness incurred by the private fund that is secured by the unfunded capital commitments of the private fund's investors." Proposed Rule at 16904.

No. 23-60471

63336–37, 63348, 63352, 63370–79.[8] The need for oversight, according to the Commission, stems from investor protection risks and harms, such as the lack of transparency, conflicts of interest, and lack of governance mechanisms. *Id.* at 63209. "[The Commission] has observed that these three factors contribute to significant investor harm, such as an adviser incorrectly, or improperly, charging fees and expenses to the private funds, contrary to the advisor's fiduciary duty, contractual obligations to the fund, or disclosures by the advisor." *Id.*

On September 1, 2023, the Private Fund Managers filed a petition for review with this court seeking review of the Final Rule pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702–704, 706, 15 U.S.C. § 80b-13(a), and Federal Rule of Appellate Procedure 15(a). The Private Fund Managers claim that "[t]he new rules would fundamentally change the way private funds are regulated in America." Pet. for Review at 1. They assert that (1) the Commission exceeded its statutory authority, (2) the Final Rule is not a logical outgrowth of the Proposed Rule, (3) the Final

---

[8] "[C]ompliance costs associated with preparation and distribution of quarterly statements . . . will include an aggregate annual internal cost of $339,493,120 and an aggregate annual external cost of $148,229,760, or a total cost of $487,722,880." Final Rule at 63330. Regarding restricted activities, the Commission estimated that each private fund adviser "would require internal time costs from compliance attorneys, accounting managers, and assistant general counsels, yielding total internal time costs per adviser of $29,344 across all restricted activities." *Id.* at 63336. The total cost for the internal time costs would be $358,994,496. *Id.* "[The Commission] estimate[d] that these advisers would also face aggregate external costs of $233,290,624 across all advisers, for a total aggregate cost of $592,285,120." *Id.* The Commission also estimated that "the total costs of making the required disclosures pursuant to the rule prohibiting preferential treatment without disclosure will impose an aggregate annual internal cost of $364,386,264.48 and an aggregate annual external cost of $41,475,520 for a total cost of $405,861,784.48 annually." *Id.* at 63348. "[T]he estimated total auditing fees for all advisers to private funds" including internal time is about $3,948,214,720. *Id.* at 63352.

No. 23-60471

Rule is arbitrary and capricious under the APA, and (4) the Commission failed to adequately consider the Final Rule's impact on efficiency, competition, and capital formation.

## II.

Under the APA, the court must uphold the Commission's decision unless it is in "excess of statutory jurisdiction, authority, or limitations" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C). We review legal issues de novo. *Davidson v. Glickman*, 169 F.3d 996, 1000 (5th Cir. 1999) (citations omitted). Factual findings of the Commission are "conclusive" if "supported by substantial evidence." 15 U.S.C. § 80b-13(a).

## III.

As an initial matter, the Commission argues that (A.) the Private Fund Managers have not demonstrated Article III standing and have not shown that venue is proper.[9] The Private Fund Managers claim that venue lies in this circuit and that standing is self-evident because the Final Rule regulates private fund advisers, and each Petitioner represents private fund advisers. As to the merits, the Private Fund Managers argue in their petition for review (B.) that the Commission exceeded its statutory authority. Because we hold that the Commission exceeded its authority, we do not reach the remaining issues on appeal.

## A.

The Commission raises standing, arguing that the Private Fund Managers have not borne their burden of establishing Article III associational

_____

[9] Neither party addressed standing or venue at oral argument.

standing. The Commission also claims that this circuit is not the appropriate venue because no other petitioner resides here.

For challenges of rules under the Advisers Act, "[a]ny person or party aggrieved by an order issued by the Commission . . . may obtain a review of such order in the United States court of appeals within any circuit wherein such person resides or has his principal office or place of business." 15 U.S.C. § 80b-13(a). The person or party must file "within sixty days after the entry of such order, a written petition praying that the order of the Commission be modified or set aside in whole or in part." *Id.* Here, the National Association of Private Fund Managers ("NAPFM") is incorporated and has its principal place of business in Texas. The Private Fund Managers additionally filed the petition for review within sixty days after the entry of the Commission's Final Rule. Thus, venue is proper in this court.

Regarding standing, NAPFM need not identify particular members "when all the members of [an] organization are affected" because the challenged rule targets an entire "industry." *Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 665 (D.C. Cir. 2019) (internal quotation marks omitted) (emphases removed). Each petitioner is affected by the Final Rule because the Final Rule regulates private fund advisers, and each petitioner represents private fund advisers. The Private Fund Managers also point out that the Commission admits each petitioner represents private fund advisers. Moreover, Article III is satisfied when "'at least one' petitioner . . . has standing." *R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 188 (5th Cir. 2023) (quoting *Town v. Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017)). Here, the Private Fund Managers have standing.

## B.

The Commission relies on section 211(h) and section 206(4) of the Advisers Act for the authority to promulgate new rules. The Commission

cites the changes made by the Dodd-Frank Act as filling a "serious statutory gap," by augmenting the Commission's rulemaking power, "by authorizing the Commission to issue rules 'for the protection of investors' concerning certain disclosures, sales practices, conflicts of interest, and compensation schemes."

In contrast, the crux of the Private Fund Managers' argument is that Congress drew a "sharp line" between private funds and funds that serve retail customers. The ICA further details requirements governing almost every aspect of a fund's operations, and private funds are exempt from this regime. This is because "[i]nvestment vehicles that remain private and available only to highly sophisticated investors have historically been understood not to present the same dangers to the public markets." *Goldstein*, 451 F.3d at 875. The Dodd-Frank Act, according to the Private Fund Managers, only provided for limited regulation of advisers to private funds and Congress kept that limited regulation in the context of an adviser's duties as an "investment adviser."

The question presented is whether the Commission has statutory authority under the Advisers Act to formulate the Final Rule to regulate private fund advisers and investors. The Commission relies on sections 206(4) and 211(h) of the Advisers Act in adopting the preferential treatment rule, restricted activities rule, quarterly statement rule, adviser-led secondaries rule, audit rule, and the amendment to compliance procedures and practices. Final Rule at 63386.

The central focus is thus on whether the Dodd-Frank Act expanded the Commission's rulemaking authority to cover private fund advisers and investors under section 211(h) of the Advisers Act, *see* Part III.B.1., and whether section 206(4) authorizes the Commission to adopt the Final Rule,

No. 23-60471

*see* Part III.B.2. We hold neither section grants the Commission such authority.[10]

1.

It starts with the text. "[S]tatutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (citation omitted). The ordinary-meaning canon is "the most fundamental semantic rule of interpretation." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 6, at 69 (2012). The court's job "is to interpret the words consistent with their ordinary meaning . . . at the time Congress enacted the statute," *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (internal quotation marks omitted), "unless the context in which the word[s] appear[]" suggests some other meaning, *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569 (2012).

Here, at first blush, section 211(h) seemingly grants the Commission the power to "facilitate the provision of simple and clear disclosures to [*all*] investors . . . including any material conflicts of interest" and "promulgate rules prohibiting or restricting certain sales practices, conflicts of interest, and compensation schemes" for *any* investment advisers that the Commission deems contrary to "the protection of investors." 15 U.S.C. § 80b-

---

[10] Two other cited sections—sections 203(d) and 211(a)—do not afford the Commission rulemaking authority nor apply to private fund advisers. The Commission also relies on section 204 in adopting the amendment to records to be maintained by investment advisers (to be codified at 17 C.F.R. § 275.204-2). *Id.* Because adopting the amendment as to which records must be maintained is obligated by the challenged rules, and the court vacates those rules, it follows that the amendment governing records maintenance must be vacated. Since all portions of the Final Rule were expressly challenged at oral argument, and the court hereby holds that the promulgation of the Final Rule was unauthorized, no part of it can stand.

11(h)(1)–(2). The Advisers Act references investment advisers (including the use of "any" or "every" investment adviser) throughout encompassing private fund advisers. *See id.* §§ 80b-2(a)(11), 80b-3(a), 80b-4(a), 80b-4a, 80b-6. In addition, even though private fund advisers do not have a relationship with the investor directly but with the fund itself, the Commission points out that the term "investor" does not always exclude private fund investors. *See, e.g.*, 15 U.S.C. § 80b-2(a)(30) (defining "foreign private adviser" in terms of the number of "investors in the United States in private funds"); *id.* § 80b-4(b)(3)(F) (requiring adviser to maintain copies of side letters that benefit "investors in a [private] fund"); 17 C.F.R. § 275.206(4)-1(e) (marketing rule's applicability to "investors in a private fund"). The phrase "for the protection of investors" has been employed numerous times to authorize the Commission rulemaking that specifically concerns private fund advisers. 15 U.S.C. § 80b-4(b)(3)(H), (b)(4)–(6).

But statutory language "cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (citation omitted); *see also* Scalia & Garner, *supra*, at 167–69 (applying the whole-text canon). And in cases where statutes are *in pari materia* ("in a like matter"), they should be interpreted harmoniously. Scalia & Garner, *supra* at 252.

The ICA and Advisers Act are "sister statutes" having been simultaneously enacted as Titles I and II. The ICA subjects investment companies to extensive regulations, replete with reporting and disclosure requirements, restrictions on expenses that may be charged to investors by the fund, restrictions on fund investments and fund capital structure, prohibitions against self-dealing, and prescriptive contractual governance requirements. *See* 15 U.S.C. §§ 80a-10, 80a-12, 80a-14, 80a-15, 80a-16, 80a-18, 80a-19, 80a-

21, 80a-22, 80a-29. Congress adopted the ICA and the Advisers Act after receiving the Commission's "exhaustive study" of "the functions and activities of investment trusts and investment companies." *SEC v. Capital Gaines Rsch. Bureau, Inc.*, 375 U.S. 180, 187 (1963). The ICA "places significant restrictions on the types of transactions registered investment companies may undertake," and it imposes additional measures designed to protect investors. *Goldstein*, 451 F.3d at 875 (citation omitted). Yet Congress clearly chose *not* to impose the same prescriptive framework on private funds.

Congress originally exempted private funds that do not make or propose to make a public offering of securities and do not have more than 100 beneficial owners. 15 U.S.C. § 80a-3(c)(1); ICA § 3, 54 Stat. at 798. Then, in 1996, Congress expanded the number of private funds by eliminating the 100-investor threshold for funds whose securities are owned exclusively by "qualified purchasers." 15 U.S.C. § 80a-3(c)(7); National Securities Markets Improvement Act, § 209, 110 Stat. at 3433–35. Unlike retail-oriented funds, private funds are free to negotiate fund agreements concerning access to periodic financial reports, *cf.* 15 U.S.C. § 80a-29(e), investor input on advisory fees chargeable to the fund, *cf. id.* § 80a-15(a)(1), and terms—including redemption terms—available to particular investors, *cf. id.* §§ 80a-22, 80a-18. By congressional design, private funds are exempt from federal regulation of their internal "governance structure." *Chamber of Comm. v. SEC*, 412 F.3d 133, 139 (D.C. Cir. 2005); *see also Burks v. Lasker*, 441 U.S. 471, 479 (1979) (The ICA "functions primarily to impose controls and restrictions on the internal management of investment companies.") (cleaned up)).

The Commission claims that the Final Rule regulates private fund advisers and investors. But the makeup of the ICA preserves the market-driven relationship between a private fund adviser, the fund, and outside investors. The Dodd-Frank Act only stepped towards regulating the relationship between the advisers and the private funds they advise.

No. 23-60471

Most telling, section 913 of the Dodd-Frank Act—the section the Commission relies on—applies to "retail customers," not private fund investors. It has nothing to do with private funds. The Dodd-Frank Act was introduced in 2010 in wake of the 2007–2008 financial crises. Final Rule at 63207. Only Title IV introduced provisions to regulate private fund advisers, bearing the heading "Regulation of Advisers to Hedge Funds and Others" and the suggestion to be cited as the "Private Fund Investment Advisers Registration Act of 2010." §§ 401, 404, 124 Stat. at 1570. It is under Title IV that the Dodd-Frank Act imposed registration and carefully limited reporting and recordkeeping requirements on some private fund advisers, along with limited rulemaking authority. §§ 403–04, 124 Stat. at 1571–74 (found at 15 U.S.C. §§ 80b-2(a)(29), (a)(30), 80b-4(b), 80b-11(e)). But the Commission cites Title IX, over 250 pages of statutory text later, for its authority to regulate private fund advisers. But Title IX discusses the items to "consider" concerning "retail customers," *see* § 913(c), 124 Stat. at 1825–27, and further instructs the Commission to draft and report about "retail customers," *see* § 913(d), 124 Stat. at 1827. Section 913(a)–(m) mentions "retail customers" at least 30 times.

The Commission claims that the word "investors" is used without modification or limitation, and the term includes private fund investors. The Commission argues that "retail customer" is defined in section 913(a), used throughout section 913(b)–(f), but the word "investor" does not appear in subsection (h). According to the Commission, Congress purposefully "switched" to "investors"—to include *private* investors—in section 211(h) and did not use "retail customers." The Commission maintains that when Congress includes particular language in one section of a statute but omits it in another section of the same act, it is "generally presumed that Congress acts intentionally." *Sebelius*, 569 U.S. at 378 (cleaned up)).

No. 23-60471

It is unlikely that Congress meant to switch to "investor" "in the middle of a provision otherwise devoted" to retail investment. *Schreiber v. Burlington N., Inc.*, 472 U.S. 1, 12 (1985). And the heading "[o]ther matters" confirms this point. The Commission claims that "[o]ther" indicates an intent to "cover more than retail customers," but the subject covered must "have some resemblance to what preceded." *Thibodeaux v. Grasso Prod. Mgmt., Inc.*, 370 F.3d 486, 491 n.5 (5th Cir. 2004). A discussion of the interaction between financial professionals and "retail customers" is what preceded. "Other" encompasses "prospective" retail customers. *See Form CRS Relationship Summary; Amendments to Form ADV*, 84 Fed. Reg. 33492, 33542 (July 12, 2019) (to be codified at 17 C.F.R. pts. 200, 240, 249, 275, 279).

The Private Fund Managers' interpretation of the statute is persuasive. We therefore hold that section 211(h) applies to "retail customers," and thus, the Commission exceeded its statutory authority in relying on that section to adopt the Final Rule.

2.

Section 206(4), as amended, authorizes the Commission to "define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative" regarding "any investment adviser." 15 U.S.C. § 80b-6(4). The Commission argues that it had the authority to adopt new rules under this section and that it may regulate acts that are "not themselves fraudulent" if the restriction is "reasonably designed to prevent" fraud or deception. *See United States v. O'Hagan*, 521 U.S. 642, 673 (1997) (cleaned up) (holding that the Commission, in a nearly identical grant of authority, may regulate acts that are "not themselves fraudulent" if the restriction is "reasonably designed to prevent" fraud or deception); *see also* 15 U.S.C. § 80b-6(4). "Each of the new rules,"

according to the Commission, is "designed to prevent fraudulent or deceptive acts, conduct, and/or courses of business."

The Final Rule's "anti-fraud" measure is pretextual. The Private Fund Managers claim that the Commission has not articulated a "rational connection" between fraud and any part of the Final Rule the Commission adopted. We agree. The Commission fails to explain how the Final Rule would prevent fraud. Section 206(4), as amended, specifically requires the Commission to "define" an act, practice, or course of business that is "fraudulent, deceptive, or manipulative" before the Commission can prescribe "means reasonably designed to prevent" "such" act, practice, or course of business. 15 U.S.C. § 80b-6(4). The Commission largely fails to "define" the fraudulent acts or practices that the Final Rule purportedly is designed to prevent. Complying with the "fund's governing agreements" is not fraud, nor is disagreement over "discretionary violations." And while some conduct could involve fraud, the Commission only has observed misconduct by about 0.05% of advisers. AR.119:13.[11] The Commission's vague assertions fall short of the definitional specificity that Congress has required.

Section 206(4) further fails to authorize the Commission to require disclosure and reporting. Other parts of the Advisers Act expressly provide for disclosure and reporting of certain information. *See* 15 U.S.C. §§80b-3(c)(1), 80b-4(b)(3), 80b-11(h)(1). This shows that where "Congress wanted to provide for" reporting and disclosure of certain information, "it did so explicitly." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002); *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012)

---

[11] "[T]his small percentage significantly exaggerates the incidence of litigation because it aggregates seventeen years of enforcement activity and compares that statistic with the current population of registered advisers rather than with a comparable seventeen-year population." AR.119:13.

No. 23-60471

("[G]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment."). While the Dodd-Frank Act expanded the Commission's oversight in many respects, it did not do so to the extent the Commission argues here in a section enacted decades earlier in 1940. *See AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 77 (2021).

The Private Fund Managers further maintain that the Final Rule is not "reasonably designed" per section 206(4) because to be "reasonably designed" requires a "sensible" fit within the "statutory text," *see Ascendium Educ. Sols., Inc. v. Cardona*, 78 F.4th 470, 482 (D.C. Cir. 2023), and a "close nexus" with "statutory aims," *see O'Hagan*, 521 U.S. at 676 (citation omitted). We agree that the Final Rule does not fit within the statutory design. Mainly, the ICA purposefully exempted private funds from the prescriptive framework, permitting private funds to freely negotiate fund agreements concerning investor access to periodic financial reports, *cf.* 15 U.S.C. § 80a-29(e), investor input on advisory fees chargeable to the fund, *cf. id.* § 80a-15(a)(1), and terms—including redemption terms—available to particular investors, *cf. id.* §§ 80a-22(b)(1). By congressional design, private funds are exempt from federal regulation of their internal "governance structure." *Chamber of Comm.*, 412 F.3d at 139. The Commission cannot promulgate rules under the guise of section 206(4) that affects this internal governance structure.

And the Final Rule lacks a "close nexus." The Commission conflates a "lack of disclosure" with "fraud" or "deception," *see* Final Rule at 63264, 63271, 63279, 63308, but a failure to disclose "cannot be deceptive" without a "duty to disclose." *See Regents of Univ. of Cal. v. Credit Suisse First Bos.*, 482 F.3d 372, 386 (5th Cir. 2007). The duty extends to the client alone, which is the fund, not the investors in the fund. *SEC v. Washington Inv. Network*, 475 F.3d 392, 404 (D.C. Cir. 2007) ("The Investment Advisers Act concerns

itself with investment advisers, who, as fiduciaries, have a duty to disclose material information to clients."); *Goldstein*, 451 F.3d at 880 ("If the person or entity controlling the fund is not an 'investment adviser' to each individual investor, then *a fortiori* each investor cannot be a 'client' of that person or entity."). The Commission cannot rely on section 206(4) for the authority to adopt the Final Rule.

## IV.

The Commission has exceeded its statutory authority in adopting the Final Rule. Under section 706 of the APA, when a court holds that an agency rule violates the APA, it "'shall'—not may—'hold unlawful and set aside' [the] agency action." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1022 (5th Cir. 2019) (citation omitted). Because the promulgation of the Final Rule was unauthorized, no part of it can stand. Accordingly, we VACATE the Final Rule.